# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

KNIGHT FIRST AMENDMENT INSTITUTE
AT COLUMBIA UNIVERSITY, *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, President of the United
States, *et al.*,

        *Defendants*.

No. 17-cv-5205 (NRB)

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

CHAD A. READLER
Acting Assistant Attorney General

JOON H. KIM
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director

*/s/ Michael H. Baer*
MICHAEL H. BAER
DANIEL HALAINEN
Trial Attorneys
U.S. Department of Justice,
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
Telephone:    (202) 305-8573
Facsimile:    (202) 616-8460
E-mail: Michael.H.Baer@usdoj.gov

*Counsel for Defendants*

## **Table of Contents**

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

LEGAL STANDARD ............................................................................................ 4

ARGUMENT ...................................................................................................... 4

   I.   This Court Lacks Jurisdiction To Decide Plaintiffs' Claims. ............................... 4

      A.   The Knight Institute Does Not Have A Cognizable Injury............................ 5

      B.   The Individual Plaintiffs Lack Standing To Sue Ms. Hicks, Ms. Sanders, And Mr. Scavino.................................................................................................. 7

      C.   Plaintiffs Cannot Obtain Equitable Relief Against The President............................. 7

   II.   Plaintiffs Cannot Establish State Action. ...................................................... 10

   III.   Plaintiffs' First Amendment Claim Fails Because Blocking The Individual Plaintiffs Does Not Implicate, Much Less Violate, The Public Forum Doctrine. ...................................... 13

      A.   If the President's Use Of Twitter Is State Action, Then It Is Government Speech. ... 14

      B.   The Public Forum Doctrine Is Inapplicable Here. ...................................... 18

   IV.   Plaintiffs' Remaining First Amendment Claims Are Meritless. ........................... 23

      A.   Plaintiffs Do Not Have A First Amendment Right To Follow The @realDonaldTrump Account On Twitter. .............................................................. 23

      B.   The Knight Institute's Right To Hear Claim Fails On The Same Terms as The Individual Plaintiffs' Claims................................................................... 24

CONCLUSION.................................................................................................. 25

## Table of Authorities

### Cases

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) ............................................................................... 19, 20, 21, 22

*Barnett v. Obama*,
  No. 09-cv-82, 2009 WL 3861788 (C.D. Cal. Oct. 29, 2009) ................................. 10

*Baur v. Veneman*,
  352 F.3d 625 (2d Cir. 2003) ........................................................................... 4

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) ...................................................................................... 25

*Borough of Duryea, Pa. v. Guarnieri*,
  564 U.S. 379 (2011) ...................................................................................... 23

*Brentwood Acad v. Tenn. Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001) ...................................................................................... 11

*Byrne v. Rutledge*,
  623 F.3d 46 (2d Cir. 2010) ......................................................................... 18, 19

*Carlos v. Santos*,
  123 F.3d 61 (2d Cir. 1997) ............................................................................. 12

*Carlson v. Bush*,
  No. 07-cv-1129, 2007 WL 3047138 (M.D. Fla. Oct. 18, 2007) ............................. 9

*Charley v. Total Office Planning Servs. Inc.*,
  202 F. Supp. 3d 424 (S.D.N.Y. 2016) ............................................................... 4

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..................................................................................... 5, 6

*Colombo v. O'Connell*,
  310 F.3d 115 (2d Cir. 2002) ........................................................................... 12

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
  412 U.S. 94 (1973) ........................................................................................ 22

*Comm. to Establish the Gold Standard v. United States*,
  392 F. Supp. 504 (S.D.N.Y. 1975) ................................................................... 9

*Cooper v. U.S. Postal Serv.*,
  577 F.3d 479 (2d Cir. 2009) ........................................................................... 10

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ............................................................................................ 20, 21

*Cty. of Santa Clara v. Trump*,
    No. 17-cv-574, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017) ....................................... 9

*Coventry Enters. LLC v. Sanomedics Int'l Holdings, Inc.*,
    191 F. Supp. 3d 312 (S.D.N.Y. 2016) .......................................................................... 4

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
    518 U.S. 727 (1996) ................................................................................................. 19

*F.D.I.C. v. Great Am. Ins. Co.*,
    607 F.3d 288 (2d Cir. 2010) ....................................................................................... 4

*Flagg v. Yonkers Sav. & Loan Ass'n, FA*,
    396 F.3d 178 (2d Cir. 2005) ..................................................................................... 10

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ...................................................................................... 7, 8, 9, 10

*Grogan v. Blooming Grove Volunteer Ambulance Corps.*,
    768 F.3d 259 (2d Cir. 2014) ..................................................................................... 11

*Hawaii v. Trump*,
    859 F.3d 741 (9th Cir. 2017) ..................................................................................... 9

*Hill v. Colorado*,
    530 U.S. 703 (2000) ................................................................................................. 17

*Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*,
    311 F.3d 534 (2d Cir. 2002) ..................................................................................... 19

*In re Dow Jones & Co., Inc.*,
    842 F.2d 603 (2d Cir. 1988) ..................................................................................... 25

*Inclan v. N.Y. Hosp. Grp., Inc.*,
    95 F. Supp. 3d 490 (S.D.N.Y. 2015) ............................................................................ 4

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) ................................................................................................. 18

*Kendall v. U.S. ex rel. Stokes*,
    37 U.S. (12 Pet.) 524 (1838) ...................................................................................... 8

*Kern v. City of Rochester*,
    93 F.3d 38 (2d Cir. 1996) ......................................................................................... 11

*Kessler v. Westchester Cty. Dep't of Soc. Servs.*,
    461 F.3d 199 (2d Cir. 2006)..................................................................4

*Lance v. Coffman*,
    549 U.S. 437 (2007)..........................................................................6

*Lloyd Corp., Ltd. v. Tanner*,
    407 U.S. 551 (1972)........................................................................20

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982)........................................................................11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..............................................................4, 5, 6, 7

*Make the Rd. by Walking, Inc. v. Turner*,
    378 F.3d 133 (2d Cir. 2004)................................................................19

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923)..........................................................................8

*Matal v. Tam*,
    137 S. Ct. 1744 (2017)....................................................................24

*McDonald v. Smith*,
    472 U.S. 479 (1985)........................................................................23

*McMeans v. Obama*,
    No. 11-cv-891, 2011 WL 6046634 (D. Del. Dec. 1, 2011) ........................................9

*Minn. State Bd. for Cmty. Colls. v. Knight*,
    465 U.S. 271 (1984)..............................................................16, 17, 24

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) ..........................................................7, 8, 9, 10

*Monsky v. Moraghan*,
    127 F.3d 243 (2d Cir. 1997)................................................................12

*Napolitano v. Flynn*,
    949 F.2d 617 (2d Cir. 1991)................................................................9

*Nat'l Ass'n of Internal Revenue Emps. v. Nixon*,
    349 F. Supp. 18 (D.D.C. 1972)..............................................................9

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998)........................................................................21

*Newdow v. Bush*,
   355 F. Supp. 2d 265 (D.D.C. 2005) ....................................................................... 8

*Newdow v. Bush*,
   391 F. Supp. 2d 95 (D.D.C. 2005) ......................................................................... 10

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ............................................................................. 10

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ................................................................................................. 8

*Patterson v. Cty. of Oneida*,
   375 F.3d 206 (2d Cir. 2004) .................................................................................. 11

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983) ........................................................................................... 18, 21

*Pitchell v. Callan*,
   13 F.3d 545 (2d Cir. 1994) .................................................................................... 11

*Pleasant Grove City, Utah v. Summum*,
   555 U.S. 460 (2009) ........................................................................... 14, 15, 17, 18

*Price v. Saugerties Cent. Sch. Dist.*,
   305 F. App'x 715 (2d Cir. 2009) ........................................................................... 25

*Raines v. Byrd*,
   521 U.S. 811 (1997) ................................................................................................. 5

*Reese v. Nixon*,
   347 F. Supp. 314 (C.D. Cal. 1972) ......................................................................... 9

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ......................................................................................... 20, 21

*Rowan v. U.S. Post Office Dep't*,
   397 U.S. 728 (1970) ............................................................................................... 17

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ............................................................................................... 14

*S.F. Redevelopment Agency v. Nixon*,
   329 F. Supp. 672 (N.D. Cal. 1971) ......................................................................... 9

*Screws v. United States*,
   325 U.S. 91 (1945) ................................................................................................. 11

*Settle v. Obama*,
  No. 15-cv-365, 2015 WL 7283105 (E.D. Tenn. Nov. 17, 2015) ............................................ 9

*Shreeve v. Obama*,
  No. 10-cv-71, 2010 WL 4628177 (E.D. Tenn. Nov. 4, 2010) .............................................. 9

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ........................................................................................................ 7

*Smith v. Ark. State Highway Emp., Local,*
  *1315*, 441 U.S. 463 (1979) ....................................................................................... 23, 24

*Spargo v. N.Y. State Comm'n on Judicial Conduct*,
  351 F.3d 65 (2d Cir. 2003) ............................................................................................ 25

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................................... 4, 5

*Stanley v. Georgia*,
  394 U.S. 557 (1969) ..................................................................................................... 24

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ......................................................................................................... 7

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ....................................................................................................... 6

*Susan B. Anthony List v. Driehaus*,
  134 S. Ct. 2334 (2014) ................................................................................................... 4

*Suskin v. Nixon*,
  304 F. Supp. 71 (N.D. Ill. 1969) ..................................................................................... 9

*Sutliffe v. Epping Sch. Dist.*,
  584 F.3d 314 (1st Cir. 2009) ......................................................................................... 22

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ................................................................................... 9, 10

*Travis v. Owego-Apalachin Sch. Dist.*,
  927 F.2d 688 (2d Cir. 1991) .......................................................................................... 19

*United States v. Am. Library Ass'n, Inc.*,
  539 U.S. 194 (2003) ..................................................................................................... 21

*United States v. Classic*,
  313 U.S. 299 (1941) ..................................................................................................... 11

vi

*United States v. Richardson*,
 418 U.S. 166 (1974)..................................................................... 6

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
 425 U.S. 748 (1976)..................................................................... 25

*Van Orden v. Perry*,
 545 U.S. 677 (2005)..................................................................... 12

*W. Farms Assocs. v. State Traffic Comm'n of State of Conn.*,
 951 F.2d 469 (2d Cir. 1991)..................................................... 19, 23

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
 135 S. Ct. 2239 (2015)......................................................... 14, 15, 21

*Warth v. Seldin*,
 422 U.S. 490 (1975)..................................................................... 25

*West v. Atkins*,
 487 U.S. 42 (1988)....................................................................... 11

*Willis v. U.S. Dep't of Health & Human Servs.*,
 38 F. Supp. 3d 1274 (W.D. Okla. 2014) ....................................... 9

*Zalaski v. City of Bridgeport Police Dep't*,
 613 F.3d 336 (2d Cir. 2010)....................................................... 20

*Zherka v. DiFiore*,
 412 F. App'x 345 (2d Cir. 2011) ............................................... 11

## Rules

Federal Rule of Civil Procedure 25(d)............................................. 3

Federal Rule of Civil Procedure 56(a) ............................................. 4

Federal Rule of Civil Procedure 56(c)(1)(A)................................... 4

## Other Authorities

Amber Phillips, *The surprising genius of Donald Trump's Twitter account*, The Washington
 Post, Dec. 10, 2015, http://wapo.st/1lS7jIY....................................22

U.S. Const., amend. I....................................................................23

## INTRODUCTION

For more than eight years, President Donald J. Trump has maintained an account on Twitter, a social media platform, using the "handle" @realDonaldTrump.  Like many of Twitter's more than 300 million active users, the President uses his account to communicate his thoughts and interact with other users by taking advantage of the various features the platform offers.  He "tweets" messages; he "retweets" the messages of others; he "follows" some accounts; and he "blocks" others.  Plaintiffs in this case—seven users blocked from the @realDonaldTrump account and a non-profit organization—seek the extraordinary relief of an injunction and declaration against the President for allegedly violating the First Amendment through this routine use of Twitter.  According to Plaintiffs, the President's management of his personal Twitter account has become state action, and his use of standard Twitter features is now constrained by the limitations of the First Amendment that apply to government action in a public forum.

Plaintiffs' novel claims fail at the threshold.  Plaintiffs lack standing, most significantly because they cannot seek their requested relief against the President; it would flout the separation of powers for the Court to issue an order limiting the President's discretion in managing his Twitter account.  Even if Plaintiffs had standing, however, their claims still fail.  A First Amendment claim may be directed only at state action, not the President's personal use of social media.  And even assuming the presence of state action, the premise of Plaintiffs' First Amendment argument—that the President's Twitter account is a "forum" to which they have been denied access—is baseless. At most, the account is a channel for *the President's* speech, and the requirement of viewpoint neutrality accordingly does not apply.  Finally, Plaintiffs also have several derivative claims raising an alleged right to access, right to petition, and right to hear, that are equally unsupported by both the facts and the law.  The Court should enter judgment for Defendants.

1

## BACKGROUND

The President created a personal Twitter account, @realDonaldTrump, in March 2009. Stipulation ("Stip.") ¶ 32, ECF No. 30-1.  Through this account, the President can post tweets, which are messages of up to 140 characters in length, to a webpage viewable by the public.  *Id.* ¶¶ 14, 17.  The tweets are displayed in reverse chronological order on the page's "timeline."  *Id.* ¶ 15.  The President can also follow other users and view their tweets in a customized "feed," a dedicated webpage that displays the tweets of the users he follows.  *Id.* ¶ 19.  Other users can "reply" to the President's tweets, which means responding with a tweet that appears both below the President's tweet and on the responding user's page (under a tab labeled "Tweets & replies"); other users, in turn, can reply to these replies, creating a series of overlapping conversations ("comment threads").  *Id.* ¶¶ 22-23.  During the eight years that the President operated the @realDonaldTrump account before his inauguration, he tweeted about a wide range of topics, from politics to popular culture.  *Id.* ¶ 32.  Since assuming the presidency, the President has continued to operate this personal account with the aid of Daniel Scavino, an Assistant to the President, and now uses this platform to communicate with the public about his administration, among other topics.  *Id.* ¶¶ 12, 32.  When the President uses the @realDonaldTrump account, his tweets generally receive thousands of replies and "likes" from other users.  *Id.* ¶¶ 24, 41.  The President can view those replies, as well as tweets that "mention" the @realDonaldTrump account.  *See id.* ¶¶ 22, 25.

Between May and June 2017, the President blocked the accounts of the following seven Twitter users: Rebecca Buckwalter (@rpbp), Philip Cohen (@familyunequal), Holly Figueroa (@AynRandPaulRyan), Eugene Gu (@eugenegu), Brandon Neely (@BrandonTXNeely), Joseph Papp (@joepabike), and Nicholas Pappas (@Pappiness) (collectively, "the Individual Plaintiffs").

Stip. ¶¶ 46-52.  The tweets that preceded the President's decision to block the Individual Plaintiffs generally expressed displeasure with the President, often with intentionally inflammatory language.  *See, e.g.*, Stip. ¶ 51 (quoting a tweet from Mr. Papp referring to the President as a "#fakeleader").  When the President "blocks" a user, the user can no longer see or reply to @realDonaldTrump tweets.  *Id.* ¶¶ 28, 54.  The user can, however, continue to participate in the comment threads appearing below @realDonaldTrump tweets by posting replies to other users who have replied to the President.  *Id.* ¶¶ 30, 57-59.  Because the account is viewable by the public, blocked users also can continue to view @realDonaldTrump tweets through a web browser on the same terms as the general public; "blocking" only prevents users from viewing @realDonaldTrump tweets when signed in to their accounts.  *Id.* ¶¶ 31, 55.

In July 2017, the Individual Plaintiffs and the Knight First Amendment Institute at Columbia University ("Knight Institute") filed this First Amendment action challenging the President's blocking of the Individual Plaintiffs' Twitter accounts.  Compl., ECF No. 1.  The Knight Institute, which has a Twitter account that was not blocked, claims it was deprived of access to the Individual Plaintiffs' speech.  *Id.* ¶ 77.  Defendants are the President, Mr. Scavino, White House Communications Director Hope Hicks, and White House Press Secretary Sarah Huckabee Sanders.[1]  *Id.* ¶¶ 17-18.  Plaintiffs claim that the President's blocking violates the First Amendment because it imposes a viewpoint-based restriction on their participation in a public forum, their right to access official statements, their right to petition the government, and their right to hear.  *Id.* ¶¶ 78-82.  The Court approved the parties' joint proposal to enter a stipulation of facts and cross-move for summary judgment on that basis.  Endorsed Order, ECF No. 29.

---

[1] Ms. Hicks and Ms. Sanders are substituted for Sean Spicer under Federal Rule of Civil Procedure 25(d).

## LEGAL STANDARD

Defendants move for summary judgment under Federal Rule of Civil Procedure 56(a).  "A motion for summary judgment is appropriately granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  *Coventry Enters. LLC v. Sanomedics Int'l Holdings, Inc.*, 191 F. Supp. 3d 312, 317 (S.D.N.Y. 2016).  "The district court must 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  *Charley v. Total Office Planning Servs. Inc.*, 202 F. Supp. 3d 424, 428 (S.D.N.Y. 2016) (quoting *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006)).  A party "asserting that a fact cannot be . . . disputed" may do so by citing to "stipulations."  Fed. R. Civ. P. 56(c)(1)(A).  Where the moving party demonstrates the absence of a genuine issue of material fact, "the non-moving party 'must come forward with specific evidence demonstrating the existence of a genuine dispute.'"  *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 496 (S.D.N.Y. 2015) (quoting *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).  Questions of subject-matter jurisdiction, like standing, may be decided on summary judgment.  *Baur v. Veneman*, 352 F.3d 625, 642 (2d Cir. 2003).

## ARGUMENT

### I.     This Court Lacks Jurisdiction To Decide Plaintiffs' Claims.

At the outset, this Court lacks jurisdiction because Plaintiffs do not have standing.  The Constitution "confers limited authority on each branch of the Federal Government," and Article III limits the judicial power to "Cases" and "Controversies."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546-47 (2016), *as revised* (May 24, 2016).  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'"  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)

4

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Because standing "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), courts are "especially rigorous" in examining standing when, as here, a suit asks the court to decide "whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

Plaintiffs are the party invoking jurisdiction and bear the burden of satisfying this especially rigorous inquiry.  *Spokeo*, 136 S. Ct. at 1547.  To establish "the 'irreducible constitutional minimum' of standing," Plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.* at 1547 (quoting *Lujan*, 504 U.S. at 560). Plaintiffs cannot meet this burden because the undisputed facts show that at least one element of standing is lacking for all of the Plaintiffs and the specific claims they seek to bring.

### A.  The Knight Institute Does Not Have A Cognizable Injury.

The Knight Institute lacks standing because its alleged injury—the inability to "hear[] the speech that the Individual Plaintiffs would have engaged in had they not been blocked," Compl. ¶ 77—is not cognizable.  At the outset, the Knight Institute has not identified an actual injury. Plaintiffs have put forward no evidence that the Knight Institute ever viewed one of the Individual Plaintiffs' tweets prior to filing this lawsuit, nor is there any evidence that the Knight Institute has viewed replies to @realDonaldTrump tweets.  Indeed, a month after filing this suit, the Knight Institute did not even follow six of the seven Individual Plaintiffs on Twitter.  Stip. ¶¶ 61-62.  In any event, a user blocked by the @realDonaldTrump account can still view the President's tweets and tweet about them, and the Knight Institute is free to view any such user's tweets.  Stip. ¶¶ 57,

61.  A blocked user can still post in the @realDonaldTrump comment threads, as all but one of the Individual Plaintiffs have done after being blocked, and the Knight Institute is free to view those comment threads.  Stip. ¶¶ 57-58.  Even assuming the existence of a "right to hear" tweets, the actions at issue in this case would not give rise to an Article III injury.

Moreover, the Knight Institute's alleged injury is entirely speculative.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-96 (2009); *see also Clapper*, 568 U.S. at 413.  Thousands of users post replies to each @realDonaldTrump tweet, and only a tiny fraction of these replies will reach the top of the comment threads.  Stip. ¶¶ 23, 41, 43-44.  Plaintiff assumes (1) that an Individual Plaintiff would have replied to an @realDonaldTrump tweet but for the blocking, (2) that other users would have liked the reply, (3) that Twitter's algorithm would have elevated the reply to a prominent place in the comment thread, *see id.* ¶ 23, (4) that a Knight Institute staffer would log in to the @knightcolumbia account and see the relevant @realDonaldTrump tweet, (5) that the staffer would click on the tweet and scroll through the replies, and (6) that the staffer would have seen the Individual Plaintiff's reply.  But the Knight Institute has neither a demonstrable history of clicking on @realDonaldTrump tweets to view the replies, nor any concrete plans to do so.  *Cf. Lujan*, 504 U.S. at 564.  This "highly attenuated chain of possibilities," which rests on speculative action by hundreds (if not thousands) of third parties not before the court, does not give the Knight Institute standing to sue.  *Clapper*, 568 U.S. at 410.

In any event, the Knight Institute's assertion of an alleged injury from the denial of a "right to hear" is nothing more than an "undifferentiated, generalized grievance," not a particularized injury in fact.  *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam); *see also United States v. Richardson*, 418 U.S. 166, 176-77 (1974).  The Knight Institute's purported injury from the "distorting" effects of being unable to "hear" the Individual Plaintiffs' speech, Compl. ¶ 77, would

6

be shared equally by any member of the public who views the @realDonaldTrump account.  That includes not only the account's millions of followers on Twitter, Stip. ¶ 36, but also anyone who accesses the account's public webpage.  In short, this injury is too generalized to sustain the Court's jurisdiction.  *See Lujan*, 504 U.S. at 575.

### B.  The Individual Plaintiffs Lack Standing To Sue Ms. Hicks, Ms. Sanders, And Mr. Scavino.

The Individual Plaintiffs urge this Court to exercise jurisdiction based on their alleged denial of access to a public forum.  *See* Compl. ¶¶ 46-47, 79-81.  As discussed in Section III, *infra*, this novel claim of First Amendment injury rests on the unsupported and erroneous premise that the President's Twitter account is a public forum for First Amendment purposes.  But even assuming these alleged injuries are cognizable, they cannot fairly be traced to Ms. Hicks, Ms. Sanders, and Mr. Scavino.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  By Plaintiffs' own account, the Individual Plaintiffs' alleged injuries were caused by the blocking of their accounts.  Compl. ¶¶ 46, 51, 55, 59, 63, 67, 71, 75.  And the facts show that the President himself blocked the Individual Plaintiffs.  Stip. ¶¶ 46-52.  Any suggestion that the Individual Plaintiffs' alleged injuries are traceable to these other defendants is not just "purely speculative," *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976), it is foreclosed by the record.

### C.  Plaintiffs Cannot Obtain Equitable Relief Against The President.

The Individual Plaintiffs must trace their alleged injuries to the President alone, but those injuries are not redressable.  The remedy Plaintiffs seek—an injunction requiring the President to take discretionary action with respect to the management of his Twitter account in his official capacity, *see* Compl. ¶ 16; Stip. ¶ 9—is not available.  *See Franklin v. Massachusetts*, 505 U.S. 788 (1992); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867).  As discussed in Section II, *infra*, Defendants contest the premise that the President acted in his official capacity, but even

7

accepting Plaintiffs' premise as true, this Court would lack jurisdiction to grant the relief requested. *See, e.g.*, *Newdow v. Bush*, 355 F. Supp. 2d 265, 282 (D.D.C. 2005). Thus, the Individual Plaintiffs lack standing to bring this challenge on the only theory of the case on which their claims can proceed, and judgment should be entered for Defendants on that basis.

To maintain the constitutional separation of powers, courts are prohibited from enjoining the discretionary conduct of the President. In *Mississippi v. Johnson*, the State of Mississippi sought to enjoin President Andrew Johnson from executing the Reconstruction Acts, which Mississippi claimed were unconstitutional. 71 U.S. at 475-78. The Supreme Court held that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* at 501. When presidential action requires "the exercise of judgment," "general principles . . . forbid judicial interference with the exercise of Executive discretion." *Id.* at 499. Just as courts cannot enjoin Congress in exercising its legislative function, they cannot enjoin the President in exercising the executive function. *Id.* at 500 ("Neither can be restrained in its action by the judicial department[.]"). To do so, the Court observed, would be "without a precedent." *Id.*[2]

The Supreme Court reaffirmed these fundamental principles in *Franklin v. Massachusetts*, 505 U.S. 788 (1992). In *Franklin*, a district court issued an injunction requiring the President to take certain actions related to the census. Writing for a plurality, Justice O'Connor explained that "the District Court's grant of injunctive relief against the President himself [was] extraordinary, and should have raised judicial eyebrows." *Id.* at 802 (plurality) (citation omitted). The plurality

---

[2] The Court has consistently acknowledged both the President's unique constitutional role and the separation-of-powers concerns that attend that position. *E.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982) ("The President's unique status under the Constitution distinguishes him from other executive officials."); *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("The general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other."); *Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 610 (1838) ("The executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power.").

reiterated that "in general, '[the] court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* at 802-03 (quoting *Mississippi*, 71 U.S. at 501).  And Justice Scalia agreed that the President "may not be ordered to perform particular executive . . . acts at the behest of the Judiciary," a conclusion "implicit in the separation of powers." *Id.* at 827 (Scalia, J., concurring in the judgment).

In line with *Mississippi* and *Franklin*, courts routinely reject demands to enjoin the President's discretionary conduct,[3] regardless of the claim.  *See, e.g.*, *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017); *Swan v. Clinton*, 100 F.3d 973, 976-81 (D.C. Cir. 1996); *Cty. of Santa Clara v. Trump*, No. 17-cv-574, 2017 WL 1459081, at *29 (N.D. Cal. Apr. 25, 2017), *appeal docketed* No. 17-16886 (9th Cir. Sept. 18, 2017); *Settle v. Obama*, No. 15-cv-365, 2015 WL 7283105, at *6 (E.D. Tenn. Nov. 17, 2015); *Willis v. U.S. Dep't of Health & Human Servs.*, 38 F. Supp. 3d 1274, 1277 (W.D. Okla. 2014); *McMeans v. Obama*, No. 11-cv-891, 2011 WL 6046634, at *3 (D. Del. Dec. 1, 2011); *Shreeve v. Obama*, No. 10-cv-71, 2010 WL 4628177, at *5 (E.D. Tenn. Nov. 4, 2010); *Carlson v. Bush*, No. 07-cv-1129, 2007 WL 3047138, at *3 (M.D. Fla. Oct. 18, 2007); *Comm. to Establish the Gold Standard v. United States*, 392 F. Supp. 504, 506 (S.D.N.Y. 1975); *Nat'l Ass'n of Internal Revenue Emps. v. Nixon*, 349 F. Supp. 18, 21-22 (D.D.C. 1972); *Reese v. Nixon*, 347 F. Supp. 314, 316-17 (C.D. Cal. 1972); *S.F. Redevelopment Agency v. Nixon*, 329 F. Supp. 672, 672 (N.D. Cal. 1971); *Suskin v. Nixon*, 304 F. Supp. 71, 72 (N.D. Ill. 1969).

---

[3] The *Franklin* plurality, like the *Mississippi* Court, "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty.'" *Franklin*, 505 U.S. at 802 (quoting *Mississippi*, 71 U.S. at 498-99).  A ministerial duty is "a simple, definite duty" that is "imposed by law" where "nothing is left to discretion."  *Mississippi*, 71 U.S. at 498; *see also Napolitano v. Flynn*, 949 F.2d 617, 622-23 (2d Cir. 1991). There can be no question here that the law imposes no ministerial duties with respect to the President's use of Twitter.

To avoid infringing on the separation of powers, courts often ask whether presidential actions may be reviewed through claims brought against a subordinate official charged with implementing a presidential order. *See, e.g.*, *Swan*, 100 F.3d at 979-81. Here, however, Plaintiffs' claims are directed squarely at discretionary choices—who to interact with on Twitter, including who to block—made only by the President himself. Stip. ¶¶ 9, 36, 46-52. Even if the Court had jurisdiction over another official, an order of relief against that official would be insufficient to grant redress, as any injunction ultimately must run to the President, who oversees the operation of the @realDonaldTrump account. *Id.* ¶ 9. Thus, Plaintiffs may obtain relief only through an injunction running to the President, and granting that relief would open the door to wide-ranging judicial management of the President's conduct as Chief Executive. *Cf. Franklin*, 505 U.S. at 824-25, 828 (Scalia, J., concurring in the judgment); *Mississippi*, 71 U.S. at 500-01. A district court in similar circumstances—confronted with a claim seeking to enjoin President George W. Bush's conduct on First Amendment grounds—concluded that it was "without the authority to grant such relief." *Newdow v. Bush*, 391 F. Supp. 2d 95, 106-07 (D.D.C. 2005); *see also Newdow v. Roberts*, 603 F.3d 1002, 1012-13 (D.C. Cir. 2010). This Court should reach the same conclusion and reject Plaintiffs' extraordinary request.[4]

## II.  Plaintiffs Cannot Establish State Action.

Even if this Court were to conclude that jurisdiction exists to enjoin the actions of the President, Plaintiffs' First Amendment claim fails because the President's decision to block the Individual Plaintiffs from the @realDonaldTrump account was not state action. It is axiomatic

___

[4] For the same reasons, the Court should reject Plaintiffs' request for declaratory relief. As Justice Scalia explained in *Franklin*, whether the relief sought is injunctive or declaratory, it is "incompatible" with the President's "constitutional position that he be compelled personally to defend his actions before a court." 505 U.S. at 827 (Scalia, J., concurring). If declaratory relief against the President were available, it similarly "would produce needless head-on confrontations between district judges and the Chief Executive." *Id.*; *see also, e.g.*, *Newdow*, 603 F.3d at 1013; *Swan*, 100 F.3d at 976 n.1; *Barnett v. Obama*, No. 09-cv-82, 2009 WL 3861788, at *12-13 (C.D. Cal. Oct. 29, 2009), *aff'd sub nom. Drake v. Obama*, 664 F.3d 774 (9th Cir. 2011); *Newdow*, 391 F. Supp. 2d at 105-07.

that Plaintiffs can maintain a First Amendment claim only by establishing that the challenged conduct is state action. *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009); *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005). Equally clear is that not all conduct of public officials is state action simply by virtue of their profession; officials routinely engage in personal conduct that is not an exercise of state power. *Patterson v. Cty. of Oneida*, 375 F.3d 206, 230 (2d Cir. 2004); *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996). And here, the President's use of his personal Twitter account is among the "acts of officers in the ambit of their personal pursuits [that] are plainly excluded" from state action. *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality)).

The question for the Court is whether the President "exercised power 'possessed by virtue of [federal] law'" when he blocked the Individual Plaintiffs, such that the blocking was "made possible only because [the President] is clothed with the authority of [federal] law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) ("[T]he deprivation must be caused by the exercise of some right or privilege created by the State . . . ."). This determination is "necessarily fact-bound," *Lugar*, 457 U.S. at 939, and "a matter of normative judgment," as "no one fact can function as a necessary condition across the board for finding state action," *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).[5]

This inquiry must be applied carefully in relation to the President, whose uniquely prominent constitutional position could be misread to suggest that state power permeates his every

---

[5] As relevant here, the state-action requirement for actions against state officials is not meaningfully different than the state-action requirement for actions against federal officials. *Lugar*, 457 U.S. at 929 ("[I]t is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical."); *see also Brentwood Acad.*, 531 U.S. at 295 (2001) (applying state-action standards to a First Amendment claim); *Grogan v. Blooming Grove Volunteer Ambulance Corps.*, 768 F.3d 259, 263 (2d Cir. 2014) (same).

action.  There can be no question, though, that even prominent public officials engage in personal conduct, whether in public or private, that involves no exercise of state power.  *Cf. Zherka v. DiFiore*, 412 F. App'x 345, 347 (2d Cir. 2011) (district attorney's telephone call to newspaper complaining about an article not state action); *Colombo v. O'Connell*, 310 F.3d 115, 118 (2d Cir. 2002) (per curiam) (school superintendent's letter, written by a private lawyer, threatening to file libel suit not state action); *Monsky v. Moraghan*, 127 F.3d 243, 245 (2d Cir. 1997) ("[S]ome actions by a judge are taken without any relationship to the judge's office or authority, and therefore are not taken under color of law."); *see also, e.g.*, *Van Orden v. Perry*, 545 U.S. 677, 723 (2005) (Stevens, J., dissenting) ("[W]hen public officials deliver public speeches, we recognize that their words are not exclusively a transmission from *the* government because those oratories have embedded within them the inherently personal views of the speaker[.]" (emphasis in original)).  The President, like other public officials, routinely engages in conduct that is not state action, whether that might be giving a toast at a wedding or giving a speech at a fundraiser.

Here, the President does not operate his personal Twitter account by virtue of federal law, nor is blocking made possible because the President is clothed in Article II powers.  His use of the @realDonaldTrump Twitter account is not a right conferred by the presidency.  Twitter is a private platform, run by a private company, and it structures the interactions of its users on its own terms.  Stip. ¶¶ 13-31.  The President established the @realDonaldTrump account in 2009, has used the account before and after his inauguration, and will be free to use it after he leaves office.[6]  *See id.* ¶ 32.  Throughout, his use of the account has been governed by Twitter's own structural limitations; any features he may or may not use are created by Twitter and shared by every other user.  *See Carlos v. Santos*, 123 F.3d 61, 65-66 (2d Cir. 1997) (finding no state action where "[a]ny citizen

---

[6] Unlike @POTUS and @WhiteHouse, the @realDonaldTrump account is associated with the President, not the presidency.  Stip. ¶ 45.  These official accounts will, however, retweet the @realDonaldTrump account.  *Id.* ¶ 37.

may perform [the challenged] acts").  The blocking feature, for example, is one several tools Twitter provides to allow users to customize their interaction with other users and to curate the information that they consume.  Stip. ¶¶ 19, 24- 25, 27-28.  And the President's decisions about who to interact with and what information to consume (what newspapers to pick up, what news programs to watch, what accounts to follow or block) are not state action.

To be sure, the President's account identifies his office, and his tweets make official statements about the policies of his administration.  *See* Stip. ¶¶ 32, 35, 37.  But the fact that the President may announce the "actions of the state" through his Twitter account does not mean that all actions related to that account are attributable to the state.  Public officials may make statements about public policy—and even announce a new policy initiative—in a variety of settings, such as on the campaign trail or in a meeting with leaders of a political party.  The fact that an official chooses to make such an announcement in an unofficial setting does not retroactively convert into state action the decision about which members of the public to allow into the event.  Similarly, the President's decision to block Twitter users on his personal account is not properly considered state action.[7]

### III. Plaintiffs' First Amendment Claim Fails Because Blocking The Individual Plaintiffs Does Not Implicate, Much Less Violate, The Public Forum Doctrine.

Plaintiffs cannot establish a violation of their First Amendment rights.  Their principal claim is that the Individual Plaintiffs have been denied access to a "public forum" on the basis of viewpoint.  They have not.  Even assuming that the President's decision to block the Individual

---

[7] Indeed, under Plaintiffs' approach, every tweet from the @realDonaldTrump account, including those that have nothing to do with government policy, would constitute state action.  *See, e.g.*, Stip. Ex. A at 6 ("Congratulations to Eric & Lara on the birth of their son, Eric 'Luke' Trump this morning! https://t.co/Aw0AV82XdE"), 11 ("A great book by a great guy, highly recommended! https://t.co/3jbDDN8YmJ"), 27 ("Will be at the Women's U.S. Open today!"), 51 ("Happy Easter to everyone!"), 56 ("Congratulations Eric & Lara. Very proud and happy for the two of you! https://t.co/s0T3cTQc40"), ECF No. 33-1.

Plaintiffs from the @realDonaldTrump account was state action, the President's use of that account would be government speech, not action that is subject to forum analysis.  The President uses the account for *his* speech, not as a forum for the private speech of others.  And his decision to block certain users allows him to choose the information he consumes and the individuals with whom he interacts—expressive choices that public officials retain the right to make, even when those choices are made on the basis of viewpoint.  This Court should resist Plaintiffs' invitation to extend forum analysis to the President's Twitter account solely based on the manner in which Twitter— a private company—has structured its website.  The President had no role in structuring the conversations among Twitter users, let alone an intent to create a forum for private expression.

## A. If the President's Use Of Twitter Is State Action, Then It Is Government Speech.

It is well-established that "government statements," along with "government actions . . . that take the form of speech," "do not normally trigger the First Amendment rules designed to protect the marketplace of ideas."  *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245-46 (2015).  As such, when the government speaks, it is free to draw distinctions based on viewpoint, unlike in other areas of First Amendment law.  *See infra* Section III.B (discussing forum analysis).  In *Walker*, for instance, the Court held that it did not violate the First Amendment for Texas to reject a specialty license plate that featured the confederate flag, even though the plate was designed by a private group and would have been displayed on private vehicles registered in Texas.  135 S. Ct. at 2243-44.  And in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 464-65 (2009), the Court held that a city's choice about whether to display a private religious organization's proposed monument in a public park was "not a form of expression to which forum analysis applies."  *See also Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (holding that it did not violate the First Amendment for the government to "selectively fund" family planning

14

services when funding recipients were prohibited from providing "counseling, referral, and . . . information regarding abortion as a method of family planning").  Because the state in each of these cases was "speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums [did] not apply."  *Walker*, 135 S. Ct. at 2250.

If the President's use of the @realDonaldTrump account is properly considered state action, there can be no question that it constitutes the President's (and therefore the government's) speech.  Both the structure of Twitter and the characteristics of the President's account confirm this conclusion.  When an individual visits the webpage for the @realDonaldTrump account, he is directed to the President's timeline.  *See* Stip. ¶ 15.  The timeline contains, *inter alia*, a list of the tweets posted by the President, in reverse chronological order, as well as images displayed above and next to the list of tweets.  *Id.* ¶¶ 15-16.  All of these items "are controlled by the user who generates them," *i.e.*, the President, not any outside speaker seeking access to the account.  *Id.* ¶ 26; *see also id.* ¶ 9.  Even if the President chooses to retweet the post of another Twitter user, that choice still reflects the President's decision about what message to convey through his account.  *See Summum*, 555 U.S. at 472 (city's selection of privately donated monuments to display "clear[ly] . . . represent[ed] government speech").

In light of these facts, and their view that the President's use of Twitter qualifies as state action, Plaintiffs cannot seriously contend that the President's timeline is anything other than government speech.  The President's use of Twitter is his means of contributing to the diverse set of conversations that take place on the Twitter platform, and his engagement in those conversations is self-evidently the President's speech, just as his participation in any other conversation would be.  Thus, Plaintiffs are left to argue that other elements associated with the account—elements created and maintained by Twitter, not the government—transform the @realDonaldTrump

15

account into something other than a channel for the President's speech.  That argument rests entirely on the fact that Twitter permits followers of the @realDonaldTrump account to respond to the President's tweets, and to respond to other users' responses.  *See, e.g.*, Compl. ¶ 46.

However, Twitter's decision to create a reply function for its users does not change the nature of the President's speech.  Responses to @realDonaldTrump tweets are independently generated speech that is located in two places: on the page of the users who post them (under a heading labeled "Tweets & replies"), and, if a user selects a particular tweet from the President's timeline, beneath that tweet.  Stip. ¶ 22.  In essence, Twitter has constructed a system where each reply tweet has two distinct characteristics: (1) the speech of the user who posts it, and (2) an element of a conversation with the author of the original tweet.  When a user is blocked, in this case by the President, only the second characteristic is implicated; blocking simply "prevent[s] another user from interacting" with the President on Twitter.  *Id.* ¶ 28.  The blocked individual remains free to continue posting tweets that criticize the President, to link the @realDonaldTrump account to such criticism (by "mentioning" the account, *see id.* ¶ 25), and even to reply to comments by other users regarding the President's tweets.[8]  *See id.* ¶ 30.  The President cannot alter, pre-screen, or prevent other users from seeing any of this content.  *See id.* ¶ 26.

This distinction is important because the "conversational" aspect of the platform that Twitter has created does not transform the President's use of the @realDonaldTrump account into

---

[8] Plaintiffs contend that the Individual Plaintiffs have been denied the ability to participate fully in the "comment threads" that are "associated with tweets from @realDonaldTrump."  Compl. ¶¶ 45, 46.  They have not.  In fact, "[a]ll but one of the Individual Plaintiffs have posted replies in comment threads that originated with @realDonaldTrump tweets after their accounts were blocked."  Stip. ¶ 58; *see also id.* ¶ 57 (providing a relevant image).  They were able to do that because, as outlined above, when a user replies to a tweet, that reply is visible from the replying user's Twitter webpage.  *See id.* ¶ 22.  The Individual Plaintiffs can view those replies, respond to them, and choose to engage other users in the same comment thread, even when the tweet that prompted the initial reply was from the @realDonaldTrump account.  *See id.* ¶ 57.  To be sure, because the Individual Plaintiffs have been blocked from the @realDonaldTrump account, they cannot go to his Twitter webpage, or see his initial tweet, when signed in to their accounts.  *Id.* ¶¶ 29, 58.  But their ability to participate in the comment threads remains unrestricted.

a forum intended for free expression by the public. *See Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 282 (1984) (seeking a "government audience for [plaintiffs'] views" did not implicate forum analysis because it was not analogous to a situation where "government property ha[d] been closed to them for use in communicating with private individuals"). Rather, the President's decision to block certain users is part and parcel of his speech on the Twitter platform, as it allows him to select the information he consumes and the users with whom he wants to interact. For instance, by blocking the Individual Plaintiffs, the President is no longer "notified if the blocked [Plaintiffs] mention[]" him, nor does he see any tweets they post. Stip. ¶ 28.

The Supreme Court has long recognized that the right to speak implicates the interest of "unwilling listener[s]" in "avoiding unwanted communication." *Hill v. Colorado*, 530 U.S. 703, 716 (2000); *see also Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 738 (1970) ("[N]o one has a right to press even 'good' ideas on an unwilling recipient."). Like private citizens, the government also has an interest in controlling the information it receives. *Knight*, 465 U.S. at 285 ("Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues.").

That interest is especially pronounced in the case of public officials, who make choices every day about the information they consume and the individuals with whom they interact. By necessity, the freedom to make such choices must extend to circumstances where a public official disagrees with the views of a speaker. Otherwise, a congressperson would risk suit every time he cut short—or refused to begin in the first place—a conversation at a public event with a constituent he knew to be an unpleasant critic. *Cf. Summum*, 555 U.S. at 468 ("[I]t is not easy to imagine how

government could function if it lacked this freedom."). The President's decision to block the Individual Plaintiffs is properly viewed as the digital analog of this daily choice.

### B.  The Public Forum Doctrine Is Inapplicable Here.

Instead of treating the @realDonaldTrump account as a channel for the President's speech, Plaintiffs urge the Court to view the account as if it were a "public forum." But the "'forum-based' approach" that courts employ to evaluate speech restrictions on government property is inapplicable here for at least two reasons. *See Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010). First, Plaintiffs cannot establish that the President's Twitter account is properly considered government property from which private individuals can speak. Second, the forum-based approach should not be extended when, as here, the President has not taken steps to convert the @realDonaldTrump account into a forum for the speech of other Twitter users.

The forum-based approach on which Plaintiffs rely "divides government property into three [main] categories—the traditional public forum, the designated public forum, and the nonpublic forum." *Byrne*, 623 F.3d at 53. A traditional public forum is a place that "by long tradition or by government fiat ha[s] been devoted to assembly and debate," like public streets and parks. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The government may impose "[r]easonable time, place, and manner restrictions" on speech in a traditional public forum, but "any restriction based on the content of the speech must satisfy strict scrutiny," and "restrictions based on viewpoint are prohibited." *Summum*, 555 U.S. at 469. A designated public forum is "property that the State has opened for expressive activity by part or all of the public." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). Speech restrictions in a designated public forum are "subject to the same limitations as [those] governing a traditional public forum." *Id.* Finally, "public property not traditionally open to public

18

expression or intentionally designated by the government as a place for such expression" generally is considered a nonpublic forum.[9]  *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir. 2004).  The government may restrict speech in a nonpublic forum "so long as the restriction is reasonable and viewpoint-neutral."  *Byrne*, 623 F.3d at 53.

But before even reaching this framework for evaluating restrictions on speech in these forums, the Court must make a threshold determination whether forum analysis applies.  The Supreme Court repeatedly has cautioned that "the public forum doctrine should not be extended in a mechanical way" to contexts that are "very different" from the "streets and parks" where the doctrine first arose.  *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672–73 (1998); *see also Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 749 (1996) (plurality) ("[W]e are wary of the notion that a partial analogy in one context, for which [courts] have developed doctrines, can compel a full range of decisions in . . . new and changing area[s].").  This Court should decline to extend the forum-based approach to this new context for two reasons.

First, Plaintiffs cannot establish that the Individual Plaintiffs seek "access to government-owned property for purposes of expression."  *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 691–92 (2d Cir. 1991); *see also W. Farms Assocs. v. State Traffic Comm'n of State of Conn.*, 951 F.2d 469, 473 (2d Cir. 1991) ("[P]ublic forum analysis applies only where a private party seeks access to public property, such as a park, a street corner, or school auditorium, in order to communicate ideas to others.").  Such "property" can be a defined physical space, like a public park, or a more "metaphysical" space, like the platform a university provides through a student activities fund.  *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995).

---

[9] As the Second Circuit has noted, courts sometimes invoke a fourth category of forum—the "limited public forum"—though that term has been used to mean "both a 'subset of the designated public forum' and a 'nonpublic forum' opened to 'certain kinds of speakers or to the discussion of certain subjects.'"  *Byrne*, 623 F.3d at 55 n.8 (quoting *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002)).

To "define the nature of the property at issue," *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010), the Court must focus on "the access sought by the speaker." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985).

Plaintiffs suggest that the "public forum" to which they seek access is the @realDonaldTrump account itself. *See* Compl. ¶¶ 1, 3. But, as explained *supra* in Section III.A, the President uses the account for his own speech on his own timeline, not as a place for the private expression of others. When other individuals speak about the President on Twitter, they do so through their own accounts and posts on their own timelines. Stip. ¶ 22. To the extent that their speech extends to other places on Twitter, it does so according to terms set by the company, not the government. *See id.* ¶¶ 22-23; *cf. Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 569 (1972) ("[P]roperty [does not] lose its private character merely because the public is generally invited to use it for designated purposes."). To conclude that the President's own account is a public forum for private speech merely because other users may post tweets replying to him would transform any public appearance by a government official into a public forum on government property, and thereby subject the official's choices to a prohibition on viewpoint-based distinctions. If that were the case, then a congressman would be prohibited from pre-screening questions at a symposium hosted by a non-profit. Similarly, a senator could not choose to be introduced by a member of the college Democrats, rather than a member of the college Republicans, at a campus-wide event at a private university. This Court should seek to avoid such incongruous results.

Second, even if the President's Twitter account is considered "property" for these purposes, the Court should decline Plaintiffs' invitation to graft public-forum doctrine onto a social media account ill-suited to traditional forum principles. *See Forbes*, 523 U.S. at 673 (analyzing whether forum analysis is "compatible with the intended purpose of the property" (quoting *Perry Ed.*

*Ass'n.*, 460 U.S. at 49).  In *Forbes*, the Court explained that subjecting public broadcasters to forum analysis "would be antithetical, as a general rule, to the discretion that stations and their editorial staff must exercise."  *Id.*; *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585 (1998).  And in *United States v. American Library Association, Inc.*, 539 U.S. 194 (2003), a majority of the Court found that forum analysis was "incompatible with the discretion that public libraries must have to fulfill their traditional missions."  *Id.* at 205 (plurality); *see also id.* at 215-16 (Breyer, J., concurring in the judgment) (agreeing with plurality's determination that "the 'public forum' doctrine [was] inapplicable").

This focus on a property's intended purpose is necessary because "[the] government 'does not create a public forum by inaction or by permitting limited discourse, but only by *intentionally* opening a nontraditional forum for public discourse.'"  *Walker*, 135 S. Ct. at 2250 (quoting *Cornelius,* 473 U.S. at 802) (emphasis added).  Even for nonpublic forums, the government must take some steps to "reserve eligibility for access to the forum to a particular class of speakers."  *Forbes*, 523 U.S. at 679-80.  For instance, in *American Library Association*, the Supreme Court rejected a challenge to a statute that required public libraries to install software that blocks obscene images and child pornography in order to receive federal funds.  539 U.S. at 199 (plurality).  A plurality of the Court declined to apply forum analysis because "[a] public library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves, any more than it collects books in order to provide a public forum for the authors of books to speak."  *Id.* at 206.  Instead, a library provides internet access to further its mission, "not to 'encourage a diversity of views from private speakers.'"  *Id.* (quoting *Rosenberger*, 515 U.S. at 834).

In this case, there is no indication that the government has taken steps to make the @realDonaldTrump account a forum for private speakers.  The President established the account

as a private citizen in 2009—more than seven years before he was elected.  *See* Stip. ¶ 32.  He posted messages on Twitter frequently prior to his election, and his use of the @realDonaldTrump account as a means of communicating his views has been well documented.  *See, e.g.*, Amber Phillips, *The surprising genius of Donald Trump's Twitter account*, The Washington Post, Dec. 10, 2015, http://wapo.st/1lS7jIY.  Even if the content of the tweets on the @realDonaldTrump account may have shifted over time, there is nothing in the record to suggest that, since the inauguration, the President has opened up his account or otherwise taken affirmative steps to provide a forum for private speech.  Absent evidence of such intent, the Court should not treat the @realDonaldTrump account as a forum.

* * *

At bottom, it is a mistake to analyze the President's decision at issue in this case—to use the Twitter account he created as a private citizen to block individuals on a private social media platform—"in terms of a doctrine rooted in the government's historic regulation of speech, by private citizens, on real, public property." *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 334 (1st Cir. 2009); *see also Forbes*, 523 U.S. at 674 (warning against giving the public forum doctrine "sweeping application" because "courts 'would be required to oversee far more of the day-to-day operations of broadcasters' conduct'" (quoting *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 127 (1973))).  Instead of applying the "highly strained analogy" of the public forum, *Sutliffe*, 584 F.3d at 334, the better course is to treat the @realDonaldTrump account for what it most plainly is: the speech of the President participating in a privately run forum, not the government managing the participation of others in a public one.

IV.    **Plaintiffs' Remaining First Amendment Claims Are Meritless.**

A. **Plaintiffs Do Not Have A First Amendment Right To Follow The @realDonaldTrump Account On Twitter.**

Plaintiffs claim that they have a First Amendment right to follow the @realDonaldTrump account as a channel for petitioning the government and as a means of accessing official statements.  Compl. ¶¶ 80-81.  Neither claim has merit.  First, blocking the Individual Plaintiffs from following the @realDonaldTrump account on Twitter does not abridge "the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const., amend. I.  "[T]he rights of speech and petition share substantial common ground."  *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011).  As such, courts have often held that a Petition Clause claim cannot exceed the scope of a claim grounded in the First Amendment's Speech Clause.  *See, e.g.*, *McDonald v. Smith*, 472 U.S. 479, 485 (1985) ("[T]here is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions.").

No "special concerns," *Guarnieri*, 564 U.S. at 389, warrant a distinct Petition Clause analysis in this case.  The Petition Clause most clearly "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."  *Id.* at 387; *see also W. Farms Assocs.*, 951 F.2d at 474 ("The First Amendment right to petition does include a right of access to the courts.").  Plainly, no such forums are at issue here.  In any event, the Petition Clause, like the other clauses of the First Amendment, does not create an entitlement to use Twitter to communicate with the government.[10]  That is because "the First Amendment does not impose any affirmative obligation on the government to listen, to respond or . . . to recognize

---

[10] Even if the First Amendment provided such a right, the Individual Plaintiffs retain myriad ways to petition the government, including through Twitter.  *See, e.g.*, Stip. ¶ 45 (explaining that "[t]he President and the White House also operate two other Twitter accounts: @POTUS and @WhiteHouse").

[an] association and bargain with it." *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 465 (1979); *see also Knight*, 465 U.S. at 285 (explaining that the right to petition does not "require government policymakers to listen or respond to individuals' communications on public issues."). Plaintiffs therefore have no free-standing Petition Clause claim.

Second, and for similar reasons, the First Amendment does not create a right to follow the @realDonaldTrump account as a means of accessing official information. *See Smith*, 441 U.S. at 465. In a previous filing, Plaintiffs suggested that such a right exists because information from the @realDonaldTrump account is a government-conferred "benefit." *See* Letter Mot. for Conf., Aug. 8, 2017, at 3 (quoting *Matal v. Tam*, 137 S. Ct. 1744, 1760 (2017)), ECF No. 13. But Plaintiffs' only support for that claim, *Matal*, was about federal trademark registration, and the Court expressly confined its analysis to instances where the "benefit" at issue involved the government providing a particular service, like fire protection. 137 S. Ct. at 1761. Even if such a right did exist, it would not be at issue here because the Individual Plaintiffs have the same ability to see tweets from the @realDonaldTrump account as the average member of the general public. All that is required to see the President's tweets is to visit the @realDonaldTrump page via an internet browser that is not signed in to Twitter. Stip. ¶ 36; *see also id.* ¶ 55. No First Amendment violation can exist under these circumstances.

### B.  The Knight Institute's Right To Hear Claim Fails On The Same Terms as The Individual Plaintiffs' Claims.

The Knight Institute cannot establish that the President's decision to block the Individual Plaintiffs violates any purported right to hear their speech. The First Amendment protects "the right to receive information and ideas," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969), as an "inherent corollary of the right[] of free speech," *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). This right is "reciprocal," *Va. State Bd. of Pharmacy v.*

*Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976), because the "right to receive ideas follows ineluctably from the sender's First Amendment right to send them," *Pico*, 457 U.S. at 867. Thus, "the rights of the recipients of speech . . . derive in the first instance from the primary rights of the speaker," and the recipient "may claim no greater First Amendment protection" than the speaker.  *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 83 (2d Cir. 2003); *see also, e.g.*, *Price v. Saugerties Cent. Sch. Dist.*, 305 F. App'x 715, 716 (2d Cir. 2009); *In re Dow Jones & Co., Inc.*, 842 F.2d 603, 607-08 (2d Cir. 1988).  Because the alleged violation of the Knight Institute's right to hear is derived from the violation of the Individual Plaintiffs' alleged right to speak, "the legal analysis of the plaintiffs' claims are unavoidably intertwined and inseparable." *Spargo*, 351 F.3d at 84.  The Individual Plaintiffs' First Amendment rights have not been violated; accordingly, the Knight Institute has no claim.

Further, even if the Individual Plaintiffs could establish a violation, the Knight Institute still would not have a claim.  Nothing in Plaintiffs' complaint or the record even suggests that the Knight Institute has viewed @realDonaldTrump comment threads, much less the Individual Plaintiffs' replies, nor does the Knight Institute have any evident practice or plan to view those comment threads.  There can be no violation of the right to hear if the Knight Institute is not listening.  The Knight Institute raises the rights of the Individual Plaintiffs, but it "cannot rest [its] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

## CONCLUSION

For these reasons, Defendants respectfully request that the Court grant their motion and enter judgment for Defendants on all claims.

Dated: October 13, 2017    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JOON H. KIM
Acting United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director

*/s/ Michael H. Baer*
MICHAEL H. BAER
DANIEL HALAINEN
Trial Attorneys
U.S. Department of Justice,
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
Telephone: (202) 305-8573
Facsimile: (202) 616-8460
E-mail: Michael.H.Baer@usdoj.gov

*Counsel for Defendants*