# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY; REBECCA BUCKWALTER; PHILIP COHEN; HOLLY FIGUEROA; EUGENE GU; BRANDON NEELY; JOSEPH PAPP; and NICHOLAS PAPPAS,<br><br>        Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, President of the United States; HOPE HICKS, White House Acting Communications Director; SARAH HUCKABEE SANDERS, White House Press Secretary; and DANIEL SCAVINO, White House Director of Social Media and Assistant to the President,<br><br>        Defendants. | No. 1:17-cv-5205<br>**ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jessica Ring Amunson (*pro hac vice*)
Tassity S. Johnson (*pro hac vice*)
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

Jameel Jaffer (JJ-4653)
Katherine Fallow (KF-2535)
Carrie DeCell (application for admission
   forthcoming)
Alex Abdo (AA-0527)
Knight First Amendment Institute at Columbia
   University
314 Low Library
535 West 116th Street
New York, NY 10027
(212) 854-9600
jameel.jaffer@knightcolumbia.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... ii

INTRODUCTON .......................................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................ 4

      A.      How Twitter works. .................................................................................... 4

      B.      The @realDonaldTrump Twitter account. ................................................ 9

      C.      Defendants' blocking of the Individual Plaintiffs from the @realDonaldTrump account. ......................................................................... 10

LEGAL STANDARD ................................................................................................................... 11

ARGUMENT ............................................................................................................................... 12

  I.     Defendants' blocking of the Individual Plaintiffs from @realDonaldTrump violates the First Amendment. ................................................................................. 12

      A.      The @realDonaldTrump account is subject to the First Amendment. ........... 12

      B.      Defendants are violating the First Amendment by excluding the Individual Plaintiffs from a public forum based on viewpoint. ..................... 17

            1.      The @realDonaldTrump account is a designated public forum. ........ 17

            2.      Defendants' blocking of the Individual Plaintiffs from @realDonaldTrump is unconstitutional viewpoint discrimination. ................................................................................. 22

      C.      Defendants are violating the First Amendment by restricting the Individual Plaintiffs' access to generally available government information based on their viewpoints. ...................................................... 23

      D.      Defendants' blocking of the Individual Plaintiffs imposes an unconstitutional restriction on their First Amendment right to petition the government for redress of grievances. .................................................. 25

  II.    The Court has jurisdiction to provide relief in this case. ............................................. 27

      A.      The Court has jurisdiction to order equitable relief against the President in this case. ............................................................................... 27

      B.      Plaintiffs have standing to obtain relief against other Defendants. ................ 32

CONCLUSION ............................................................................................................................ 33

# TABLE OF AUTHORITIES

## Cases

*Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977)....................................................... 20, 24

*Baumgartner v. United States*, 322 U.S. 665 (1944) .................................................................. 21

*Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668 (1996) ......................... 27

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853
(1982).................................................................................................................................... 22

*BE & K Constr. Co. v. NRLB*, 536 U.S. 516 (2002) ................................................................... 26

*Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011) ................................................. 25, 26

*Boumediene v. Bush*, 553 U.S. 723 (2008) ................................................................................. 28

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47 (2d Cir. 2016).................................................. 33

*Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016)............................................................ 27

*City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S.
167 (1976).............................................................................................................................. 19

*Clinton v. Jones*, 520 U.S. 681 (1997)................................................................................... 28, 30

*Competitive Enter. Inst. v. Office of Sci. and Tech. Policy*, 827 F.3d 145 (D.C.
Cir. 2016) .............................................................................................................................. 16

*Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788 (1985)........... 17, 18, 21

*D'Alessandro v. City of N.Y.*, No. 17-594-cv, 2017 WL 4641256 (2d Cir. Oct. 17,
2017) ...................................................................................................................................... 33

*Davison v. Loudoun Cty. Bd. of Supervisors*, No. 1:16-cv-932, 2017 WL 3158389
(E.D. Va. July 25, 2017) ................................................................................................. passim

*Denver Area Ed. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996) .......................... 21

*Doe 1 v. Trump*, No. 17-1597, 2017 WL 4873042 (D.D.C. Oct. 30, 2017) ............................... 15

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................................... 27

*Forrester v. White*, 484 U.S. 219 (1988) .............................................................................. 28, 29

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)............................................................. 30, 31, 32

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), *vacated and cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, No. 16-1436, 2017 WL 2722580 (U.S. June 26, 2017) ................................................................... 15, 31

*Jones v. Heyman*, 888 F.2d 1328 (11th Cir. 1989) ........................................ 19

*Kentucky v. Graham*, 473 U.S. 159 (1985)................................................... 32

*Kleindienst v. Mandel*, 408 U.S. 753 (1972).................................................. 22

*L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32 (1999)............................ 24, 25

*Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384 (1993)....................... 27

*Make The Road by Walking, Inc. v. Turner,* 378 F.3d 133 (2d Cir. 2004) ...................... 17, 19, 22

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ............................................... 20, 23, 24

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007) ......................... 11

*McMeans v. Obama*, No. 11-cv-891, 2011 WL 6046634 (D. Del. Dec. 1, 2011)...................... 31

*Mirabella v. Villard*, 853 F.3d 641 (3d Cir. 2017) ............................................ 26, 27

*Mississippi v. Johnson*, 71 U.S. 475 (1866)................................................... 30

*Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971) ............................................. 21

*Monsky v. Moraghan*, 127 F.3d 243 (2d Cir. 1997) ........................................... 16

*Musso v. Hourigan*, 836 F.2d 736 (2d Cir. 1988) ............................................. 19

*N.Y. Times v. Sullivan*, 376 U.S. 254 (1964) ................................................ 21

*Newdow v. Bush*, 355 F. Supp. 2d 265 (2005)................................................. 31

*Nicholas v. City of New York*, No. 15-cv-9592, 2017 WL 766905 (S.D.N.Y. Feb. 27, 2017) .................................................................................... 25

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982)..................................................... 28

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) .............................................. 29, 32

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ................................... 3, 18, 26

*Paulsen v. Cty. of Nassau*, 925 F.2d 65 (2d Cir. 1991) ...................................... 17

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)............................ 17, 18

*Pitchell v. Callan*, 13 F.3d 545 (2d Cir. 1994) .......................................................... 16

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995)................................................. 27

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009)...................................... 20

*R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533 (2d Cir. 2011) ............................ 19

*Raines v. Byrd*, 521 U.S. 811 (1997) ........................................................................ 28

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995).................. 17, 18, 22, 23

*Rossignol v. Voorhaar*, 316 F.3d 516 (4th Cir. 2003) ................................................ 17

*S.F. Redevelopment Agency v. Nixon*, 329 F. Supp. 672 (N.D. Cal. 1971) ................................. 30

*Se. Promotions Ltd. v. Conrad*, 420 U.S. 546 (1975) ................................................. 20

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ....................................................... 24

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ........................................................ 22

*Sullivan v. Met. Trans. Auth. Police Dep't*, No. 13 Civ. 7677, 2017 WL 4326058
   (S.D.N.Y. Sept. 13, 2017)..................................................................................... 12

*Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011) ........................................................... 19

*Suskin v. Nixon*, 304 F. Supp. 71 (N.D. Ill. 1969) .................................................... 30

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) .................................................. 31, 32

*U.S. Postal Serv. v. Hustler Magazine, Inc.*, 630 F. Supp. 867 (D.D.C. 1986) ............................ 26

*United States v. Burr*, 25 F. Cas. 187 (No. 14,694) (CC Va. 1807) ........................... 29

*United States v. Giordano*, 442 F.3d 30 (2d Cir. 2006)............................................. 16

*United States v. Nixon*, 418 U.S. 683 (1974)............................................................ 29

*Universal Church, Inc. v. Universal Life Church/ULC Monastery*, No. 14 Civ.
   5213, 2017 WL 3669625 (S.D.N.Y. Aug. 8, 2017).............................................. 11

*Va. State Board of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S.
   748 (1976)........................................................................................................... 22

*White v. City of Norwalk*, 900 F.2d 1421 (9th Cir. 1990).......................................... 19

*Youngstown Sheet & Tube Co. v. Sawyer*, 535 U.S. 579 (1952) ....................... 29, 31, 32

**Other Authorities**

Twitter, "About," https://about.twitter.com/ .................................................................. 18

Twitter, "Muting Accounts on Twitter,"
    https://support.twitter.com/articles/20171399 ........................................................ 9

**Rules**

Fed. R. Civ. P. 56 .......................................................................................................... 11

**Constitutional Provisions**

U.S. Const. amdt. I ........................................................................................................ 25

## INTRODUCTON

The President's Twitter account, @realDonaldTrump, has become an important source of news and information about the government, and an important forum for speech by, to, and about the President. The account is akin to a digital town hall, with the President speaking from the podium at the front of the room and assembled citizens responding to him and engaging with one another about the President's statements. In an effort to suppress dissent, the President and his aides are ejecting from this forum—"blocking"—the Individual Plaintiffs and other Twitter users who have criticized the President or his policies.[1] This practice is unconstitutional, and this lawsuit seeks to end it.

Plaintiffs are entitled to summary judgment. There is no genuine issue of material fact. To the contrary, the parties' joint stipulation filed on September 28, 2017 includes the undisputed facts necessary to establish the Court's jurisdiction as well as the appropriateness of declaratory and injunctive relief against President Trump and his aides.

The First Amendment applies here because Defendants use @realDonaldTrump for official purposes. As the joint stipulation makes clear, White House staff members assist the President in drafting and posting tweets to the account. The President and his aides use the account to make official announcements, defend the President's official decisions and actions, report on the President's meetings with foreign leaders, and promote the administration's positions on health care, immigration, foreign affairs, and other matters. The President's aides have stated that tweets from @realDonaldTrump are "official statements," and they have cited the tweets in response to official congressional inquiries. The tweets have been treated as official

---

[1] In this brief, "Individual Plaintiffs" refers to the seven people in this lawsuit who were blocked from @realDonaldTrump. "Plaintiffs" refers to all eight plaintiffs listed in the caption, including the Knight First Amendment Institute at Columbia University ("Knight Institute").

statements by national public officials, public agencies, world leaders, and federal courts. The record thus establishes that Defendants use @realDonaldTrump as a "tool of governance." *See Davison v. Loudoun Cty. Bd. of Supervisors*, No. 1:16-cv-932, 2017 WL 3158389 (E.D. Va. July 25, 2017) (holding that county official used her Facebook page as a tool of governance and that accordingly the account was subject to the First Amendment).

Defendants' blocking of the Individual Plaintiffs from the @realDonaldTrump account violates the First Amendment for several reasons.

First, the blocking violates the prohibition against viewpoint-based exclusion of speakers from a designated public forum. The government creates a designated public forum when it opens a space for speech by the public at large without restriction as to subject matter or speaker. This is what Defendants have done here. The @realDonaldTrump account is a digital space in which anyone with a Twitter account can respond to and debate the President's statements ("tweets") in "comment threads" associated with those tweets. Given the nature of the forum, Defendants' concession that they have excluded the Individual Plaintiffs based on viewpoint amounts to a concession that Defendants have violated the Individual Plaintiffs' right to speak as well as the Knight Institute's right to hear.

Defendants' argument that the @realDonaldTrump account is "government speech" mistakes the part for the whole: While the *President's* tweets are government speech, the millions of comments on his tweets by ordinary citizens are not, and no one would mistake them for it. Again, town halls and open city council meetings supply useful analogies. The mere fact that a forum includes government speech does not convert it to something other than a public forum.

Second, and independent of the public forum analysis, Defendants' blocking of the Individual Plaintiffs violates the First Amendment because it restricts their access to generally available government information in retaliation for their criticism of the President. Through his Twitter account, the President makes information about his presidency generally available to anyone who follows him on Twitter. The First Amendment forecloses Defendants from burdening the Individual Plaintiffs' access to this otherwise generally available information solely because the Individual Plaintiffs have criticized the President or his policies.

Third, and independent of the two claims described above, Defendants' conduct violates the Individual Plaintiffs' First Amendment right to petition the government for redress of grievances. The @realDonaldTrump account is, among other things, a channel through which ordinary citizens can complain about government policy directly to the President and his closest aides. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (noting importance of social media platforms, and Twitter in particular, as channels through which citizens exercise rights protected by Petition Clause). Plaintiffs do not contend that Defendants are required to make this channel available to the public at large, but having done so, Defendants cannot close it to the Individual Plaintiffs solely because they have criticized the President or his policies.

Defendants' contention that the Court lacks power to remedy the unconstitutional conduct complained of here is meritless. The President is not above the law, and the notion that the separation of powers requires this Court to turn a blind eye to the President's violations of First Amendment rights turns the separation of powers on its head. Moreover, even if there were merit to Defendants' argument that the Court cannot enjoin the President—and there is not—the Court would still have the authority to grant declaratory relief against the President as well as injunctive and declaratory relief against the President's aides. Those aides include Dan Scavino,

White House Social Media Director and Assistant to the President, who by Defendants' admission is actively involved in administering the @realDonaldTrump account and has the access necessary to unblock the Individual Plaintiffs.

Plaintiffs respectfully request that the Court deny Defendants' motion and enter summary judgment in Plaintiffs' favor.

## STATEMENT OF FACTS

### A.   How Twitter works.

Twitter is a social media platform with more than 300 million active users worldwide, including some 70 million in the United States. Joint Stipulation ("Stip.") ¶ 13, ECF No. 30-1. The platform's defining feature is interactivity, which it fosters by allowing users to post short messages and to repost or respond to others' messages. *Id.*

Users. A Twitter "user" is an individual who has created an account on the platform. A user can post "tweets," generally up to 140 characters in length, to a webpage on Twitter that is attached to the user's account. Tweets can include photographs, videos, and links. *Id.* ¶ 14.

A Twitter user must have an account name, or "handle," which is an @ symbol followed by a unique identifier (*e.g.*, @realDonaldTrump), and a descriptive name (*e.g.*, Donald J. Trump). Alongside the handle, a user's webpage will display the date the user joined Twitter and a button that invites others to "Tweet to" the user. (This button is visible only to other Twitter users.) A user's Twitter webpage may also include a short biographical description; a profile picture, such as a headshot; a "header" image, which appears as a banner at the top of the webpage; the user's location; and other information. *Id.* ¶ 16. Thus, part of the webpage for @realDonaldTrump recently looked like this (annotated in red):



<u>Timelines</u>. A Twitter user's webpage displays all tweets generated by the user, with the most recent tweets appearing at the top of the page. This display is known as a user's "timeline." When a user posts a tweet, the timeline updates immediately to include that tweet. Anyone who can view a user's Twitter webpage can see the user's timeline. *Id.* ¶ 15.

Twitter webpages and their associated timelines are visible to everyone with internet access, including those who are not Twitter users. Although non-users can view users' Twitter webpages, however, they cannot interact with users on the Twitter platform. *Id.* ¶ 18.

<u>Tweets</u>. An individual "tweet" comprises the tweeted content (*i.e.*, the message, including any embedded photograph, video, or link), the user's account name (with a link to the user's Twitter webpage), the user's profile picture, the date and time the tweet was generated, and the

number of times the tweet has been replied to (♡), retweeted by (⟲), or liked by (♡) other users. *Id.* ¶ 17.

Following. Twitter users can subscribe to other users' messages by "following" those users' accounts. Users see all tweets posted or retweeted by accounts they are following. This display is labeled "Home" on Twitter's site, but it is often referred to as a user's "feed." *Id.* ¶ 19.

Verification. Twitter permits users to establish accounts under their real names or pseudonyms. Users who want to establish that they are who they claim to be can ask Twitter to "verify" their accounts. When an account is verified, a blue badge with a checkmark appears next to the user's name on his or her Twitter page and on each tweet the user posts. *Id.* ¶ 20.

Retweeting. In addition to posting tweets to their followers, Twitter users can "retweet"—*i.e.*, repost—the tweets of other users, by posting them directly to their own followers or by "quoting" them in their own tweets. When a user retweets a tweet, it appears on the user's timeline in the same form as on the original user's timeline, but with a notation indicating that the post was retweeted. *Id.* ¶ 21.

Replies and comment threads. A Twitter user can also reply to other users' tweets. Generally, a reply can be up to 140 characters in length and can include photographs, videos, and links. A reply appears on the user's timeline under a tab labeled "Tweets & replies." The reply may also be viewed from the original user's feed by clicking on the tweet that prompted the reply—the reply will appear below the original tweet, along with other replies to the same tweet. *Id.* ¶ 22. A Twitter user can also reply to other replies. A user whose tweet generates replies will see the replies below his or her original tweet, with any replies-to-replies nested below the replies to which they respond. Twitter is called a "social" media platform in large part because of these comment threads, which reflect multiple overlapping conversations among and across

groups of users. *Id.* ¶ 23. Below is a recent @realDonaldTrump tweet that prompted tens of thousands of comments, including the four shown below (annotated in red):



Blocking. Users may choose to exclude other users from viewing and responding to their tweets by using Twitter's "blocking" function. When logged into his or her account, a blocked user cannot see or reply to the blocking user's tweets, view the blocking user's list of followers or followed accounts, or use the Twitter platform to search for the blocking user's tweets. The blocking user will not be notified if the blocked user mentions her; nor will the blocking user see any tweets posted by the blocked user. *Id.* ¶ 28.

If the blocked user attempts to follow the blocking user, or to access the Twitter webpage from which the user is blocked, the user will see a message indicating that the other user has blocked her from following the account and viewing the tweets associated with the account. *Id.* ¶ 29. This is an example of a notification from Twitter that a user has been blocked:



8

Muting. An alternative to blocking a user is to "mute" him or her. Twitter, "Muting Accounts on Twitter," https://support.twitter.com/articles/20171399.[2] A user who mutes a follower does not see the tweets or replies of the muted account, but the follower is still able to view and reply to the muting user's tweets. *Id.* The reply tweets of the muted person will appear in comment threads and be visible to other followers, but they will not be visible to the account holder. *Id.*

## B.    The @realDonaldTrump Twitter account.

With the assistance of his White House staff, President Trump operates and oversees a verified Twitter account with the handle @realDonaldTrump. *Id.* ¶¶ 9, 12, 39. Defendant Dan Scavino, the White House Social Media Director and Assistant to the President, *id.* ¶ 12, "assists President Trump in operating the @realDonaldTrump account, including by drafting and posting tweets to the account." *Id.* ¶ 39. Other White House aides "also suggest content for @realDonaldTrump tweets." *Id.* Mr. Scavino "has access to the @realDonaldTrump account, including the access necessary to block and unblock individuals from the @realDonaldTrump account." *Id.* ¶ 12.

Since President Trump's inauguration in January 2017, the President and his aides have used the @realDonaldTrump account as a channel for communicating with the public about his presidency. *Id.* ¶ 32.[3] The account is used by the President and his aides to make formal announcements, defend the President's official actions, report on meetings with foreign leaders, and promote the administration's positions on health care, immigration, foreign affairs, and other

---

[2] *See* Stip. at 3 n.2 ("The parties agree that the Court may take judicial notice of the information published in the 'Using Twitter' and 'Policies and reporting' guides available on Twitter's 'Twitter Support' webpage, https://support.twitter.com/.").

[3] The President and his aides tweeted from the @realDonaldTrump account 1,556 times between Inauguration Day and September 25, 2017. All of the tweets are reproduced in an exhibit to the parties' joint stipulation. *Id.* Ex. A.

matters. *Id.* ¶ 38. The President has described his use of Twitter as "MODERN DAY PRESIDENTIAL," his aides have stated that tweets from @realDonaldTrump should be understood as "official statements by the President of the United States," *id.* ¶ 37, and the tweets have been treated as such by the National Archive and Records Administration and federal courts. *Id.* ¶ 40.

As of the date of the joint stipulation, @realDonaldTrump had 35 million followers, *id.* ¶ 36, a number which continues to grow. *See* https://twitter.com/realDonaldTrump?ref_src= twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor (reflecting over 41 million followers as of November 3, 2017). Each of the President's tweets generates thousands of replies—some of which generate hundreds or thousands of replies in turn. Stip. ¶¶ 41–42.

### C. Defendants' blocking of the Individual Plaintiffs from the @realDonaldTrump account.

Plaintiffs include seven individuals who have been blocked from the @realDonaldTrump account because of opinions they expressed in replies to the President's tweets about official government matters. For example, Rebecca Buckwalter, a writer and political consultant, was blocked by the President on June 6, 2017. That morning, the President tweeted, "Sorry folks, but if I would have relied on the Fake News of CNN, NBC, ABC, CBS washpost or nytimes, I would have had ZERO chance of winning WH." Ms. Buckwalter was blocked after she tweeted in reply, "To be fair you didn't win the WH: Russia won it for you." *Id.* ¶ 46. Eugene Gu, a surgical resident at Vanderbilt University Medical Center, was blocked by the President on June 18, 2017, after Dr. Gu responded to a tweet by President Trump discussing his approval rating by tweeting, "Covfefe: The same guy who doesn't proofread his Twitter handles the nuclear button." *Id.* ¶ 49. Police officer Brandon Neely was blocked by the President on June 12, 2017, after he responded to a tweet by President Trump relating to the opening of a new coal mine by

tweeting, "Congrats and now black lung won't be covered under #TrumpCare." *Id.* ¶ 50. And Joseph Papp, an anti-doping advocate and author, was blocked by the President on June 3, 2017, after he replied to the President's tweet of his weekly presidential address with a pair of linked tweets stating, "Greetings from Pittsburgh, Sir," and "Why didn't you attend your #PittsburghNotParis rally in DC, Sir? #fakeleader." *Id.* ¶ 51.

As a result of the President's blocking, Individual Plaintiffs cannot view the President's tweets, reply directly to those tweets, or view the comment threads associated with those tweets while they are logged into their Twitter accounts. *Id.* ¶ 54. They can access the President's tweets only by logging out of their accounts and using a search engine to view the @realDonaldTrump timeline, by using a private browsing window (such as an "incognito" browsing window), or by logging into an account that has not been blocked. *Id.* ¶¶ 55, 56. All of these "workarounds" require the Individual Plaintiffs to expend additional time and effort in order to read and respond to the President's tweets—that is, to expend time and effort that they would not have to expend if they had not criticized the President or his policies. *Id.* ¶¶ 56, 58–60.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' when it might affect the outcome of the suit under governing law," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citation omitted), and "[a] genuine dispute exists if a reasonable factfinder could decide in the nonmoving party's favor," *Universal Church, Inc. v. Universal Life Church/ULC Monastery*, No. 14 Civ. 5213, 2017 WL 3669625, at *4 (S.D.N.Y. Aug. 8, 2017). "When cross-motions for summary judgment are made the standard is the same; each motion must be

considered independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Sullivan v. Met. Trans. Auth. Police Dep't*, No. 13 Civ. 7677, 2017 WL 4326058, at *5 (S.D.N.Y. Sept. 13, 2017).

## ARGUMENT

**I.     Defendants' blocking of the Individual Plaintiffs from @realDonaldTrump violates the First Amendment.**

**A.     The @realDonaldTrump account is subject to the First Amendment.**

The undisputed facts establish that Defendants use the @realDonaldTrump account as an instrument of governance. The account is accordingly subject to the First Amendment.

To begin, the main webpage of @realDonaldTrump bears all the indicia of an official account. The page is registered to Donald J. Trump, "45th President of the United States of America, Washington, D.C." Stip. ¶ 35. Since inauguration, the account's header photographs have been images associated with the President's official duties. They have shown the President signing an executive order in the Oval Office, delivering official remarks at the White House and other locations, and meeting with the Pope, heads of state, and other foreign dignitaries. *Id.* ¶ 35 & Ex. B. The President and his aides treat the @realDonaldTrump account as interchangeable with the other official White House Twitter accounts. For example, the @WhiteHouse account directs Twitter users to "Follow for the latest from @POTUS @realDonaldTrump and his Administration," and tweets from @realDonaldTrump are frequently retweeted by @POTUS and @WhiteHouse (and vice versa). *Id.* ¶ 37.

Tweets from @realDonaldTrump since the President's inauguration overwhelmingly concern his official duties and decisions.[4] Defendants routinely use the account to announce

---

[4] Defendants cite a handful of instances in which the President used the @realDonaldTrump account to post more personal information, Gov't Br. at 13 n.7, but even a cursory review of

official decisions, offer official comment on news developments, describe the administration's

foreign policy decisions, and promote the administration's policies. *Id.* ¶ 38. For example:

- On June 7, 2017, the White House[5] used the account to announce for the first time that the President would nominate Christopher Wray for the position of FBI Director. *Id.*

- On June 22, 2017, the White House used the account to declare that the President did not possess tapes of conversations with former FBI Director James Comey. *Id.*

- On July 26, 2017, the White House used the account to announce that the President would ban transgender individuals from serving in the military. *Id.* ¶ 41.

- On July 28, 2017, the White House used the account to inform the public that the President had fired his first chief of staff, Reince Priebus, and replaced him with then–Secretary of Homeland Security General John F. Kelly. *Id.* Ex. A at 22.

- On August 7, 2017, the White House used the account to inform the public about the President's discussions with the South Korean president concerning North Korea's nuclear program. *Id.* Ex. A at 19.

- On September 5, 2017, the White House used the account to announce the President's decision to "allow[] Japan & South Korea to buy a substantially increased amount of highly sophisticated military equipment from the United States." *Id.* Ex. A at 9.

- On September 21, 2017, the White House used the account to announce a new executive order aimed at denuclearization of North Korea. *Id.* Ex. A at 2.

The President and his aides have described the account as an official one. For example,

on July 2, 2017, the President tweeted, "My use of social media is not Presidential – it's

MODERN DAY PRESIDENTIAL." *Id.* ¶ 37. On June 6, 2017, then–White House Press

---

Exhibit A to the joint stipulation shows that the President has used the account for such purposes only very rarely.

[5] Defendants concede that Mr. Scavino and other unnamed White House aides assist in drafting tweets and administering the @realDonaldTrump account. Stip. ¶¶ 12, 39. Plaintiffs attribute tweets from @realDonaldTrump to the "White House" because it is not clear which specific individuals were involved in drafting or posting any particular tweet.

Secretary Sean Spicer stated at a press conference that President Trump's tweets should be considered "official statements by the President of the United States." *Id.* Defendant Scavino has promoted @realDonaldTrump, @POTUS, and @WhiteHouse equally as channels through which "President Donald J. Trump . . . [c]ommunicat[es] directly with you, the American people!" *Id.* The White House also responded to a request for official White House records from the House Permanent Select Committee on Intelligence by referring the Committee to the President's "statement" made on Twitter on June 22, 2017. *Id.*

The participation of White House staff in the day-to-day operation of the @realDonaldTrump account is further evidence that the account is being used for official purposes. Defendant Scavino "assists President Trump in operating the @realDonaldTrump account, including by drafting and posting tweets to the account." *Id.* ¶ 39; *see also id.* ¶ 12 ("Mr. Scavino posts messages on behalf of President Trump to @realDonaldTrump and other social media accounts, including @POTUS and @WhiteHouse."). "President Trump also sometimes dictates tweets to Mr. Scavino, who then posts them on Twitter," and "President Trump and/or Mr. Scavino sometimes retweet the tweets of those who participate in comment threads associated with the @realDonaldTrump account." *Id.* ¶ 39. Official staff involvement is not limited to Mr. Scavino, as "[o]ther White House aides besides Mr. Scavino will, in certain instances, also suggest content for @realDonaldTrump tweets." *Id.* And Mr. Scavino "has access to the @realDonaldTrump account, including the access necessary to block and unblock individuals from the @realDonaldTrump account." *Id.* ¶ 12.

Federal agencies and federal courts have treated the @realDonaldTrump account as a source of official government statements. The National Archives and Records Administration has advised the White House that the President's tweets must be preserved as official records

under the Presidential Records Act. *Id.* ¶ 40. The Ninth Circuit cited one of the President's tweets in striking down an executive order restricting immigration. *Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir. 2017), *vacated and cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, No. 16-1436, 2017 WL 2722580 (U.S. June 26, 2017) (noting the White House Press Secretary had indicated that the President's tweets should be treated as official statements); Stip. ¶ 40. A district court recently relied on the White House's tweets in striking down the President's proposed ban on transgender individuals from military service. *Doe 1 v. Trump*, No. 17-1597, 2017 WL 4873042, at *7 (D.D.C. Oct. 30, 2017) (describing tweets from @realDonaldTrump as the President's "statement[s] via Twitter").

Against this background, it is plain that the @realDonaldTrump account is being used as an instrument of governance, and accordingly that it is subject to the First Amendment. *Davison v. Loudoun County Board of Supervisors*, 2017 WL 3158389, is instructive. That case presented the question whether the First Amendment applied to a county official's Facebook page. The court considered whether the Facebook page "possessed the 'requisite nexus' with [her] 'public office' to be fairly attributable to the government." *Id.* at *6 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). The official argued that her Facebook page was personal, not official, because she had created it before assuming office and occasionally posted personal content. The court disagreed, finding that the official used the Facebook page "as a tool of governance." *Id.* at *7. The court noted that the official had used government resources (including her staff) to administer the page; that she had used the page "to keep her constituents abreast of her activities as Chair and of important events in local government"; that county newsletters directed constituents to the page; and that the official had made efforts to "swathe the . . . page in the trappings of her office." *Id.*

15

All of the indicia of state action that the court identified in *Davison* are present here. As in *Davison*, the @realDonaldTrump account is properly understood as an official account subject to the First Amendment.

Defendants' arguments to the contrary are unpersuasive. Defendants emphasize that the President established the @realDonaldTrump account before he became President, Gov't Br. at 12, but that is not dispositive. The appropriate inquiry is functional rather than formalistic. Thus, the Second Circuit has made clear that "there is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." Instead, "courts look to the nature of the officer's act," not simply to whether the officer is on or off duty or using private or government property. *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994); *see Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997) (judge acted under color of law by bringing his dog to the clerk's office, where it "aggressively nuzzled" under women's skirts); *see also United States v. Giordano*, 442 F.3d 30, 43 (2d Cir. 2006) (Sotomayor, J.).[6]

The crucial fact here is that, since the President's inauguration, the President and his staff have used the @realDonaldTrump account almost exclusively for official purposes. Contrary to Defendants' suggestion, this is not a situation where the President has made an isolated official statement in an otherwise personal or private setting. Gov't Br. at 13. Instead, the President and his aides operate the @realDonaldTrump account as a complement to (or substitute for) other official communications channels, including the White House's other Twitter accounts, @POTUS and @WhiteHouse. Moreover, Defendants' decision to block the Individual Plaintiffs was based on the Individual Plaintiffs' responses to the President's tweets about official matters.

---

[6] In analogous circumstances, the D.C. Circuit has held that an agency official may not avoid the requirements of the Freedom of Information Act by using a private email system for official communications. *Competitive Enter. Inst. v. Office of Sci. and Tech. Policy*, 827 F.3d 145, 149 (D.C. Cir. 2016).

In this context, Defendants cannot avoid the constraints of the First Amendment. *Cf. Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (off-duty police officers acted under color of law when they seized all copies of local newspaper in retaliation for previous criticism of their fitness for office); *see also Davison*, 2017 WL 3158389, at *8 (holding that, even "assuming the specific act of banning Plaintiff from the 'Chair Phyllis J. Randall' Facebook Page can be analyzed separately, this likewise 'arose out of public, not personal, circumstances'" (quoting *Rossignol*, 316 F.3d at 524)).

### B.     Defendants are violating the First Amendment by excluding the Individual Plaintiffs from a public forum based on viewpoint.

#### 1.     The @realDonaldTrump account is a designated public forum.

"[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *Make The Road by Walking, Inc. v. Turner,* 378 F.3d 133, 142–43 (2d Cir. 2004). In determining whether government officials have created a designated public forum, courts consider the forum's compatibility with expressive activity and whether the government's overall "policy and past practice" shows that the forum is intended to be used for speech by the public. *See Paulsen v. Cty. of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991); *see also Cornelius*, 473 U.S. at 802.

The @realDonaldTrump account is a designated public forum. There is no question that the forum at issue here is compatible with expressive activity—the entire purpose of a Twitter account is to facilitate speech. The account is a "metaphysical space," in the language of the Supreme Court, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995), in which the President speaks and members of the public respond to, and engage with one another

about, those statements. *See id*. (applying public forum analysis to student newspaper funding); *see Perry Educ. Ass'n*, 460 U.S. at 46–47 (school mail system); *Cornelius*, 473 U.S. at 801 (charitable contribution program). The forum thus includes speech by the President as well as speech by ordinary citizens—in the same way that a town hall meeting ordinarily encompasses speech by government officials as well as speech by the assembled public.

That the White House purposefully opened this forum to speech by the general public is evidenced by the conduct and statements of the President and his aides, and by their decision to use Twitter, an inherently interactive platform. The President and his aides regularly retweet the tweets of supporters who have replied to @realDonaldTrump, evidence that they are attentive to the reply tweets in the comment threads. *E.g.*, Stip. Ex. A. at 3–4, 9, 13, 20. (That Defendants have blocked the Individual Plaintiffs for their replies to the President's tweets is further evidence that Defendants are attentive to the comment threads.) Defendants elected to use an interactive platform, and they make extensive use of the platform's interactive features. It bears emphasis that the defining feature of Twitter is its facilitation of real-time interaction. *See* Twitter, "About," https://about.twitter.com/. As the Supreme Court emphasized in *Packingham*, social media platforms like Twitter offer "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," in part because these platforms permit citizens to "engage with [their elected representatives] in a direct manner." *Packingham*, 137 S. Ct. at 1737. The decision of the President and his aides to use Twitter, specifically, to communicate with the public is powerful evidence of an intent to create a forum open to speech by the public at large.

The White House's overall policy and practice relating to the @realDonaldTrump account likewise evidences such an intent. The account is accessible to anyone with a Twitter account without regard to political affiliation or any other limiting criteria. Stip. ¶ 36. Defendants

have not published any rule or policy purporting to restrict, by form or subject matter, the speech of those who participate in the forum. *Id*. Nor have they sought to limit the forum to specific classes of speakers based on their status—*e.g.*, to the President's family, friends, or business colleagues. They have permitted anyone who wants to follow the account to do so. Over forty million Twitter users now follow it. The only users who cannot participate in the forum are those whom the President and his aides have selectively blocked.[7]

Again, the @realDonaldTrump account functions like a digital town hall meeting—one in which the President stands at the front of the room and assembled citizens respond to his statements and engage with each other about those statements. The courts have long recognized that these types of meetings constitute designated public forums. *See, e.g.*, *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011) (expressing "no doubt" that "audience time during . . . city council meetings constituted a designated public forum); *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) ("City Council meetings . . . where the public is afforded the opportunity to address the Council[] are the focus of highly important individual and governmental interests . . . . [S]uch meetings, once opened, have been regarded as public forums, albeit limited ones."); *Jones v. Heyman*, 888 F.2d 1328, 1331 (11th Cir. 1989) ("[T]he city commission designated their meeting a public forum when the commission intentionally opened it to the public and permitted public discourse on agenda items."); *see also Musso v. Hourigan*, 836 F.2d 736, 742 (2d Cir. 1988) (noting that public speech is usually allowed at an open school board meeting); *cf. City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175

---

[7] Because Defendants have opened the @realDonaldTrump account to the general public without any limiting criteria, the account is properly characterized as a designated public forum rather than a limited public forum. *See R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533, 539 (2d Cir. 2011). The type of forum is not dispositive in this case, however, because viewpoint discrimination is impermissible even in limited and nonpublic forums. *See Make the Road by Walking*, 378 F.3d at 143.

(1976) (holding that government could not exclude people from open school board meetings based on viewpoint).

Defendants' argument that the @realDonaldTrump account is government speech, Gov't Br. at 14–17, is misguided. The government speech doctrine holds that government officials need not maintain viewpoint neutrality when they articulate the government's policies. *See, e.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017). That principle plainly applies to the President's tweets. It does not, however, apply to the comment threads, in which thousands of ordinary citizens respond to the President and engage with one another. The comment threads are not government speech, and no one would mistake them for it. *Cf. Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 472 (2009) (privately donated monuments displayed by city "are meant to convey and have the effect of conveying a government message, and they thus constitute government speech"). The mere fact that @realDonaldTrump's tweets constitute government speech does not mean that the comment threads associated with his tweets are something other than a public forum. Indeed, every city council and town hall meeting *includes* government speech.

In addition, Defendants miss the point when they suggest that the @realDonaldTrump account is not a public forum because the President and his aides have opted to use a privately run platform. *See* Gov't Br. at 20. The public forum doctrine is not inapplicable simply because the government uses private rather than public property to establish a space for expression. *See, e.g.*, *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 555 (1975) (holding that a privately owned theater leased by a city was a public forum); *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977) (applying public forum doctrine to private campaign headquarters); *Davison*, 2017 WL 3158389, at *10 (applying public forum analysis to county official's Facebook page); *see*

*also Denver Area Ed. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 792 (1996) (Kennedy, J., concurring in part) (public fora are not "limited to property owned by the government"); *Cornelius*, 473 U.S. at 801 (noting that public forum analysis applies to "public property or private property dedicated to public use").

Defendants' last line of defense to the public forum claim—that the President has a "right" not to hear from critics, Gov't Br. at 17—is exactly backwards. The courts have repeatedly recognized our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," and they have repeatedly observed that this debate "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964); *see also Monitor Patriot Co. v. Roy*, 401 U.S. 265, 274 (1971); *Baumgartner v. United States*, 322 U.S. 665, 673–74 (1944). The suggestion that public officials enjoy a right to insulate themselves from criticism of their actions and policies is incorrect. Moreover, Defendants' argument that by blocking the Individual Plaintiffs and other critics the President is merely "select[ing] the information he consumes and the users with whom he wants to interact," Gov't Br. at 17, mischaracterizes the implications of Defendants' conduct. By blocking the Individual Plaintiffs, the President and his aides do not merely insulate the President from viewpoints to which he would prefer not to be exposed. They also prevent the Individual Plaintiffs from viewing the President's tweets, replying directly to those tweets, or viewing the comment threads associated with those tweets while they are logged into their Twitter accounts. Stip. ¶ 54.[8] Blocking also

---

[8] Defendants argue that there is no injury because "[a] blocked user can still post in the @realDonaldTrump comment threads." Gov't Br. at 6. However, this argument overlooks that a blocked user cannot reply to @realDonaldTrump—only to those who reply to him. Stip. ¶¶ 55–56. The difference is significant. *Id.* ¶ 56 ("[S]ome of the Plaintiffs have stopped replying to

interferes with the ability of Plaintiff Knight Institute and the public to read the Individual Plaintiffs' critical replies in the context of the public discourse taking place in those comment threads.[9]

### 2. Defendants' blocking of the Individual Plaintiffs from @realDonaldTrump is unconstitutional viewpoint discrimination.

The First Amendment forecloses the government from excluding individuals from a designated public forum based on viewpoint. *See, e.g.*, *Rosenberger*, 515 U.S. at 828, 829–30 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," and the government is forbidden from engaging in viewpoint discrimination "even when the . . . public forum is one of its own creation"); *Make The Road by Walking,* 378 F.3d at 143 (explaining that viewpoint discrimination is prohibited by the First Amendment even in limited and non-public forums); *Davison,* 2017 WL 3158389, at *10 (same).

Here, there is no dispute that Defendants blocked the Individual Plaintiffs because of their viewpoints. Moreover, the record makes clear that the injury to Plaintiffs' speech rights is tangible and real. As a result of the blocking, the Individual Plaintiffs cannot read or respond to

---

replies to @realDonaldTrump tweets altogether, while others reply less frequently than if they had not been blocked.").

[9] Defendants' actions also violate the First Amendment rights of the Knight Institute to receive the dissenting speech blocked by Defendants. *See, e.g.*, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion); *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972). Contrary to Defendants' argument, Gov't Br. at 5–7, the Knight Institute has standing to assert a First Amendment claim because it has suffered a particularized injury—injury to its right to receive information. *See Va. State Board of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) (holding that prescription drug consumers had standing to challenge state restriction on drug advertising as violating their right to receive information). "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 n.7 (2016). Nor is there any merit to Defendants' suggestion that the Knight Institute has not adequately alleged that it reads the comment threads on @realDonaldTrump. That fact can be inferred from the fact that the Knight Institute follows @realDonaldTrump. Stip. ¶ 1.

tweets from @realDonaldTrump while they are signed into their accounts. Stip. ¶ 28. All of the purported "workarounds" are burdensome and time-consuming. And the Individual Plaintiffs' speech is burdened in this way only because they made statements criticizing the President. No conceivable government interest could justify the imposition of this burden on Plaintiffs' core political speech. *See, e.g.*, *Tam*, 137 S. Ct. at 1765 ("[I]t is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys."); *Rosenberger*, 515 U.S. at 829 (observing that viewpoint discrimination is "blatant," "egregious," and presumptively unconstitutional).

## C.    Defendants are violating the First Amendment by restricting the Individual Plaintiffs' access to generally available government information based on their viewpoints.

Defendants' blocking of the Individual Plaintiffs from the @realDonaldTrump account violates the First Amendment for the independent reason that it imposes a viewpoint-based burden on the Individual Plaintiffs' access to government information that Defendants otherwise make generally available to the public. Plaintiffs do not contend that the First Amendment requires Defendants to make the @realDonaldTrump account accessible to the public at large. Having decided to make the President's statements generally available, however, Defendants cannot constitutionally restrict the Individual Plaintiffs from accessing those statements simply because the President disagrees with their views.

As the Supreme Court observed last term, "[t]he Government 'may not deny a benefit to a person on a basis that infringes [the First Amendment] even if he has no entitlement to that benefit.'" *Tam*, 137 S. Ct. at 1760–61 (quoting *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 133 S. Ct. 2321, 2328 (2013)). Applying this principle in *Tam*, the Supreme Court invalidated a statutory ban on the registration of "disparag[ing]" trademarks on the ground that

the restriction discriminated based on viewpoint. The Court invalidated the ban even though trademark holders do not have a freestanding right to the benefits of trademark registration. *Id.* at 1675, 1752–53.

The principle that the Court applied in *Tam* was endorsed by eight Justices of the Supreme Court fourteen years earlier, in *Los Angeles Police Department v. United Reporting Publishing Corporation*, 528 U.S. 32, 43 (1999). *United Reporting* involved a challenge to the LAPD's withholding of information concerning arrestees. The Court held that the plaintiffs lacked standing, but eight Justices made clear that the First Amendment foreclosed the government from using viewpoint as a criterion for withholding from some individuals information otherwise made accessible to all. *United Reporting*, 528 U.S. at 43 (Ginsburg, J., concurring) ("[O]nce a [government entity] decides to make such a benefit available to the public," it may not exclude potential recipients of that information on the basis of "an illegitimate criterion such as viewpoint."); *id.* at 42 (Scalia, J., concurring) (suggesting that an as-applied First Amendment challenge to "a restriction upon access that *allows* access to the press . . . but at the same time *denies* access to persons who wish to use the information for certain speech purposes" would be cognizable); *id.* at 45–46 (Stevens, J., dissenting) (opining that the First Amendment is violated "when the State makes information generally available, but denies access to a small disfavored class" based on viewpoint or political affiliation); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 569 (2011) (invalidating law that imposed content- and speaker-based restrictions on access to pharmacy prescription information and observing that "restrictions on the disclosure of government-held information can facilitate or burden the expression of potential recipients and so transgress the First Amendment"); *Am. Broad. Cos.*, 570 F.2d at 1083 ("We think that once there is a public function, public comment, and

participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable."); *Nicholas v. City of New York*, No. 15-cv-9592, 2017 WL 766905, at *5 (S.D.N.Y. Feb. 27, 2017) (holding that plaintiff stated "First Amendment claim based on the arbitrary or else viewpoint-based exclusion of some photographers" from accident scene).

The principle that the Supreme Court articulated in *United Reporting*, *Sorrell*, and *Tam* applies here. Defendants acknowledge that the @realDonaldTrump account includes government information. Stip. ¶¶ 32, 38; *see generally* Stip. Ex. A. They acknowledge that they have made the information available, without restriction, to the general public. Stip. ¶ 36. And they acknowledge that the Individual Plaintiffs have been burdened in accessing that information simply because the President disagrees with their political views. Stip. at 1. Collectively, these acknowledgements establish that Defendants are violating the First Amendment.

**D. Defendants' blocking of the Individual Plaintiffs imposes an unconstitutional restriction on their First Amendment right to petition the government for redress of grievances.**

Defendants' blocking of the Individual plaintiffs also violates the First Amendment because it imposes a viewpoint-based burden on their right "to petition the Government for a redress of grievances." U.S. Const. amdt. I. Though the right to speak and the right to petition are related, they are not duplicative: "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). Accordingly, the Supreme Court has counseled courts not to "presume . . . that Speech Clause precedents necessarily and in every case resolve Petition Clause claims." *Id.*; *see,*

*e.g.*, *BE & K Constr. Co. v. NRLB*, 536 U.S. 516, 536–37 (2002) (interpreting labor law to avoid infringement of right to petition as *Noerr-Pennington* doctrine did in antitrust law).

Defendants' blocking of the Individual Plaintiffs would violate the Petition Clause even if the @realDonaldTrump account were not a public forum, *see* Part I.B.1, *supra*, and even if Defendants' blocking of the Individual Plaintiffs were not an unconstitutional restriction of an access right otherwise extended to all, *see* Part I.C, *supra*. This is because the @realDonaldTrump account is, among other things, a channel through which ordinary citizens can petition the President directly about his administration's practices and policies. Indeed, the Supreme Court observed just last Term that Twitter's interactive features make the platform especially suited to this purpose. *Packingham*, 137 S. Ct. at 1735 ("[O]n Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner."); *cf. Mirabella v. Villard*, 853 F.3d 641, 647 (3d Cir. 2017) (addressing petition via email). Moreover, the Individual Plaintiffs were blocked after they used the channel for the purpose of petitioning the President about his administration's policies. *See* Stip. ¶¶ 46–52; *see Guarnieri*, 564 U.S. at 394–95 (noting that petitions "assume an added dimension when they seek to advance political, social, or other ideas of interest to the community as a whole").[10]

Plaintiffs do not contend that Defendants are required to make the @realDonaldTrump account available as a channel through which members of the public may exercise their Petition Clause rights. Nor do Plaintiffs contend that the First Amendment requires Defendants to

---

[10] The First Amendment protects the right to petition even when the right is exercised in a manner that officials deem to be offensive. *See, e.g.*, *U.S. Postal Serv. v. Hustler Magazine, Inc.*, 630 F. Supp. 867, 871 (D.D.C. 1986) ("As elected representatives of the people," members of Congress "cannot simply shield themselves from undesirable mail in the same manner as an ordinary addressee.") Thus, Defendants are wrong to propose that the President has a right to shield himself from constituent viewpoints he finds undesirable. *Cf.* Gov't Br. at 14, 17–18 (asserting the President's right "to choose the information he consumes and the individuals with whom he interacts . . . even when those choices are made on the basis of viewpoint").

respond to the public's petitions, or even to read them. Having made the channel available, however, Defendants cannot constitutionally close the channel solely to those who disagree with the President or his policies. *See Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 680 (1996) (noting that "the government has no legitimate interest in repressing" "ordinary citizens['] . . . viewpoints on matters of public concern"); *see Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *Mirabella*, 853 F.3d at 649–50 (holding retaliation for petition activity unconstitutional).

## II.     The Court has jurisdiction to provide relief in this case.

Contrary to Defendants' argument, the Court has jurisdiction to order the declaratory and injunctive relief necessary to remedy the First Amendment violations described above. The injuries that Plaintiffs have suffered here are quintessentially cognizable injuries in fact. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). They are traceable to Defendants' actions. Stip. ¶¶ 12, 46–54. And the relief sought—injunctive and declaratory relief against the President and his aides—would provide redress. *Chevron Corp. v. Donziger*, 833 F.3d 74, 120–21 (2d Cir. 2016). Citing the principle of separation of powers, Defendants contend that the President's unconstitutional conduct is beyond the reach of the Court. None of the precedents they cite supports this contention, and indeed to adopt it would turn the separation of powers on its head.

### A.     The Court has jurisdiction to order equitable relief against the President in this case.

Defendants argue that the President is above the law. He is not. It is the courts' constitutional duty "'to say what the law is' in particular cases and controversies," *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (quoting *Marbury v. Madison*, 1 Cranch 137,

177 (1803)), and this obligation is, if anything, especially crucial when the lawfulness of the President's conduct is at issue. *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) ("To hold that the political branches have the power to switch the Constitution on or off at will . . . would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say 'what the law is.'" (citation omitted)). In this case, Plaintiffs contend that the President and his aides have violated rights protected by the First Amendment, causing them concrete injury. Resolving disputes like this one is what the courts are for. *Raines v. Byrd*, 521 U.S. 811, 829 (1997) (the "irreplaceable value" of the core judicial power "lies in the protection it has afforded the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action." (citation omitted)).

Defendants' contention that the Court lacks authority to issue injunctive relief against the President is belied by Supreme Court precedent. "[I]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Clinton v. Jones*, 520 U.S. 681, 705 (1997) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 753–54 (1982)). The Supreme Court has observed that "the Judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and . . . it may direct appropriate process to the President himself" in appropriate cases. *Jones*, 520 U.S. at 705. Immunity is available only if the government justifies it in a particular context. *Forrester v. White*, 484 U.S. 219, 224 (1988). The courts recognize presidential immunity only where "the dangers of intrusion on the authority and functions of the Executive Branch" outweigh "the constitutional weight of the interest to be served" by the court's exercise of jurisdiction. ; *United*

*States v. Nixon*, 418 U.S. 683, 711–13 (1974)*Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982); *cf.*

*Forrester*, 484 U.S. at 224.

Here, the injury to Plaintiffs' constitutional rights is clear, and the weight of the

"constitutional . . . interest to be served" by the Court's exercise of jurisdiction is substantial, but

Defendants have failed to identify any specific "authority or function[] of the Executive Branch"

that could be compromised by the entry of injunctive relief. Nor could they. Enjoining the

President from excluding critics from his Twitter account would not interfere in any way with

the President's exercise of the powers that the Constitution vests in him, or with the discharge of

duties that the Constitution assigns to him. *Cf. United States v. Nixon*, 418 U.S. at 711–13

(weighing vindication of Fifth and Sixth Amendment rights against President Nixon's

"generalized interest in confidentiality" as it "relates to the effective discharge of a President's

powers"). The courts have enjoined past presidents in contexts involving far weightier executive

interests than those at issue here. *See, e.g.*, *id.* at 706 (affirming subpoena requiring President

Nixon to turn over tapes of his conversations with White House aides); *Youngstown Sheet &

Tube Co. v. Sawyer*, 535 U.S. 579, 582, 584, 587–88 (1952) (enjoining President Truman's order

directing the seizure of privately owned steel mills); *United States v. Burr*, 25 F. Cas. 187, 191,

196 (No. 14,694) (CC Va. 1807) (affirming issuance of subpoena requiring President Jefferson to

turn over confidential correspondence); *see also Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir.

1973) (discussing presidential immunity implications of *Youngstown* decision). Notwithstanding

Defendants' suggestion to the contrary, the Court's jurisdiction is not extinguished by the mere

invocation of presidential power. *United States v. Nixon*, 418 U.S. at 706 ("[N]either the doctrine

of separation of powers, nor the need for confidentiality of high-level communications, without

more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances.").

Defendants' reliance on *Mississippi v. Johnson*, 71 U.S. 475 (1866), is misplaced. In *Mississippi*, "[t]he single point" under the Court's consideration was whether "the President [could] be restrained by injunction from carrying into effect an act of Congress alleged to be unconstitutional." *Id.* at 498. The Court recognized that such an injunction would intrude not only upon the President's Article II duty to "see that the laws are faithfully executed," *id.* at 499, but also on Congress's Article I prerogative to pass legislation. The injunction Mississippi sought—in the immediate aftermath of the Civil War—thus threatened a fundamental constitutional conflict: if the President complied with the order, he risked impeachment for failure to execute the laws; if he did not comply, he risked imprisonment for contempt of court. *Id.* at 500–01.[11] The Court invoked the separation of powers to avoid this conflict, but in doing so, it expressly reaffirmed the judicial duty to decide cases and controversies—including those stemming from executive acts: "The Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its actions by the judicial department; *though the acts of both, when performed, are, in proper cases, subject to its cognizance.*" *Id.* at 500 (emphasis added); *accord Jones*, 520 U.S. at 703 (noting that the Court has "long held that when the President takes official action, [it] has the authority to determine whether he has acted within the law").[12]

---

[11] Two of the cases Defendants cite in support of immunity, Gov't Br. at 9, addressed similar requests for a court order directing or restraining the President's execution of laws passed by Congress. *See S.F. Redevelopment Agency v. Nixon*, 329 F. Supp. 672, 672 (N.D. Cal. 1971); *Suskin v. Nixon*, 304 F. Supp. 71, 72–73 (N.D. Ill. 1969).

[12] Defendants mischaracterize *Franklin v. Massachusetts*, 505 U.S. 788 (1992), as having "reaffirmed" the immunity principle from *Mississippi*. Gov't Br. at 8. Justice O'Connor's comment in *Franklin* that "injunctive relief against the President . . . should have raised judicial

This case does not present the kind of structural conflict that were presented in *Mississippi*; to the contrary, it presents exactly the kind of question that the *Mississippi* Court made clear the courts should resolve. Plaintiffs' claims here implicate neither Congress's authority to enact legislation nor the President's duty to implement it. Rather, Plaintiffs challenge specific acts, untethered from any constitutional or statutory duty, through which the President and his aides have denied and continue to deny the Plaintiffs' First Amendment rights to speak and petition on matters of public concern. Neither the Supreme Court nor the Second Circuit has ever held that the President enjoys blanket immunity from injunctive relief to remedy such ongoing constitutional violations.[13] The Court has the authority to enjoin the President here, and Plaintiffs respectfully request that the Court exercise that authority here. *Cf. Youngstown*, 343 U.S. at 655 ("With all its defects, delays and inconveniences," citizens "have discovered no technique for long preserving free government except that the Executive be under the law.") (Jackson, J., concurring).[14]

---

eyebrows" was dicta in the non-controlling, plurality part of the opinion addressing standing. Justice O'Connor ultimately concluded that the Court "need not decide whether injunctive relief against the President was appropriate" because the injury alleged could "be redressed by declaratory relief against the Secretary [of Commerce] alone." *Id.* at 803 (plurality opinion).

[13] The remaining cases Defendants cite in support of immunity, Gov't Br. at 9, fall into one of two categories: either the court ordered equitable relief against the President's subordinates in lieu of the President, *see, e.g.*, *Hawaii*, 859 F.3d at 788; *Swan v. Clinton*, 100 F.3d 973, 979–81 (D.C. Cir. 1996); or the court ruled against the plaintiffs on numerous other grounds, such that any conclusions regarding presidential immunity were unnecessary to the resolution of the case, *see, e.g.*, *McMeans v. Obama*, No. 11-cv-891, 2011 WL 6046634, at *3 (D. Del. Dec. 1, 2011); *Newdow v. Bush*, 355 F. Supp. 2d 265, 276–77 (2005).

[14] In a footnote, Defendants argue that the Court lacks authority to grant declaratory relief against the President, but the only authority they cite for this remarkable proposition is a concurrence from Justice Scalia. Gov't Br. at 10 n.4. Neither the Supreme Court nor the Second Circuit has ever held that the President is immune from declaratory relief.

**B.    Plaintiffs have standing to obtain relief against other Defendants.**

The Court also has jurisdiction to provide injunctive and declaratory relief against the President's aides. Defendants do not argue that the President's aides are entitled to immunity here. They argue, instead, that the Court cannot issue equitable relief against these defendants because Plaintiffs' injuries are not traceable to their acts. Gov't Br. at 7. This argument fails as a matter of both fact and law.

The Supreme Court and lower courts have recognized that executive aides and other subordinates may be ordered to redress injuries caused by the President's actions, regardless of whether those aides were personally responsible for those injuries. Even where the challenged action was within the President's sole discretion—or "where the President personally denoted an Executive action or omission as his own"—the courts have directed injunctive relief toward lower executive officials as a "matter of comity," "even though the effect of the process is to restrain or compel the President." *Nixon v. Sirica*, 487 F.2d at 709; *see Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion) (concluding that declaratory relief against the Secretary of Commerce would likely redress the apportionment injury caused by an action within the President's sole responsibility); *Youngstown*, 343 U.S. at 582, 589 (affirming injunction against Secretary of Commerce from carrying out executive order); *Swan v. Clinton*, 100 F.3d 973, 979 (D.C. Cir. 1996) (concluding that "injunctive relief against [subordinate] officials alone could provide Swan with an adequate remedy, despite the fact that only the President has the power to officially. . . reinstate Swan"). Accordingly, the Court has jurisdiction to issue injunctive relief against President Trump's aides whether or not they personally blocked the Individual Plaintiffs from the @realDonaldTrump account. *Cf. Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . 'generally represent only another way of

32

pleading an action against an entity of which an officer is an agent'" and therefore are, "in all respects other than name, to be treated as a suit against the entity." (citation omitted)); *D'Alessandro v. City of New York*, No. 17-594-cv, 2017 WL 4641256, at *5 (2d Cir. Oct. 17, 2017) (same).

In any event, Defendant Scavino, at least, is personally involved in the conduct that results in Plaintiffs' continuing injuries. He "assists President Trump in operating the @realDonaldTrump account, including by drafting and posting tweets to the account." Stip. ¶ 39; *see also id.* ¶ 12. He has the access and ability to block and unblock users from the account. *Id.* ¶ 12. Whatever role Mr. Scavino played in the initial blocking of the Individual Plaintiffs, the joint stipulation makes clear that he has the power to unblock them, and that by failing to unblock them he is contributing to their ongoing injuries. The joint stipulation makes clear, in other words, that Plaintiffs' injuries are fairly traceable to Mr. Scavino's actions. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (the requirement that Plaintiffs' injuries be "fairly traceable" to the challenged actions of Defendants "does not create an onerous standard").

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to summary judgment on all of their claims.

November 3, 2017

Jessica Ring Amunson (*pro hac vice*)
Tassity S. Johnson (*pro hac vice*)
Jenner & Block LLP
1099 New York Avenue, NW,
Suite 900
Washington, DC 20001

Respectfully submitted,

  */s/ Jameel Jaffer*
Jameel Jaffer (JJ-4653)
Katherine Fallow (KF-2535)
Carrie DeCell (application for admission
    forthcoming)
Alex Abdo (AA-0527)
Knight First Amendment Institute at Columbia
    University

314 Low Library
535 West 116th Street
New York, NY 10027
(212) 854-9600
jameel.jaffer@knightcolumbia.org