# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

KNIGHT FIRST AMENDMENT INSTITUTE
AT COLUMBIA UNIVERSITY, *et al.*,

       *Plaintiffs*,

  v.

DONALD J. TRUMP, President of the United
States, *et al.*,

       *Defendants*.

No. 17-cv-5205 (NRB)

## BRIEF OF *AMICI CURIAE* FIRST AMENDMENT LEGAL SCHOLARS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Joshua A. Geltzer
Amy L. Marshak
Daniel B. Rice
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Ave NW
Washington, DC 20001
(202) 662-9042
jg1861@georgetown.edu

*Counsel for Amici Curiae First Amendment Legal
Scholars*

## Table of Contents

INTERESTS OF *AMICI CURIAE* ................................................................1

INTRODUCTION ........................................................................................1

ARGUMENT ..............................................................................................3

    A.  Government-owned and government-controlled channels of communication that are designed for expressive use and generally open to the public are public fora ........3

    B.  Social media applications are designed for broad public access and dialogue..............6

    C.  Defendants' use of the @realDonaldTrump Twitter account demonstrates their intent to create a designated public forum ...................................................8

    D.  By blocking Twitter users based on their critical tweets, defendants engaged in forbidden viewpoint discrimination.........................................................13

    E.  Failing to recognize that President Trump's Twitter feed is a public forum would permit the government to silence critics, mislead the public as to how the government is viewed, and chill dissent ...................................................16

CONCLUSION..........................................................................................20

**Table of Authorities**

**Cases**

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)..................................................................................... 5, 9, 12, 13

*Associated Press v. United States*,
326 U.S. 1 (1945)................................................................................................. 17

*Byrne v. Rutledge*,
623 F.3d 46 (2d Cir. 2010).................................................................................. 11

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings College of Law v. Martinez*,
561 U.S. 661 (2010)............................................................................................ 14

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)........................................................................................3, 4, 5, 17

*Davison v. Loudoun County Bd. of Supervisors*,
No. 1:16cv932, 2017 WL 3158389 (E.D. Va. July 25, 2017) ..................................7, 11, 14, 18

*Garrison v. Louisiana*,
379 U.S. 64 (1964).............................................................................................14

*Hague v. Comm. for Indus. Org.*,
307 U.S. 496 (1939).............................................................................................3

*hiQ Labs, Inc. v. LinkedIn Corp.*,
No. 17-cv-03301-EMC, 2017 WL 3473663 (N.D. Cal. Aug. 14, 2017) ...................................7

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992)........................................................................................5, 10, 20

*Liverman v. City of Petersburg*,
844 F.3d 400 (4th Cir. 2016) ...................................................................................7

*Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*,
429 U.S. 167 (1976)...........................................................................................18

*Marsh v. Alabama*,
326 U.S. 501 (1946)...........................................................................................10

*Matal v. Tam*,
137 S. Ct. 1744 (2017).........................................................................................19

*Packingham v. North Carolina*,
137 S. Ct. 1730 (2017).......................................................................................2, 6, 7, 10

*Page v. Lexington County Sch. Dist. One*,
   531 F.3d 275 (4th Cir. 2008) ....................................................................................11

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983) ................................................................................2, 3, 4, 9

*Police Dep't of Chicago v. Mosley*,
   408 U.S. 92 (1972) ....................................................................................13

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) ................................................................................5, 10, 13

*Reno v. ACLU*,
   521 U.S. 844 (1997) ..........................................................................6, 12, 14, 15

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ........................................................................4, 13, 17, 20

*Saia v. New York*,
   334 U.S. 558 (1948) ....................................................................................16

*Se. Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975) ................................................................................4, 10

*Sutliffe v. Epping Sch. Dist.*,
   584 F.3d 314 (1st Cir. 2009) ..........................................................................15

*Twitter, Inc. v. Sessions*,
   No. 14-cv-04480-YGR, 2017 WL 2876183 (N.D. Cal. July 6, 2017) ....................................7

*United States v. Am. Library Ass'n*,
   539 U.S. 194 (2003) ....................................................................................6

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   135 S. Ct. 2239 (2015) ................................................................................5, 12

*Widmar v. Vincent*,
   454 U.S. 263 (1981) ....................................................................................4

## Other Authorities

Seva Gunitsky, *Corrupting the Cyber-Commons: Social Media as a Tool of Autocratic Stability*, Perspectives on Politics, Mar. 2015, at 42 ................................................................19

Lyrissa Lidsky, *Public Forum 2.0*, 91 B.U. L. Rev. 1975, 1996 (2011) ................................10, 16

Nolan D. McCaskill, *Trump Credits Social Media for His Election*, Politico, Oct. 20, 2017, https://www.politico.com/story/2017/10/ 20/trump-social-media-election-244009 ................8

Arch Puddington, *Breaking Down Democracy: Goals, Strategies, and Methods of Modern Authoritarians* (June 2017), Freedom House, https://freedomhouse.org/sites/default/files/June2017_FH_Report_Breaking_Down_Democracy.pdf ...................................19

Mallory Shelbourne, *ACLU Sues Maryland, Kentucky Governors over Social Media Censorship*, The Hill, Aug. 1, 2017, http://thehill.com/legal/ 344793-aclu-files-lawsuit-against-maryland-kentucky-governors-over-social-media-censorship ......................18

*Woman Says Greitens Blocked Her for Using Puke Emoji*, Tennessean, Oct. 7, 2017, http://www.tennessean.com/story/news/politics/2017/10/07/woman-says-greitens-blocked-her-using-puke-emoji/743104001/ ...............................................................18

*About*, Twitter, https://about.twitter.com/ .......................................................................8

*Company*, Twitter, https://about.twitter.com/en_us/company.html ...............................8

*Inclusion and Diversity*, Twitter, https://careers.twitter.com/en/diversity.html ............8

*Muting Accounts on Twitter*, Twitter, https://support.twitter.com/articles/20171399 ..................14

*Our Values*, Twitter, https://about.twitter.com/en_us/values.html .................................8

## INTERESTS OF *AMICI CURIAE*[1]

The following *amici* legal scholars are experts in the First Amendment (affiliations are listed for identification purposes only):

- Erwin Chemerinsky, Dean and Jesse H. Choper Distinguished Professor of Law, University of California, Berkeley, School of Law

- Genevieve Lakier, Assistant Professor of Law, University of Chicago Law School

- Lyrissa Lidsky, Dean and Judge C.A. Leedy Professor of Law, University of Missouri School of Law

- Laurence H. Tribe, Carl M. Loeb University Professor and Professor of Constitutional Law, Harvard Law School

- Rebecca Tushnet, Frank Stanton Professor of First Amendment Law, Harvard Law School

- Sonja R. West, Otis Brumby Distinguished Professor in First Amendment Law, University of Georgia School of Law

- Tim Wu, Isidor and Seville Sulzbacher Professor of Law, Columbia Law School

These *amici* have taught courses in constitutional law or the First Amendment, have published articles and books on these topics, and have dedicated significant attention to the study of First Amendment freedoms.  Based on their experience, *amici* are concerned that failing to recognize President Trump's @realDonaldTrump Twitter feed as a public forum would threaten critical First Amendment values.

## INTRODUCTION

Across all levels of government, public officials increasingly turn to social media to communicate directly with their constituents and engage in discussions on the important policy issues of the day.  On Twitter, thousands of people may participate in a single conversation

---

[1] The parties have consented to the filing of this brief.  No counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici* and their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

thread on a government official's account, with millions more following the conversation from their homes and offices—allowing individuals to amplify their voices and participate in public discourse in new and powerful ways.  Never before have conversations between government officials and the people they represent been more accessible or inclusive.  It is not surprising, therefore, that courts have recognized the critical role that Twitter, Facebook, and other social media sites play in contemporary life as "the modern public square."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

But the open public discourse that social media sites like Twitter have been designed to promote is being threatened by public officials' increasingly common efforts to prevent other users who criticize them and their policies from accessing the officials' accounts.  These efforts harm the blocked users by denying them the opportunity to participate fully in the rapid, ongoing conversations occurring on social media.  But more fundamentally, efforts to block users based on their criticism of the government threaten the very dangers that the First Amendment's ban on viewpoint discrimination seeks to prevent: allowing the government to silence its critics, foster warped perceptions of officials' popularity, and chill dissenting voices who may avoid speaking out for fear of reprisal.

As will be shown in this brief, under the Supreme Court's precedents, President Trump's @realDonaldTrump Twitter feed qualifies as a public forum—a public space owned or controlled by the government that has been opened to the general public to engage in expressive activity—in which the government is forbidden to engage in viewpoint discrimination.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).  By opening the @realDonaldTrump Twitter feed to the general public, utilizing Twitter's speech-enhancing features, and engaging in a robust back-and-forth with commenters, defendants have

demonstrated their intent to designate the feed as a public forum.  Defendants therefore violated

plaintiffs' First Amendment rights by blocking them from following and replying to

@realDonaldTrump because of their criticism of the President and his policies.  It is imperative

to protect robust democratic dialogue occurring online from this kind of government

manipulation and exploitation.

## ARGUMENT

### A. Government-owned and government-controlled channels of communication that are designed for expressive use and generally open to the public are public fora.

In the early twentieth century, the Supreme Court recognized that the First Amendment

requires the government to maintain certain types of government-owned and government-

controlled spaces as public fora, open to all for purposes of speech and assembly.  *See Hague v.*

*Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) ("Wherever the title of streets and parks may

rest, they have immemorially been held in trust for the use of the public and, time out of mind,

have been used for purposes of assembly, communicating thoughts between citizens, and

discussing public questions.  Such use of the streets and public places has, from ancient times,

been a part of the privileges, immunities, rights, and liberties of citizens.").  In *Perry Education*

*Association v. Perry Local Educators' Association*, the Court formalized a doctrinal structure for

identifying those types of public spaces in which the government is limited in its ability to

restrict First Amendment activity, dividing such spaces into "three types of fora: the traditional

public forum, the public forum created by government designation, and the nonpublic forum."

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985).

"Traditional public fora are those places which 'by long tradition . . . have been devoted

to assembly and debate.' . . . Public streets and parks fall into this category."  *Id.* (quoting *Perry*,

460 U.S. at 45).  "In addition to traditional public fora, a public forum may be created by

3

government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Id.* Although the government is neither "required to create" a designated forum "in the first place," nor "required to indefinitely retain [its] open character . . . , as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry*, 460 U.S. at 45–46.  For both traditional and designated public fora, "[r]easonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Id.* at 46.  But the government is forbidden "to exercise viewpoint discrimination, even when the . . . forum is one of its own creation." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  In nonpublic fora—that is, "[p]ublic property which is not by tradition or designation a forum for public communication"—"the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46.

"The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802.  In order to discern the government's intent, courts look to "the policy and practice of the government" with respect to its use of the property, "the nature of the property," and "its compatibility with expressive activity." *Id.*  Applying these principles, the Court has noted that a public forum is a venue that is "generally open to the public." *Widmar v. Vincent*, 454 U.S. 263, 268 (1981).  Moreover, a public space that is "designed for and dedicated to expressive activities," *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975), or that "has as a principal purpose . . . the free exchange of ideas," *Int'l Soc'y for Krishna Consciousness,*

*Inc. v. Lee* (*ISKCON*), 505 U.S. 672, 679 (1992) (quoting *Cornelius*, 473 U.S. at 800),

presumptively qualifies as a public forum.  More generally, government property that serves

multiple functions may qualify as a public forum so long as "the open access and viewpoint

neutrality commanded by the [forum] doctrine is 'compatible with the intended purpose of the

property.'"  *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673 (1998) (quoting *Perry*,

460 U.S. at 49).  By contrast, "where the principal function of the property would be disrupted

by expressive activity," courts will not find that the government has intended to create a public

forum.  *Cornelius*, 473 U.S. at 804.

Certain categories of government-owned and government-controlled property are not

scrutinized under the forum doctrine.  First, when the government engages in its own speech, it is

entitled to "speak for itself" and to "select the views that it wants to express"; therefore, "the

Free Speech Clause has no application," and distinctions based on viewpoint are permitted.

*Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) (internal quotation marks

omitted).  In determining whether it is the government speaking, rather than private parties,

courts have looked to factors such as whether the communication conveys a message from the

government, whether the speech is "closely identified in the public mind" with the government,

and whether the government maintains "control over the messages conveyed."  *Walker v. Tex.*

*Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2248–49 (2015).

Additionally, because of their responsibility to curate content to fill scarce space, public

broadcasters and public libraries generally fall outside the forum doctrine, allowing them to draw

greater distinctions based on content and viewpoint.  *See, e.g.*, *Forbes*, 523 U.S. at 673 ("In the

case of television broadcasting, . . . broad rights of access for outside speakers would be

antithetical, as a general rule, to the discretion that stations and their editorial staff must exercise

to fulfill their journalistic purpose and statutory obligations."); *United States v. Am. Library Ass'n*, 539 U.S. 194, 204 (2003) (plurality op.) ("To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons.").

This case, as will be shown below, involves neither of these exceptions to the public forum doctrine, which applies squarely to the @realDonaldTrump Twitter feed and consequently bars viewpoint discrimination there.

**B. Social media applications are designed for broad public access and dialogue.**

The Internet has wrought a transformative shift in American public life. Exchanges that once occurred on sidewalks and street corners have been channeled into social media and other tools of mass connectivity. Having dramatically lowered the barriers to public participation, the Internet has amplified the voices of individual citizens and rendered elected officials instantly accountable. It has never been easier to hear from, speak to, or opine about local, state, and national policymakers and their policies.

Courts have appreciated the democratizing potential of cyberspace ever since their earliest encounters with the medium. Two decades ago, the Supreme Court described the Internet as "a vast platform from which to address and hear from a worldwide audience." *Reno v. ACLU*, 521 U.S. 844, 853 (1997). In providing "relatively unlimited, low-cost capacity for communication of all kinds," the Internet enables virtually anyone to "become a town crier with a voice that resonates farther than it could from any soapbox." *Id.* at 870.

More recently, the Court identified the Internet—and "social media in particular"—as "the most important place[] . . . for the exchange of views" in contemporary life. *Packingham*, 137 S. Ct. at 1735. As an instrument for "speaking and listening in the modern public square," social media affords "perhaps the most powerful mechanisms available to a private citizen to

make his or her voice heard." *Id.* at 1737; *see also Liverman v. City of Petersburg*, 844 F.3d 400, 407–08 (4th Cir. 2016) ("A social media platform amplifies the distribution of the speaker's message . . . ."). Users employ these tools to "engage in a wide array of protected First Amendment activity." *Packingham*, 137 S. Ct. at 1735–36.

Accordingly, courts "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Id.* at 1736. The Supreme Court's classification of cyberspace as "the modern public square" "embraces the social norm that assumes the openness and accessibility of that forum to all comers." *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-cv-03301-EMC, 2017 WL 3473663, at *7 (N.D. Cal. Aug. 14, 2017), *appeal docketed*, No. 17-16783 (9th Cir. Sept. 6, 2017). Governmental restrictions on the use of social media—a "vital, developing forum"—cannot be excused simply because "alternative channels" exist to transmit and receive information. *Davison v. Loudoun County Bd. of Supervisors*, No. 1:16cv932, 2017 WL 3158389, at *12 (E.D. Va. July 25, 2017), *appeal docketed*, No. 17-2002 (4th Cir. Aug. 29, 2017).

Twitter, the medium at issue in this case, exemplifies the civic dynamism of social-networking tools. In many ways, "Twitter acts as the modern, electronic equivalent of a public square." *Twitter, Inc. v. Sessions*, No. 14-cv-04480-YGR, 2017 WL 2876183, at *8 (N.D. Cal. July 6, 2017). Its users converse openly with one another on urgent social and political issues, inviting real-time responses from interested contributors. These discussions increasingly involve policymakers themselves: Twitter enables Americans to "petition their elected representatives and otherwise engage with them in a direct manner." *Packingham*, 137 S. Ct. at 1735. Indeed, because of the platform's prominence, "Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose." *Id.* President Trump has even claimed,

"without social media, I'm not sure that I'd be here today." Nolan D. McCaskill, *Trump Credits Social Media for His Election*, Politico, Oct. 20, 2017, https://www.politico.com/story/2017/10/20/trump-social-media-election-244009.

Twitter's vast capacity to stimulate civic discourse is by design. Twitter's corporate ethos emphasizes "free expression" and the power of "every voice . . . to impact the world," and its public mission is to "[g]ive everyone the power to create and share ideas and information instantly, without barriers." *Our Values*, Twitter, https://about.twitter.com/en_us/values.html; *Company*, Twitter, https://about.twitter.com/en_us/company.html. As Twitter explains on its website, "[p]eople come to Twitter to freely express themselves," to "[s]park a global conversation," and to "[s]ee every side of the story." *Inclusion and Diversity*, Twitter, https://careers.twitter.com/en/diversity.html; *About*, Twitter, https://about.twitter.com/.

### C. Defendants' use of the @realDonaldTrump Twitter account demonstrates their intent to create a designated public forum.

President Trump has taken advantage of the core conversational features of the social media environment, demonstrating his intent to designate the @realDonaldTrump Twitter feed as a public forum. Although it is true that defendants use the platform to express President Trump's own views and provide information to his followers—which the government claims renders the entire @realDonaldTrump feed purely government speech—they do so as part of the broader conversations taking place on the feed. In this way, the comment threads that appear on the @realDonaldTrump feed have become popular and important fora for public debate by, about, and even with the President regarding his policies.

Although President Trump "was not required to create the forum in the first place," he has chosen to use the @realDonaldTrump feed as a venue that is "open for use by the general public." *Perry*, 460 U.S. at 45, 47. "The @realDonaldTrump account is generally accessible to

the public at large"—including the President's 35 million followers—"without regard to political affiliation or any other limiting criteria."  Stipulation ¶ 36, Sept. 25, 2017, ECF No. 28-1.  The President has not opted to "protect" his tweets—*i.e.*, make them accessible only to his followers, *id.* ¶ 27—or generally to limit which users can follow @realDonaldTrump.  "The only accounts that cannot follow @realDonaldTrump are those that the President has blocked."  *Id.* ¶ 36.

Not only is the @realDonaldTrump feed generally open to all comers, but President Trump has fostered an environment for debate through his use of the account.  "Typically, tweets from @realDonaldTrump generate thousands of replies from members of the public, and some of those replies generate hundreds or thousands of replies in turn," *id.* ¶ 41; "[h]is tweets frequently receive 15,000–20,000 retweets or more," *id.* ¶ 42; and it is common for his tweets "to approach 100,000 likes," *id.*  And these responses are not the end of the conversation.  Rather, using the @realDonaldTrump account, President Trump frequently has tweeted in response to replies to his prior tweets, to replies to other users' tweets, and even to other users' tweets that do not mention @realDonaldTrump.  He also has retweeted other users' tweets, whether or not those were replies to @realDonaldTrump tweets, and whether or not they mentioned @realDonaldTrump.[2]  In this way, defendants' use of the @realDonaldTrump account resembles not government speech but a town hall meeting.

Additionally, viewpoint-neutral access to the @realDonaldTrump Twitter feed is clearly "compatible with the intended purpose" of the feed, *Forbes*, 523 U.S. at 673, as Twitter users understand that the "principal purpose" of the site is to promote "the free exchange of ideas,"

---

[2] A brief review of the @realDonaldTrump Twitter feed offers examples of each of these categories of responses to others' commentary.  *See, e.g.*, https://twitter.com/realDonaldTrump/status/ 915890821228048385 (Oct. 5, 2017) (thanking another user for a positive comment); https://twitter.com/ realDonaldTrump/status/910454516557983744 (Sept. 20, 2017) (responding to a flattering reply to @realDonaldTrump); https://twitter.com/ realDonaldTrump/status/ 860088511202029569 (May 4, 2017) (responding to a tweet that does not mention @realDonaldTrump).

*ISKCON*, 505 U.S. at 679.  And, even beyond what would be possible in a physical forum, the @realDonaldTrump feed is "capable of accommodating a large number of public speakers without defeating the essential function of . . . the program."  *Summum*, 555 U.S. at 478.

Contrary to the government's position, the President's feed does not fall outside the public forum doctrine simply because the government does not formally "own" the @realDonaldTrump Twitter account and did not design the digital environment and tools that allow the site to function as "the modern public square."  *Packingham*, 137 S. Ct. at 1737.  As noted above, defendants have affirmatively chosen to use Twitter's speech-enhancing features, and the government cannot avoid the strictures imposed on public fora merely by renting a suitable space to hold its public meetings, rather than hosting meetings in space it owns.  *Cf. Conrad*, 420 U.S. at 547, 555 (finding a privately owned theater under long-term lease to a city to be a "public forum[] designed for and dedicated to expressive activities"); *Marsh v. Alabama*, 326 U.S. 501, 507 (1946) (applying the public forum doctrine to streets in a company-owned town; "[w]hether a corporation or a municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free").  *See generally* Lyrissa Lidsky, *Public Forum 2.0*, 91 B.U. L. Rev. 1975, 1996 (2011) ("[G]overnment ownership is not a *sine qua non* of public forum status.").  President Trump and his employees are the exclusive users of the @realDonaldTrump account, and they, not Twitter, exercise effective control over the public's access to the feed and its ability to interact with the President there.  Moreover, members of the public interacting with President Trump through the @realDonaldTrump feed understand themselves to be directly addressing the government and its policies on an official feed, just as they would through the @POTUS and @WhiteHouse feeds—which the government acknowledges have official status,

even though they too operate using tools provided by a private corporation.  *See* Defs.' Memo. of Law in Supp. of Mot. for Summ. J. 12 n.6, 23 n.10, Oct. 13, 2017, ECF No. 35.

Indeed, on similar facts, the Eastern District of Virginia recently applied forum analysis to hold that a local government official had acted unconstitutionally in blocking a constituent's access to the official's Facebook page because of the constituent's critical comments about other local officials.  *See Davison*, 2017 WL 3158389.  In reaching this conclusion, the court recognized that, "[w]hen one creates a Facebook page, one generally opens a digital space for the exchange of ideas and information."  *Id.* at *10.  Because the official had "allowed virtually unfettered discussion" on her Facebook page and had solicited comments from her constituents, the court concluded, the official's actions qualified as a "governmental 'designation of a place or channel of communication for use by the public'" that was "more than sufficient to create a forum for speech."[3]  *Id.* (quoting *Cornelius*, 473 U.S. at 802); *cf. Page v. Lexington County Sch. Dist. One*, 531 F.3d 275, 284 (4th Cir. 2008) (suggesting that forum analysis would be appropriate if a government website included "a type of 'chat room' or 'bulletin board' in which private viewers could express opinions or post information").

Although the government contends that defendants' use of the @realDonaldTrump account is solely government speech, the unregulated breadth of the expressive activity here differentiates this case from other venues in which the Supreme Court has deemed government

---

[3] Because, as is detailed below, defendants engaged in viewpoint discrimination in blocking plaintiffs, the Court need not reach the question whether the @realDonaldTrump Twitter feed qualifies as a designated or limited public forum.  The *Davison* court declined to identify the specific type of forum at issue because "the record demonstrate[d] that Defendant engaged in viewpoint discrimination by banning Plaintiff from her Facebook page," and "[v]iewpoint discrimination is prohibited in all forums."  *Davison*, 2017 WL 3158389, at *10 (internal quotation marks omitted).  In light of the blurred lines between the categories of "designated public forum," "limited public forum," and "nonpublic forum opened to certain kinds of speakers or to the discussion of certain subjects," the Second Circuit has taken a similar approach where, as here, the government has engaged in prohibited viewpoint discrimination.  *Byrne v. Rutledge*, 623 F.3d 46, 54 n.8 (2d Cir. 2010) (internal quotation marks omitted).

activity to be its own speech.  In contrast to true government speech, no one would confuse other users' expressive activities displayed on the @realDonaldTrump feed as conveying a message from the government, associate the commentary with the government, or assume the government maintains "control over the messages conveyed" by other users.  *Walker*, 135 S. Ct. at 2248–49. Rather, as the Supreme Court has recognized, forum analysis is the appropriate lens through which to view a venue in which "private parties, and *not only the government*, use[] the system to communicate."  *Id.* at 2252 (emphasis added).  That is precisely what occurs on the @realDonaldTrump feed.

The Court's case law regarding public broadcasters also supports the conclusion that the @realDonaldTrump feed is a government forum.  Although public broadcasters generally are not subject to scrutiny under the forum doctrine, in *Forbes* the Court found candidate debates to be an exception to this rule, reasoning that a debate is "by design a forum for political speech by the candidates . . . with minimal intrusion by the broadcaster."  523 U.S. at 675.  Twitter users responding to President Trump's tweets participate in discussions on important policy topics with virtually no editorial intrusion, and Twitter allows for far broader participation than a televised debate.  Thus, Twitter and other interactive social media fit within the public forum rubric, not the more deferential doctrines generally applicable to traditional media.  *Cf. Reno*, 521 U.S. at 868–69 (declining to treat speech on the "vast democratic forums" of the Internet similarly to broadcast media).

Most fundamentally, motivating the Court's decisions in government speech and public broadcasting cases is a concern that demanding open access ultimately would be more speech-restrictive because such a requirement likely would lead the government to close the venue entirely.  *See, e.g.*, *Summum*, 555 U.S. at 480 ("[W]here the application of forum analysis would

lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place."); *Forbes*, 523 U.S. at 680–81 (finding a nonpublic forum where wholly open access could "result in less speech, not more," because, "[w]ere it faced with the prospect of cacophony, on the one hand, and First Amendment liability, on the other, a public television broadcaster might choose not to air candidates' views at all").  Here, by contrast, forbidding the President to block people is the more speech-enhancing course.  Given his millions of Twitter followers, the thousands of participants in many of the comment threads on his feed, and the value that President Trump himself has placed on his ability to interact directly with the public, it strains belief that defendants would shut down the entire forum over the inability to silence those who disagree with the President.  Thus, there is no inherent incompatibility between the government activity at issue—maintaining and using the @realDonaldTrump account—and allowing access to anyone who wishes to participate in the conversation.

### D.  By blocking Twitter users based on their critical tweets, defendants engaged in forbidden viewpoint discrimination.

It is well established that the government is forbidden from engaging in viewpoint discrimination in a public forum.  *See, e.g.*, *Rosenberger*, 515 U.S. at 829.  "[G]overnment may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."  *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

Here, the government does not contest that "the Individual Plaintiffs were blocked from the President's Twitter account because the Individual Plaintiffs posted tweets that criticized the President or his policies."  Stipulation at 1.  Prohibiting users from exercising the full breadth of their free speech rights because of their opposition to the President or his policies is "the

quintessential form of viewpoint discrimination against which the First Amendment guards."[4]
*Davison*, 2017 WL 3158389, at *11.  As the Supreme Court has recognized, "speech concerning public affairs is more than self-expression; it is the essence of self-government.  The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'"  *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

The fact that plaintiffs may be able to express their views elsewhere on Twitter or on the Internet does not alleviate the injuries they have suffered.  "If restrictions on access to a . . . public forum are viewpoint discriminatory, the ability of a group to exist outside the forum would not cure the constitutional shortcoming."  *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings College of Law v. Martinez*, 561 U.S. 661, 690 (2010); *see also Reno*, 521 U.S. at 879–80 (rejecting the government's suggestion that, under the statute at issue, the speaker's ability to post content elsewhere on the Internet would suffice to cure the constitutional harm).  Although plaintiffs can take additional steps to view @realDonaldTrump tweets and can participate in the ensuing conversations to some degree, these burdensome workarounds prevent the blocked users from engaging in the forum on the same terms as other Twitter users.  *See* Stipulation ¶¶ 55, 60.

---

[4] Outright blocking also was unnecessary, even if the President wished not to view unfavorable messages from individual accounts.  Twitter allows users to "mute" other accounts, meaning that tweets, replies, and notifications from those persons will no longer be visible to the user who mutes them, although others may continue to view the content.  *See Muting Accounts on Twitter*, Twitter, https://support.twitter.com/articles/20171399.  The incremental effect of blocking, then, is to impose burdens on the blocked users' participation and on other users' access to their commentary.

Four individual harms are particularly acute in the context of the kind of dialogue that Twitter promotes.  First, blocked users cannot see President Trump's tweets in real-time—whether through "push" notifications or by scrolling through their own feeds—which may delay their ability to access the President's statements.  *Id.* ¶ 55.  In the context of the rapid interactions that occur over Twitter and other social media, the absence of instant notification may impede users' efforts to shape the public dialogue on a given issue.  *Cf. Reno*, 521 U.S. at 870 (emphasizing the ability to engage in "interactive, real-time dialogue" as a reason why online speech merits broad First Amendment protection).

Second, there is special value in being able to retweet @realDonaldTrump tweets, with commentary, to one's hard-won Twitter audience.  Blocked users are precluded from sharing their interpretations of the President's words, juxtaposed with the underlying messages, to their existing follower bases.  Nor can they retweet older @realDonaldTrump tweets to expose perceived inconsistencies between his current and former public statements.  Both the blocked users and the broader public suffer from this distortion in the marketplace of ideas.

Third, because a blocked user's reply cannot be seen on the feed of the blocking user, his or her commentary is excluded from the @realDonaldTrump feed.  This exclusion harms the blocked user because "there is a significant benefit to public debate in allowing a citizen to express his or her views in the same place as the government.  To force a citizen to express his or her views elsewhere on the internet would be akin to banishing a citizen from making his views known in city hall, but instead on a street corner outside the building."  *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 339 (1st Cir. 2009) (Torruella, J., concurring in part and dissenting in part).

Fourth, in light of social media's importance to modern life, President Trump's practice of blocking individual users robs them of a singularly valuable opportunity to make their speech

heard.  "Given the number of followers that President Trump has on Twitter and the level of

engagement with his tweets, the comment threads that appear beneath each of his tweets are seen

by a very large number of people. . . . A reply near the top of the reply thread of [the] account . . .

is likely to be seen many thousands of times," and a user "may gain more followers as a result."

Stipulation ¶ 44.  In this way, access to the @realDonaldTrump feed acts as a modern-day

loudspeaker, amplifying the speaker's message in a way he or she is unable to accomplish

otherwise.  *Cf. Saia v. New York*, 334 U.S. 558, 560–61 (1948) (striking down a municipal

ordinance which forbade the use of sound amplification devices except with official permission

because it placed the use of an "indispensable instrument[] of effective public speech" in the

"uncontrolled discretion" of the government).

### E.   Failing to recognize that President Trump's Twitter feed is a public forum would permit the government to silence critics, mislead the public as to how the government is viewed, and chill dissent.

The stakes in this case are high.  While defendants' use of Twitter may be novel for

government officials in the United States, their approach foreshadows a sharp deterioration in

political engagement if officials need not abide by the First Amendment's vital constraints in

maintaining multidirectional messaging platforms.[5]  This Court's decision will begin to

determine whether that engagement will remain a genuine exchange of ideas or, instead, devolve

into a self-selected, one-sided cheerleading exercise.

It is axiomatic that free expression and the debate it facilitates are at the heart of

democratic self-governance.  That debate occurs, critically, in government-generated public fora.

"In addition to furthering the First Amendment rights of individuals, the use of government

---

[5] As plaintiffs allege, defendants' viewpoint discrimination implicates not only the public forum doctrine, but also the right of citizens to petition government for redress of grievances.  The Petition Clause guarantees the right to speak to those empowered to take action in response, thereby promoting governmental accountability to the electorate.  *See* Lidsky, *supra*, at 2009–10.

property for expressive activity helps further the interests that freedom of speech serves for society as a whole: it allows the uninhibited, robust, and wide-open debate about matters of public importance that secures an informed citizenry; it permits the continued building of our politics and culture; it facilitates political and societal changes through peaceful and lawful means; and it helps to ensure that government is responsive to the will of the people." *Cornelius*, 473 U.S. at 815–16 (Blackmun, J., dissenting) (internal quotation marks and citations omitted). It is the *difference* of opinion that is particularly crucial to this source of our democratic health, for the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press v. United States*, 326 U.S. 1, 20 (1945).

Today, as demonstrated in Part B above, Americans' exchange of political ideas happens increasingly on social media platforms like Twitter.  The question then becomes whether, when political leaders like the President establish and maintain a Twitter feed on which they discuss the leading political issues of the day, receive thousands of near-instantaneous reactions, and then respond to some of those reactions, the First Amendment permits them to silence naysayers and allow only supporters to express themselves.

Accepting the government's argument that the President is permitted to engage in viewpoint discrimination on the @realDonaldTrump Twitter feed could have dire consequences. If so permitted, defendants will be able to continue distorting the President's predominant means of dialogue with the American public into an unchallenged podium in which only applause greets his proclamations.  Allowing defendants to continue to feign democratic engagement while squelching skeptical voices runs contrary to the Supreme Court's teachings about why viewpoint discrimination is so corrosive to democratic functioning: "the prohibition on viewpoint

discrimination serves that important purpose of the Free Speech Clause, which is to bar the government from skewing public debate," *Rosenberger*, 515 U.S. at 894 (Souter, J., dissenting), as it prevents the government from allowing "one side of a debatable public question to have a monopoly in expressing its views," *Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–76 (1976).  That skewing of public debate—indeed, of even how a public debate is understood by those trying to assess its contours—is precisely what the government seeks to perpetuate in arguing that the President's Twitter feed is not a public forum.

This is not what Americans expect when they scroll through a government official's Twitter feed and read the comments made by others in response to the official's comments. They believe—indeed, they are entitled to believe—that they are viewing something of a cross-section of the interested public's reactions to the official's pronouncements and approach to governance.  Seeing sometimes thousands of responses, they believe they are seeing all.  But they are not, at least when it comes to @realDonaldTrump, due to the deliberate actions of defendants to distort the conversations sparked there.

Although this President may be the first to rely so heavily on his Twitter feed for engaging with the public, he will not be the last.  Already, other American political figures have begun experimenting with eliminating dissent and opposition from their social media pages.  *See, e.g.*, *Davison*, 2017 WL 3158389; *Woman Says Greitens Blocked Her for Using Puke Emoji*, Tennessean, Oct. 7, 2017, http://www.tennessean.com/story/news/politics/2017/10/07/woman-says-greitens-blocked-her-using-puke-emoji/743104001/; Mallory Shelbourne, *ACLU Sues Maryland, Kentucky Governors over Social Media Censorship*, The Hill, Aug. 1, 2017, http://thehill.com/legal/344793-aclu-files-lawsuit-against-maryland-kentucky-governors-over-social-media-censorship.  Over time, defendants' innovative approach to censoring critics may

lead officials at all levels of government to seek the type of curated adoration in which healthy democratic dialogue dwindles.

Such practices are a familiar playbook for authoritarian regimes. For them, cultivating a false impression that political leaders are adored by the public is critical to warping the public's understanding of how those leaders are *really* viewed by the public and, in turn, to quashing democratic impulses. *See* Seva Gunitsky, *Corrupting the Cyber-Commons: Social Media as a Tool of Autocratic Stability*, Perspectives on Politics, Mar. 2015, at 42, 45 (discussing government use of social media in countries such as China, North Korea, and Russia to "reinforce regime legitimacy through careful management of online discourse," and concluding that "social media creates space for the management of public discourse that sidelines or discredits anti-regime sentiment, while at the same time mobilizing the regime's own supporters"); Arch Puddington, *Breaking Down Democracy: Goals, Strategies, and Methods of Modern Authoritarians* 19 (June 2017), Freedom House, https://freedomhouse.org/sites/default/files/June2017_FH_Report_Breaking_Down_Democracy.pdf (China "deploys armies of paid and volunteer commentators to flood social media with progovernment remarks, influence online discussions, report or attack those who make antigovernment comments, or sow confusion about particular incidents that might reflect poorly on the leadership."). This real-world exploitation of social media makes it all the more imperative that the First Amendment remain a bulwark against any governmental impulse to "silence dissent," "distort the marketplace of ideas," and "remove certain ideas or perspectives from a broader debate." *Matal v. Tam*, 137 S. Ct. 1744, 1766–67 (2017) (Kennedy, J., concurring in part and concurring in the judgment).

Finally, allowing the government to persist in viewpoint discrimination would have a predictable chilling effect on others seeking to take part in political speech in the now-ubiquitous

Twittersphere.  As the Supreme Court explained in the context of campus speech, "to cast disapproval on particular viewpoints . . . risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life."  *Rosenberger*, 515 U.S. at 836.  Here, other Twitter users are sure to learn from plaintiffs' fate: questioning or criticizing President Trump's policies can lead to banishment from the vital forum defendants operate.  For journalists and other citizens keen to understand the President's policies, this means a loss in the ability to follow his policy pronouncements directly, a delay in hearing about them, and thus a deficit in responding to them.  Many users might rationally decide to temper their commentary rather than risk diminished access to the modern public square.

## CONCLUSION

As Justice Kennedy once cautioned,

> [T]he policies underlying the [public forum] doctrine cannot be given effect unless we recognize that open, public spaces . . . that are suitable for discourse may be public forums . . . . Without this recognition our forum doctrine retains no relevance in times of fast-changing technology and increasing insularity. . . . [O]ur failure to recognize the possibility that new types of government property may be appropriate forums for speech will lead to a serious curtailment of our expressive activity.

*ISKCON*, 505 U.S. at 697–98 (Kennedy, J., concurring in judgments).  Twitter has changed where political discourse occurs in this country, as has the President's innovative use of that medium.  But the use of new technologies has not altered the principle that, where the government facilitates a vigorous back-and-forth among and with the public, a public forum exists.  Maintaining fidelity to the First Amendment's prohibition on viewpoint discrimination will go a long way toward maintaining robust democratic dialogue in the digital age.  By hewing to well-established doctrine, this Court can prevent modern venues like Twitter from being exploited by government officials to silence critics and bask in artificial adulation.

Dated: November 6, 2017

Respectfully submitted,

_/s/ Joshua A. Geltzer_____

Joshua A. Geltzer (admitted *pro hac vice*)
Amy L. Marshak (application for admission
pending)
Daniel B. Rice
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Ave NW
Washington, DC 20001
(202) 662-9042
jg1861@georgetown.edu

*Counsel for Amici Curiae First Amendment Legal
Scholars*

21