# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KNIGHT FIRST AMENDMENT INSTITUTE AT
COLUMBIA UNIVERSITY, *et al.*,

        *Plaintiff*,

    v.

DONALD J. TRUMP, President of the United
States, *et al.*,

        *Defendants*.

No. 17-cv-5205 (NRB)

**BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION IN
SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICUS CURIAE ................................................................1

INTRODUCTION .................................................................................................................1

    I       SOCIAL MEDIA HAS BEN WIDELY ADOPTED BY GOVERNMENTAL
             AGENCIES AND OFFICIALS AT ALL LEVELS TO COMMUNICATE TO
             AND WITH THEIR CONSTITUENTS ...................................................................3

    II.      MEMBERS OF THE PUBLIC HAVE A FIRST AMENDMENT RIGHT
             OF ACCESS TO THE SOCIAL MEDIA FEEDS OF GOVERNMENTAL
             OFFICIALS AND AGENCIES; THIS RIGHT IS INFRINGED WHEN
             THEY ARE BLOCKED BECAUSE THE OFFICIAL DISLIKES THEIR
             VIEWPOINT ......................................................................................................12

    III.     MEMBERS OF THE PUBLIC HAVE A FIRST AMENDMENT RIGHT TO
             COMMUNICATE WITH GOVERNMENTAL OFFICIALS THROUGH
             SOCIAL MEDIA WHEN SUCH CHANNELS ARE GENERALLY OPEN
             TO THE PUBLIC; THIS RIGHT IS INFRINGED WHEN THEY ARE
             BLOCKED BECAUSE THE OFFICIAL DISLIKES THEIR
             VIEWPOINT ......................................................................................................16

CONCLUSION ...................................................................................................................23

# TABLE OF AUTHORITIES

## Cases

*American Broadcasting Companies, Inc. v. Cuomo*,
   570 F.2d 1080 (2d Cir. 1977) ................................................................14

*Anderson v. Cryovac*,
   805 F.2d 1 (1st Cir. 1986) ....................................................................15

*Borreca v. Fasi*,
   369 F. Supp. 906 (D. Hawaii 1974) ......................................................15

*Bradford v. Director, Employment Security Department*,
   128 S.W.3d 20 (2003) ..........................................................................12

*Burton v. Mann*,
   No. 47488, 2008 WL 8779064 (Va. Cir Jan. 30 2008) ..........................12

*City of San Jose v. Superior Court of Santa Clara*,
   2 Cal 5th 608 (2017) ............................................................................12

*Competitive Enterprise Institute v. Office of Science & Technology Policy*,
   827 F.3d 145 (D.C. Cir. 2016) ..............................................................12

*Davison v. Plowman*,
   2017 WL 105984 (E.D. Va., Jan. 10, 2017) ..........................................17

*Griffis v. Pinal Cty.*,
   156 P.3d 418 (2007) ..............................................................................12

*O'Neill v. Shoreline*,
   240 P.3d 1149 (2010) ............................................................................12

*Packingham v. North Carolina*,
   ___ U.S. ___, 137 S. Ct. 1730 (2017) .............................................17, 23

*Perry Education Ass'n v. Perry Local Educators's Ass'n*,
   460 U.S. 37 (1982) ...........................................................................16, 22

*Quad–City Community News Service, Inc. v. Jebens*,
   334 F. Supp. 8 (S.D. Iowa 1971) ..........................................................14

*Reno v. American Civil Liberties Union*,
   521 U.S. 844 (1977) ..............................................................................23

*Res Reporter Co., Inc. v. Columbus County*,
   S.E.2d 390 (2007) .................................................................................12

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980) ..............................................................................13

*Southeastern Promotions Ltd. v. Conrad*,
   420 U.S. 546 (1975) ............................................................................................16

*Southwestern Newspapers v. Curtis*,
   584 S.W. 2d 362 (Tex. Civ. App. 1979) ...........................................................15

*Stevens v. New York Racing Ass'n, Inc*.,
   665 F. Supp. 164,(E.D.N.Y. 1987).....................................................................14

*Telemundo of Los Angeles v. City of Los Angeles*,
   283 F. Supp. 2d 1095 (C.D. Cal. 2003)..............................................................15

*Times-Picayune Pub. Corp. v. Lee*,
   15 Media L. Rep. 1713, 1988 WL 36491 (E.D. La. 1988) .................................13

*United Teachers of Dade v. Stierheim*,
   213 F. Supp. 2d 1368 (S.D. Fla. 2002) .........................................................14, 15

*Westinghouse Broadcasting Co. v. Dukakis*,
   409 F. Supp. 895 (D. Mass. 1976) .................................................................14, 15

## State Attorney General Opinions

MD 81 Op. Att'y Gen. 140 (1996) .............................................................................12

N.D. Op. Att'y Gen. 2008-O-15 (2008) ....................................................................12

OK AG 12 (2009) .......................................................................................................12

Tex. Att'y Gen. ORD-1790 (2001) ...........................................................................12

## Other Authorities

Andrew J. Tobis, "Cleveland Mayor Frank Jackson fields questions – some of them not so
   tough – in his first Twitter town hall," CLEVELAND.COM, (Aug. 30, 2017),
   http://www.cleveland.com/cityhall/index.ssf/2017/08/cleveland_mayor_frank_jackson_
   l60.html.................................................................................................................19

Annie Linskey, *In Annapolis, a second debate in cyberspace*, THE BALTIMORE SUN,
   (Mar. 17, 2012, 5:36 PM), http://www.baltimoresun.com/news/maryland/politics/bs-md-
   lawmaker-twitter-20120317-story.html .................................................................6

Congressional Management Foundation, *#SocialCongress2015*, (2015),
   http://www.congressfoundation.org/storage/documents/CMF_Pubs/cmf-social-congress-
   2015.pdf. ................................................................................................................4

Congressional Research Service, *Social Media in Congress: The Impact of Electronic Media on Member Communications*, R44509, (May 26, 2016), https://fas.org/sgp/crs/misc/R44509.pdf ................................................................................4

Greg Bluestein, *Georgia lawmaker: Talk of ditching Confederate statutes could cause Democrat to 'go missing'*, THE ATLANTA JOURNAL CONSTITUTION, (Aug. 30, 2017) http://politics.blog.ajc.com/2017/08/29/georgia-republican-warns-democrat-she-could-go-missing-over-criticism-of-civil-war-monuments/ ........................................................6

http://www.nixle.com/public-safety-communications/ ................................................................1

https://storify.com/FAFSA/ ........................................................................................................17

https://usdigitalregistry.digitalgov.gov/ .......................................................................................3

Jill Lepore, "The State of the Presidential Debate," THE NEW YORKER, (Sept. 19, 2016), https://www.newyorker.com/magazine/2016/09/19/the-state-of-the-presidential-debate ...........2

Joanne Kenen, *The selling of Obamacare 2.0*, POLITICO (Nov. 13, 2014, 5:10 AM), http://www.politico.com/story/2014/11/obamacare-enrollment-2015-112846 ...........................4

Lyrissa B. Lidsky, *Government Sponsored Social Media and Public Forum Doctrine under the First Amendment: Perils and Pitfalls*, 19 Pub. Law. 2 (2011), http://scholarship.law.ufl.edu/facultypub/626 ........................................................................................................16

Michael Gove and Kai Diekmann, *Full transcript of interview with Donald Trump*, THE TIMES, (Jan. 16, 2017, 9:00 AM) https://www.thetimes.co.uk/article/e621220e-dbc2-11e6-a7b1-3a60b507a068 ............................................................................................11

Mickoleit, A., "Social Media Use by Governments: A Policy Primer to Discuss Trends, Identify Policy Opportunities and Guide Decision Makers," OECD Working Papers on Public Governance, No. 26, OECD Publishing, Paris (2014), http://www.oecd-ilibrary.org/docserver/download/5jxrcmghmk0s-en.pdf?expires=1507662581&id=id&accname=guest&checksum=3B1D0678BEFC9B33A5B24E5706530756 ..........................................................................11

Open Government Guide, Reporters Committee for Freedom of the Press, https://www.rcfp.org/open-government-guide ...........................................................................12

Ron Eland, *City adopts emergency alert system*, SEDONA RED ROCK NEWS, (Oct. 18, 2017), http://www.redrocknews.com/news/88888896-city-news/67159-city-adopts-emergency-alert-system ................................................................................................................2

S. Shyam Sundar, *et al*., "Source Cues in Online News: Is Proximate Source More Powerful than Distal Sources," Journalism and Mass Communications Quarterly, vol. 88 (Dec. 1, 2011) ........................................................................................................11

Tamara Keith, "Commander-In-Tweet: Trump's Social Media Use and Presidential Media Avoidance," NPR, (Nov. 18, 2016, 3:46 PM), http://www.npr.org/2016/11/18/502306687/commander-in-tweet-trumps-social-media-use-and-presidential-media-avoidance ........................................................................2

Tom Precious, *Cuomo and lawmakers start new year on nasty note, via Twitter and speeches*, THE BUFFALO NEWS, (Jan. 4, 2017), http://buffalonews.com/2017/01/04/cuomo-lawmakers-start-new-year-nasty-note-via-twitter-speeches ........................................................5

U.N. Dep't of Econ and Soc. Affairs, *United Nations E-Government Survey 2016: E-Government in Support of Sustainable Development*, U.N. Sales No. E.16.II.H.2 (2016)..........3

## STATEMENT OF INTEREST OF AMICUS CURIAE

Recognizing the Internet's power as a tool of democratization, the Electronic Frontier Foundation (EFF) has, for over 25 years, worked to protect the rights of users to transmit and receive information online. EFF is a non-profit civil liberties with more than 38,000 dues-paying members, bound together by mutual strong interest in helping the courts ensure that such rights remain protected as technologies change, new digital platforms for speech emerge and reach wide adoption, and the Internet continues to re-shape governments' interactions with their citizens. EFF frequently files amicus briefs in courts across the country, including briefs that highlight the pervasive use of the Internet and social media platforms as a means of delivering governmental services and communicating, back and forth, with constituents. Among many other landmark cases, EFF submitted an amicus brief in *Packingham v. North Carolina*, 137 S. Ct. 1730, (U.S. 2017), that was cited numerous times in the Court's opinion, and addressed many of the same issues addressed in the brief submitted here.

## INTRODUCTION

President Trump's use of @theRealDonaldTrump to announce U.S. policy and communicate directly with the American people is just one example of how Twitter and other social media are widely used by officials and agencies at all levels of government across the country. Social media has proved to be an efficient way for government to communicate vital information to the public. Indeed, as was seen with recent spate of natural disasters, social media serves critical public safety purposes. It is not surprising that some private social media platforms are specifically designed for such purposes.[1]

---

[1] *See, e.g.*, http://www.nixle.com/public-safety-communications/; Ron Eland, *City adopts emergency alert system*, SEDONA RED ROCK NEWS, (Oct. 18, 2017),

Given the pervasive use of social media, this Court must recognize that individuals have First Amendment rights both to receive governmental messages transmitted through social media as well as to participate in the communicative forums created by them. And this Court must find that the President's viewpoint-based blocking of the plaintiffs burdens their First Amendment rights, and is thus unconstitutional.

President Trump's use of Twitter has familiar historical analogs. Past U.S. Presidents adopted new communication technologies to engage directly with the public. FDR's Fireside Chats were delivered directly into Americans' homes by radio.[2] Eisenhower broadcast Presidential announcements on public access television.[3] And starting with the 1960 election, Presidential candidate debates were televised as well.[4]

And what was so obvious with those historic analogs, should be as obvious now. It would have been plainly impermissible for the President to punish certain individuals by making it more difficult for them to get these broadcasted messages than every other American. A court surely would have rejected a President's attempt to get a court order barring all broadcasters from momentarily delivering their signal to certain viewers disfavored by the President.

The result should be no different merely because social media platforms make such blocking so easy. What might have required a court order before is now easily accomplishable as a feature of the platforms. But the effect remains the same: disfavored citizens are punished.

---

http://www.redrocknews.com/news/88888896-city-news/67159-city-adopts-emergency-alert-system.

[2] Tamara Keith, "Commander-In-Tweet: Trump's Social Media Use and Presidential Media Avoidance," NPR, (Nov. 18, 2016, 3:46 PM), http://www.npr.org/2016/11/18/502306687/commander-in-tweet-trumps-social-media-use-and-presidential-media-avoidance.

[3] *Id*.

[4] Jill Lepore, "The State of the Presidential Debate," THE NEW YORKER, (Sept. 19, 2016), https://www.newyorker.com/magazine/2016/09/19/the-state-of-the-presidential-debate.

I.   **SOCIAL MEDIA HAS BEN WIDELY ADOPTED BY GOVERNMENTAL AGENCIES AND OFFICIALS AT ALL LEVELS TO COMMUNICATE TO AND WITH THEIR CONSTITUENTS.**

Governments all over the country – indeed, all over the word – use various social media platforms to disseminate important information to the public, and to debate the policies of the day with each other and with their constituents, all in a rapid and freely accessible manner.

In 2016, a United Nations study on the use of social media and other web-based tools for the delivery of government services online and for the participation of the public, reported that 152 member states out of 193 (roughly 80%) include links to social media and other networking features on their national websites. U.N. Dep't of Econ and Soc. Affairs, *United Nations E-Government Survey 2016: E-Government in Support of Sustainable Development*, at 65, U.N. Sales No. E.16.II.H.2 (2016).[5] And 20 percent of member states reported that engagement through social media led to new policy decisions and services. *Id*. at 68. Social media was viewed as a low-cost, ready-made solution for posting basic public-sector information and for citizen collaboration, regardless of a country's economic level. *Id*. at 3.

In the last decade as the use of social media has grown generally, the political use of social media has increasingly factored in U.S. national and state elections, the legislative process, and how government agencies offer services to the public. Over 10,000 social media profiles for U.S. federal agencies and sub-agencies have been registered with the United States Digital Service.[6] And that impressive number is an underestimate since many agencies remain unregistered despite their active participation on social media. For example, the United States Department of Agriculture's Food and Nutrition Service actively uses Twitter

---

[5] http://workspace.unpan.org/sites/Internet/Documents/UNPAN97453.pdf.
[6] For a searchable database of registered federal government profiles, see https://usdigitalregistry.digitalgov.gov/.

(@USDANutrition) to promote healthy food options and opportunities for nutrition education but has not registered its account with the U.S.D.S.

Federal agencies frequently used and continue to use social media to promote U.S. policy interests. The Obama Administration's Department of Health and Human Services' social media feeds advocated for passage of the Affordable Care Act. After passage, it continued to educate the public on enrollment periods and new protections for healthcare, with digital advertisements driving at least 4 million users to sign up with HealthCare.gov in the first year.[7] Similarly, the U.S. Department of State's Twitter page, @StateDept, routinely posts statements, photographs, and links regarding official visits with foreign dignitaries and the U.S. position on world events.

Members of Congress are also actively engaged in social media as a method of conversing with their constituents and connecting with their communities. All 100 Senators and the overwhelming majority of Representatives use social media. Congressional Research Service, *Social Media in Congress: The Impact of Electronic Media on Member Communications*, R44509, (May 26, 2016).[8] In a survey of members of Congress and their staff, the Congressional Management Foundation found that 76% of respondents felt that social media enabled more meaningful interactions with constituents; 70% found that social media made them more accountable to their constituents; and 71% said that constituent comments directed to the representative on social media would influence an undecided lawmaker. Congressional Management Foundation, *#SocialCongress2015*, (2015).[9]

After large policy announcements from the executive branch, Members of Congress often

---

[7] Joanne Kenen, *The selling of Obamacare 2.0*, POLITICO (Nov. 13, 2014, 5:10 AM), http://www.politico.com/story/2014/11/obamacare-enrollment-2015-112846.
[8] https://fas.org/sgp/crs/misc/.pdf.
[9] http://www.congressfoundation.org/storage/documents/CMF_Pubs/cmf-social-congress-2015.pdf.

disseminate their opinions via social media. When former Secretary of State John Kerry gave a speech supporting military action in Syria, members of Congress took to Twitter and even used the platform to advance public petitions to prevent military action.



State legislatures also extend public debate in their chambers to social media forums so that they are more visible by the public, specifically their constituents. In New York, debates over funding and employee salaries between the legislature and the governor's office took place on Twitter.[10] In the Maryland, legislators debated the benefits of state legislation versus county regulations.[11] And in the Georgia, Representatives engaged in heated debate over the removal of

---

[10] Tom Precious, *Cuomo and lawmakers start new year on nasty note, via Twitter and speeches*, THE BUFFALO NEWS, (Jan. 4, 2017), http://buffalonews.com/2017/01/04/cuomo-lawmakers-start-new-year-nasty-note-via-twitter-speeches/.
[11] Annie Linskey, *In Annapolis, a second debate in cyberspace*, THE BALTIMORE SUN, (Mar. 17, 2012, 5:36 PM), http://www.baltimoresun.com/news/maryland/politics/bs-md-lawmaker-twitter-20120317-story.html.

confederate monuments.[12]

The use of social media as an efficient method of communication between governmental offices and the public is perhaps best seen with state and local governments. Local police departments, councilpersons, mayors, and state legislatures use their Facebook, Twitter, and other social media feeds as real-time bulletin boards for important community information.

The crucial public benefits of social media use by local governments was made starkly obvious during the recent natural disasters. These uses highlight the real dangers of denying individuals access to the information disseminated by their government via social media.

Consider the multiple hurricanes that made landfall in the United States in 2017. The Mayor of San Juan Puerto Rico used her Twitter feed, @CarmenYulinCruz, to direct the city towards emergency resources in the wake of Hurricane Maria and alert residents on the status of the slow and ongoing recovery. Similarly, the Mayor of Houston, @SylvesterTurner, and the Mayor of Dallas, @Mike_Rawlings, provided their residents with the latest information on Hurricane Harvey relief through Twitter and other social media pages. And the governor of Florida, @FLGovScott, tweeted in both English and Spanish to alert citizens on evacuation from Hurricane Irma, emergency recovery spending in the state legislature, and state bills to offer support to Puerto Rico in the devastating aftermath of their own hurricane.

During the recent firestorms in California, residents in Sonoma and Napa counties could rely on local officials and agencies using social media to transmit important information, including evacuation orders and resources about fire containment, emergency contact information, medical services, and food bank need.

---

[12] Greg Bluestein, *Georgia lawmaker: Talk of ditching Confederate statutes could cause Democrat to 'go missing',* THE ATLANTA JOURNAL CONSTITUTION, (Aug. 30, 2017) http://politics.blog.ajc.com/2017/08/29/georgia-republican-warns-democrat-she-could-go-missing-over-criticism-of-civil-war-monuments/.



**Santa Rosa Police Department**
October 9 at 4:58am · 🌐

Mandatory Evacuation Due to Fast Moving Fires: Skyfarm, Fountaingrove Parkway, and Montecito Heights.

Leave immediately. This is a life threatening situation. Shelter is available at the Finley Community Center on West College Avenue at Stony Point Road.

👍 Like      💬 Comment      ↪ Share

👍😢😮 221                                      Top Comments ▾

663 Shares                                      78 Comments

Write a comment...                          😊 🐾

**Rose Cruz-Latham** Send help to 3812 Sky Farm Dr. People are trapped at the top of SkyFarm!! Just spoke to our dear friend who is surrounded by flames ! Please !!!!!
Like · Reply · 😢 7 · October 9 at 6:02am

↳   7 Replies

**Jennifer Stadt-Warren** Darlene Johnson Elmore
Let me know if i can do anything your family is welcome here I have 2 bedrooms and beds to sleep 4 , I have the kennel too so please let me know if I can help in any way , thinking if you 😟 stay safe
Like · Reply · 👍 2 · October 9 at 6:16am

**Sonoma Sheriff** ✔ @sonomasheriff · Oct 14                        ⌄
Buses staged at Safeway at Hwy 12 / Calistoga Rd for anybody who needs alternate transportation.
💬 2        🔁 111        ♡ 71        ✉

**Sonoma Sheriff** ✔ @sonomasheriff · Oct 12                        ⌄
Sutter and Kaiser have established numbers to find evacuated patients to other facilities. KP: 855-599-0033. Sutter: 866-961-2889
💬 1        🔁 132        ♡ 61        ✉



**Cecilia Aguiar-Curry** ✔
@AamAguiarCurry

〔 Follow 〕  ⌄

If you're in an area affected by the fires, text
your zip code to 888777 for information on
where to go. #tubbsfire #atlasfire #nunsfire



FOR INFORMATION on
Evacuation. Shelters. Road Closures.

**Text your zip code to:**
# 888777

Cecilia Aguiar-Curry

12:35 PM · 9 Oct 2017 from Napa, CA

**19** Retweets  **9** Likes

---

**CAL FIRE** ✔ @CAL_FIRE · Oct 13
#TubbsFire [update] between Calistoga and Santa Rosa (Napa & Sonoma
County) is now 34,770 acres and 25% contained. fire.ca.gov/current_incide...



---

 ⇵ Sonoma Sheriff Retweeted

**County of Sonoma** ✔ @CountyofSonoma · Oct 12        ⌄
All food donations should be directed to @refb. Check their website
(refb.org) for donation and volunteer info.



**Redwood Empire Food Bank**

The Redwood Empire Food bank (REFB) is the largest
hunger-relief organization serving north coastal
California, from Sonoma County to the Oregon border.

refb.org

◯ 1        ⇄ 75        ♡ 47        ✉

Crucially, these feeds are viewed as authoritative and reliable in times of public safety and civic confusion. After Hurricane Harvey, Mayor Turner published a Facebook post to dispel rumors that citizenship documentation was needed to receive disaster aid. This post, translated into six languages, was designed to ensure the people of Houston received accurate information.



Local police departments also update the public through social media about ongoing investigations, and, in many cases, individual access to these feeds is necessary for residents and other people in the area to timely assess public safety. The Boston Police Department updated

the city in the aftermath of the 2013 Boston Marathon bombing, including telling residents to
shelter in place and then alerting when the bombing suspect was captured.



Similarly, the Las Vegas Police Department used Twitter to give the community real-
time updates after the October 2017 mass-shooting at a country music festival, including
disclosing to the public that there was only one shooter.



Public officials commonly use nominally "personal" social media profiles for these
official communications. For example, when John Kerry became Secretary of State in 2013, he
inherited and used the handle @StateDept. But one year later he began promoting U.S.
diplomatic policy through the handle @JohnKerry as his official twitter feed. The @POTUS
handle was not created until 2015. Before then, Former President Barrack Obama used his

named account @BarackObama for campaign materials and would sign messages from the @WhiteHouse handle with "bo" to indicate his authorship.

When President-elect Trump decided, as he told British press in January 2017, that he intended to keep his named Twitter handle, @theRealDonaldTrump, because it garnered more followers than the @POTUS handle at the time,[13] he was in no way outside the norm. Heads of government institutions and political leaders will on average have more followers on their individual accounts than on their official or institutional ones. Mickoleit, A., "Social Media Use by Governments: A Policy Primer to Discuss Trends, Identify Policy Opportunities and Guide Decision Makers," OECD Working Papers on Public Governance, No. 26, OECD Publishing, Paris (2014).[14] Additionally, researchers studying the psychology of online news have found that social media users and news readers do not typically distinguish between institutional and personal accounts when accessing news stories; therefore, it is unlikely that the average Twitter user in the United States distinguishes between President Donald Trump's use of @theRealDonaldTrump and his use of @POTUS when accessing the accounts or reading about U.S. government policy and actions. S. Shyam Sundar, *et al*., "Source Cues in Online News: Is Proximate Source More Powerful than Distal Sources," Journalism and Mass Communications Quarterly, vol. 88, 719-736 (Dec. 1, 2011).

In analogous contexts, courts have found officials to be conducting governmental business despite their use of personal accounts on private third-party communications services.

For example, courts interpreting public records laws have found that emails sent from and

---

[13] Michael Gove and Kai Diekmann, *Full transcript of interview with Donald Trump*, THE TIMES, (Jan. 16, 2017, 9:00 AM) https://www.thetimes.co.uk/article/e621220e-dbc2-11e6-a7b1-3a60b507a068.

[14] http://www.oecd-ilibrary.org/docserver/download/5jxrcmghmk0s-en.pdf?expires=1507662581&id=id&accname=guest&checksum=3B1D0678BEFC9B33A5B24E5706530756.

received by the private email accounts of governmental officials to be public records. In so doing, these courts have focused on the function of the email accounts as, at least in part, a platform for conducting public business rather than a private account or a privately-run service.

The D.C. Circuit recently ordered the disclosure of emails containing government business sent to and from the personal email account of John Holdren, the former head of the Office of Science and Technology Policy, finding that the use of a private domain does not subvert citizens' right to know what the department is up to. *Competitive Enterprise Institute v. Office of Science & Technology Policy*, 827 F.3d 145, 150 (D.C. Cir. 2016).

States courts interpreting state records laws are ruling similarly, with the Supreme Court of California most recently determining the accessibility of public records on private email. *See City of San Jose v. Superior Court of Santa Clara*, 2 Cal 5th 608, 629 (2017); *Griffis v. Pinal Cty.*, 156 P.3d 418, 421 (2007); *Bradford v. Director, Employment Security Department*, 128 S.W.3d 20 (2003); *Res Reporter Co., Inc. v. Columbus County*, S.E.2d 390, 393 (2007); *Burton v. Mann*, No. 47488, 2008 WL 8779064 at *3(Va. Cir Jan. 30 2008); *O'Neill v. Shoreline*, 240 P.3d 1149 (2010). State Attorneys General have agreed. MD 81 Op. Att'y Gen. 140 (1996); N.D. Op. Att'y Gen. 2008-O-15 (2008); OK AG 12 (2009); Tex. Att'y Gen. ORD-1790 (2001).[15]

## II.     MEMBERS OF THE PUBLIC HAVE A FIRST AMENDMENT RIGHT OF ACCESS TO THE SOCIAL MEDIA FEEDS OF GOVERNMENTAL OFFICIALS AND AGENCIES; THIS RIGHT IS INFRINGED WHEN THEY ARE BLOCKED BECAUSE THE OFFICIAL DISLIKES THEIR VIEWPOINT.

Given that agencies and officials use social media to convey important public safety information, denying individuals access to those feeds because of a disapproval of their

---

[15] The Reporters Committee for Freedom of the Press is tracking the issue as it arises in state courts throughout the country through their online comparative Open Government Guide, found at https://www.rcfp.org/open-government-guide.

viewpoints endangers lives. And denying disfavored citizens access to policy announcements and debates among legislators hinders their ability to monitor the performance of their governmental officials and otherwise participate in their own governance.

Such discriminatory denial of access also violates the First Amendment. When governmental events and communications are generally open to the public, viewpoint-based exclusion of some individuals is unconstitutional.

This requirement of equal access was the law before the advent of social media, when governmental officials and agencies communicated to the public through the press, playing its "surrogate" role. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (explaining surrogate role the press plays in channeling information from the government to the public). Discrimination against a newspaper was in effect discriminating against that newspaper's readers.

The law should be no different now that officials and agencies can communicate directly with the public rather than through news media intermediaries: "The First Amendment guarantees a limited right of access to news regarding activities and operations of government. This right includes, at a minimum, a right of access to information *made available to the public* or made available generally to the press." *Times-Picayune Pub. Corp. v. Lee*, 15 Media L. Rep. 1713, 1988 WL 36491, at *9 (E.D. La. 1988) (emphasis added) (nullifying a sheriff's direction that his officers not process a newspaper's public records requests, nor notify it of or allow its reporters to attend press conferences, nor notify it of significant events, such as shootings and traffic fatalities).

The Second Circuit thus held that the First Amendment rights of ABC News "and its viewing public" would "be impaired by the exclusion" of ABC from election night campaign

13

rallies that were otherwise open to the news media. *American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977). "[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable." *Id.* The Second Circuit specifically rejected the argument that the right of access involved was "necessarily the outer limit of the constitutional protection of the First Amendment." *Id.*

Likewise, in *Stevens v. New York Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987), the court ruled that a photojournalist could not be barred from bringing his camera into the racetrack paddock areas that were otherwise open to all other journalists because the event sponsor disapproved of the way the photojournalist covered the event. Such content-based restrictions on access were prohibited. But because of the important First Amendment rights involved, even content-neutral access restrictions would be unconstitutional unless the plaintiff could demonstrate that "the restriction does not serve a legitimate government objective or that the benefits derived from the restriction are fewer than the harm it causes." *Id.* at 176.

This equal access rule has wide acceptance in courts around the country in a wide variety of contexts. The rule was applied to enjoin the exclusion of a teacher's union newspaper from the School Board press room in Florida, *United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1372-73 (S.D. Fla. 2002), and the exclusion from city council meetings in Boston of TV stations being operated by management during a labor strike. *Westinghouse Broadcasting Co. v. Dukakis*, 409 F. Supp. 895 (D. Mass. 1976). It was applied to ensure that an underground newspaper in Iowa had access to police records, *Quad–City Community News Service, Inc. v. Jebens,* 334 F. Supp. 8, 13 (S.D. Iowa 1971) (explaining that the information "has already been made available to the public insofar as other media's reporters are the public's representatives"),

and to guarantee that all media outlets had access to discovery materials the judge had shared with one media outlet. *Anderson v. Cryovac*, 805 F.2d 1, 10 (1st Cir. 1986). And it was applied against the Mayor of Honolulu who had excluded a reporter, whom the mayor found was "irresponsible, inaccurate, biased, and malicious" in his reporting, from an otherwise open press conference. *Borreca v. Fasi*, 369 F. Supp. 906, 910 (D. Hawaii 1974).

The exclusion of individuals because of government disapproval of their viewpoints raises special concerns that officials could manipulate the public's perception of them by disseminating their messages only through favorable filters. "Hand-picking those in attendance," the *Borreca* court observed, "intensifies the manipulation." *Id*.

That the public, in these cases through the press, could ultimately get the information from other, less direct channels does not cure the constitutional defect. In *Southwestern Newspapers v. Curtis*, 584 S.W. 2d 362, 363, 369 (Tex. Civ. App. 1979), the court enjoined a district attorney from requiring that reporters from a certain newspaper make appointments to gain access to official news sources, while he made them available without appointments to all other media. As the court in *Westinghouse*, 409 F. Supp. at 896, found, access must be provided with "equal convenience." *See also Stierheim*, 213 F. Supp. 2d at 1374 (finding First Amendment violation where reporters were "nevertheless deprived of the newsgathering environment and opportunities" afforded to the other news media).

Nor does it matter that the government shares the access decisions with a private actor. In *Telemundo of Los Angeles v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1103 (C.D. Cal. 2003), the Court found that a TV station had a First Amendment right to cover the city's official El Grito ceremony because the city and its nongovernmental co-presenters permitted another broadcaster to do so. That the city shared, and in some situations yielded, decision-making

authority with a private civic organization and another broadcaster, did not diminish the city's obligation to provide equal access. *See also Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546 (1975) (applying public forum doctrine to privately owned theater leased to the city).

The First Amendment thus protects access to governmental communications, ensuring that individuals are not denied speech alerting them in times of crisis, distributing necessary information about government services, and providing transparency about elected and appointed officials' actions and statements.

### III. MEMBERS OF THE PUBLIC HAVE A FIRST AMENDMENT RIGHT TO COMMUNICATE WITH GOVERNMENTAL OFFICIALS THROUGH SOCIAL MEDIA WHEN SUCH CHANNELS ARE GENERALLY OPEN TO THE PUBLIC; THIS RIGHT IS INFRINGED WHEN THEY ARE BLOCKED BECAUSE THE OFFICIAL DISLIKES THEIR VIEWPOINT.

Certain social media platforms in widespread use by governmental agencies and officials allow them not only to communicate to the public, but allow the public to communicate back to the agency and with each other, thus creating forums for private speech. In so doing, the government endows the public with First Amendment rights to speak in these forums. Just what kind of forum is created will depend on how the official specifically operates it.[16] But viewpoint discrimination resulting in the targeted expulsion of individual citizens and residents from these forums is barred regardless of whether it is a public, limited or designated, or non-public forum. *Perry Education Ass'n v. Perry Local Educators's Ass'n*, 460 U.S. 37, 46 (1982) (holding that even in a non-public forum, a speaker may not be excluded as "an effort to suppress expression merely because public officials oppose the speaker's views").

---

[16] Lyrissa B. Lidsky, *Government Sponsored Social Media and Public Forum Doctrine under the First Amendment: Perils and Pitfalls*, 19 Pub. Law. 2 (2011), *available at* http://scholarship.law.u.edu/facultypub/626.

The social media platforms federal, state, and local governments commonly use – such as Twitter, Facebook, Instagram – create such forums. And government officials and agencies commonly use them for these democratizing purposes. As the Supreme Court recently recognized, "[O]n Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. Indeed, Governors in all 50 states and almost every Member of Congress have set up accounts for this purpose." *Packingham v. North Carolina*, ___ U.S. ___, 137 S. Ct. 1730, 1735, (2017). Thus, in *Davison v. Plowman*, 2017 WL 105984, *3-*4 (E.D. Va., Jan. 10, 2017), the court found that the comment section to the Commonwealth Attorney's Facebook page to be a limited public forum since the County "'encourage[s]' commenters 'to engage [their local government through social media by submitting . . . comments and questions regarding posted topics.'"

These forums are by their nature, and often by default, open to large segments of the population – potentially every person with access to the Internet around the world – and are not constrained by size, capacity, and even time, like physical spaces.

The U.S. federal government has operated social media profiles in this way for some time. The U.S. Department of Education, for example, routinely holds monthly "office hours" where parents and students can ask about the federal student loan process on Twitter using the tag #AskFAFSA. Department of Education uses the Twitter handle @FAFSA to reply directly to individuals' questions and then compiles monthly questions and responses on a separate site for increased visibility.[17]

---

[17] The compiled Twitter questions and answers through the tag #AskFAFSA can be found for each month at https://storify.com/FAFSA/.

17



Similarly, the Transportation and Security Administration maintains a Twitter feed where individuals, regardless of their nationality, can submit questions about safety regulations for flying to, from, and within the United States by tweeting to the handle @AskTSA.



At the local level, representatives and councilmembers open their social media profiles to their constituents by holding online versions of town halls, even promoting hashtags (searchable links) where constituents can submit their opinions and advocate for changes to improve their communities. In 2015, the mayor of Boston, @Marty_Walsh, announced a call for collaboration on both social media and in the press to revamp Boston's City Hall and the surrounding plaza. Residents took to Twitter using the tag #CityHallPlaza to submit recommendations for the space, upload pictures as a part of the campaign, and even submit their detailed proposals for the space

so that other engaged citizens could learn more.



In Cleveland, Mayor Frank Jackson, holds "Twitter town halls" where residents can tweet

questions to him and he responds via live video.[18]

The benefits of a direct engagement forum to both government and the public are readily

apparent in the emergency services context. During Hurricane Harvey, the Mayor of Houston

was able to converse with his constituents on Facebook to deliver important information, dispel

---

[18] Andrew J. Tobis, "Cleveland Mayor Frank Jackson fields questions – some of them not so tough – in his first Twitter town hall," CLEVELAND.COM, (Aug. 30, 2017), http://www.cleveland.com/cityhall/index.ssf/2017/08/cleveland_mayor_frank_jackson_60.html.

rumors in order to limit confusion during the crisis, and in one case ensure that emergency

medical services could attend to a baby whose breathing machine would soon lose power.



This single interaction demonstrates that even though government social media serves a

widespread audience, the capabilities for tailored and direct response are remarkable. On a single

tweet from President Trump, citizens can respond directly to the President and comment on his

policy announcements, other lawmakers can respond to the President and comment on the

policy, and citizens can then respond to those lawmakers' responses. For example, President

Trump's suggestion that New York Senator Chuck Schumer bore some policy responsibility for

the October 31, 2017 terrorist attack in New York City started a multi-level debate on

immigration policy that included other U.S. senators and citizens from different sides of the

political spectrum.



After Representative Ted Lieu, @tedlieu, tweeted his letter calling for a congressional

hearing on U.S. military deployment in Niger, individuals both supporting and opposing his position, responded with comments offering suggestions on the direction and focus of such a hearing.



It is clear then that in practice, social media platforms like Twitter that allow for the general public to comment upon governmental posts, or communicate directly with officials, agencies, or to otherwise participate in a publicly viewable debate, function like the paradigmatic speakers' corner in a public park. *See Perry*, 460 U.S. at 45 (identifying streets and parks as

"quintessential public forums" for "assembly, communicating thoughts between citizens, and discussing public questions"). Indeed, governmental social media accounts probably host these functions more than parks and streets currently do. As the Supreme Court recognized just last term, "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1977), and social media in particular." *Packingham*, 137 S. Ct. at 1735 (included citation abbreviated) (explaining that a denial of access to social media was a significant abridgement of First Amendment rights given modern civic and social communication).

Viewpoint discrimination in such forums plainly violates the First Amendment.

## CONCLUSION

The President's blocking of private Twitter users based on their disfavorable view of him is unconstitutional.

Social media use by governments around the world, on every level of government is the rule now, not the exception. And while social media currently supplements other methods of communication to and with the public, one could credibly predict that it will shortly become the predominant form of communication. As a result, members of the public must have a cognizable First Amendment right to receive such otherwise public communications from the government, and to participate in the forums that are created.

The First Amendment prohibits viewpoint discrimination in all analogous, pre-digital situations. It must do so here as well.

DATED:  November 6, 2017                 Respectfully submitted,


By: ___/s/ *Mitchell L. Stoltz*_____
     Mitchell L. Stoltz

ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

*Attorney for Amicus Curiae Electronic Frontier
Foundation*

24