UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP,<br>President of the United States et al.,<br><br>    Defendants. | 1:17-CV-05205 (NRB) |

**BRIEF FOR FEDERAL COURTS SCHOLARS
AS *AMICI CURIAE* SUPPORTING PLAINTIFFS**

                                Brian T. Burgess
                                Andrew Kim (application for *pro hac*
                                admission forthcoming)
                                GOODWIN PROCTER LLP
                                901 New York Avenue, N.W.
                                Washington, D.C. 20001
                                (202) 346-4000
                                bburgess@goodwinlaw.com
                                andrewkim@goodwinlaw.com

                                Of Counsel:
                                Stephen I. Vladeck
                                727 East Dean Keeton Street
                                Austin, TX 78705
                                (512) 475-9198
                                svladeck@law.utexas.edu

                                *Attorneys for Amici Curiae*

Dated:  November 6, 2017

**TABLE OF CONTENTS**

**Page**

INTEREST OF THE *AMICI CURIAE* ...................................................................................1
INTRODUCTION ...........................................................................................................1
ARGUMENT..................................................................................................................3
I.    COURTS HAVE THE AUTHORITY TO ENJOIN THE PRESIDENT AS TO OFFICIAL CONDUCT..........3
    A.    *JOHNSON* DOES NOT ESTABLISH A RULE THAT PLACES THE PRESIDENT CATEGORICALLY OUTSIDE OF JUDICIAL AUTHORITY. .................................................3
    B.    COURTS HAVE EXERCISED THEIR EQUITABLE POWER TO ENJOIN THE PRESIDENT'S DISCRETIONARY DIRECTIVES. .............................................................8
    C.    COURTS HAVE EXERCISED EQUITABLE AUTHORITY DIRECTLY OVER THE PRESIDENT HIMSELF..............................................................................................12
CONCLUSION..............................................................................................................13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*al-Marri v. Rumsfeld*,
  360 F.3d 707 (7th Cir. 2004) ..................................................................................................10

*Cty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ....................................................................................11

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ........................................................................................................5, 6, 9

*Gaines v. Thompson*,
  74 U.S. (7 Wall.) 347 (1869) ....................................................................................................5

*Georgia v. Stanton*,
  73 U.S. (6 Wall.) 50 (1867) ......................................................................................................4

*Halperin v. Kissinger*,
  606 F.2d 1192 (D.C. Cir. 1979) ..............................................................................................10

*Hawaii v. Trump*,
  859 F.3d 741 (9th Cir. 2017) ..................................................................................................11

*Louisiana v. McAdoo*,
  234 U.S. 627 (1914) ..................................................................................................................5

*Ex parte McCardle*,
  74 U.S. (7 Wall.) 506 (1869) ....................................................................................................4

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1867) .......................................................................................... *passim*

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ..................................................................................................5

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ..............................................................................................................7, 8

*Nixon v. Sirica*,
  487 F.2d 700 (D.C. Cir. 1973) ..........................................................................................10, 11

*Ohio v. Wyandotte Chems. Corp.*,
  401 U.S. 493 (1971) ..................................................................................................................4

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ................................................................................... 11

*United States v. Lee*,
    106 U.S. 196 (1882) ............................................................................................... 3, 11

*United States v. Nixon*,
    418 U.S. 683 (1974) ..................................................................................................12

*Ex parte Yerger*,
    75 U.S. (8 Wall.) 85 (1869) ........................................................................................ 4

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................................ 8, 9

**Other Authorities**

David P. Currie, *The Constitution and the Supreme Court: The First Hundred
    Years, 1789-1888* (2015) ..................................................................................3, 4, 5

Jerry L. Mashaw, *Federal Administration and Administrative Law in the Gilded
    Age*, 119 Yale L.J. 1362 (2010) .................................................................................5

Henry P. Monaghan, *The Protective Power of the Presidency*,
    93 Colum. L. Rev. 1 (1993) ........................................................................................7

Laura Krugman Ray, *From Prerogative to Accountability: the Amenability of the
    President to Suit*, 80 Ky. L.J. 739 (1992) ........................................................ 2, 9, 13

Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*,
    97 Colum. L. Rev. 1612 (1997) ..................................................................................5

Patricia M. Wald & Jonathan R. Siegel, *The D.C. Circuit and the Struggle for
    Control of Presidential Information*, 90 Geo. L.J. 737 (2002) ............................ 7, 10

## INTEREST OF THE *AMICI CURIAE*

The following *amici* are professors who study and teach federal courts at leading law schools:

- William D. Araiza, Professor of Law, Brooklyn Law School

- Karen M. Blum, Research Professor of Law, Suffolk University School of Law

- Caprice Roberts, Professor of Law, Savannah Law School

- Kermit Roosevelt, Professor of Law, University of Pennsylvania Law School

- Lawrence G. Sager, Alice Jane Drysdale Sheffield Regents Chair in Law, University of Texas School of Law

- Joan Steinman, University Distinguished Professor and Professor of Law, Illinois Institute of Technology Chicago-Kent School of Law

- Stephen I. Vladeck, Professor of Law, University of Texas School of Law

- Howard M. Wasserman, Professor of Law, FIU College School of Law

(Affiliations are listed only for purposes of identification.)  The *amici* have extensive experience studying the jurisdiction of federal courts and the separation of powers.  *Amici* submit this brief to explain the limits of the presidential immunity invoked by the Government in this case.  This brief draws on the authors' research and expertise to analyze this issue for the benefit of the Court.[1]

## INTRODUCTION

Federal courts have equitable power to order the President of the United States to comply with the law and the Constitution.  That power is rarely exercised for reasons grounded in judicial prudence and comity—respect for the office of the Presidency demands it, and, practically speaking, a subordinate officer who serves the President is typically a better-suited

---

[1] This brief is being filed pursuant to this Court's October 30, 2017 Order directing all *amici* to file briefs by November 6, 2017.  Dkt. No. 39.

defendant in suits seeking injunctive relief against the Executive. But the fact that courts should proceed cautiously before exercising equitable power over the President directly does not mean that courts lack such power, or that they may not exercise it in an appropriate case in which no other means exist to enforce federal law.

The Government defends a much more sweeping restriction on judicial authority. Relying largely on a Reconstruction-era case, *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867), the Government argues that "courts are prohibited from enjoining the discretionary conduct of the President." Defs.' Mem. of Law in Support of Mot. for Summary Judgment (Dkt. No. 35), at 8 ("Gov't Mot."). But *Johnson* does not support such a broad rule, as both courts and commentators have recognized. *See* Laura Krugman Ray, *From Prerogative to Accountability: the Amenability of the President to Suit*, 80 Ky. L.J. 739, 754 (1992) ("Although *Mississippi v. Johnson* has been cited often, it is almost invariably invoked to support a point either broader or narrower than its actual holding . . . ."). *Johnson* did not hold what the Government is arguing now—that there is something unique about the President as a litigant that requires complete judicial abdication, going well beyond the deference courts traditionally accord to officers of the Executive branch. Rather, *Johnson* was a procedural ruling that was itself a precursor to the political question doctrine, a decision reflecting the hesitance of the judiciary to wade into a significant inter-branch dispute in the fragile aftermath of the Civil War.

Moreover, more modern decisions by the Supreme Court demonstrate that courts have the authority to ensure that the President does not disregard the law. Courts have typically exercised their equitable power to stop the President's directives by enjoining the President's subordinate officers. But in unusual cases in which direct action against the President is the only

2

way to maintain legal accountability, courts have subjected the President to legal process for his official conduct.

This is one such occasion. As the Government insists, Plaintiffs' claims are directed at actions "made only by the President himself." Gov't Mot. at 10. Nothing in *Johnson* or any subsequent controlling authority holds that a President may infringe the constitutional rights of the people he serves without facing any accountability in federal court.

## ARGUMENT

I. **COURTS HAVE THE AUTHORITY TO ENJOIN THE PRESIDENT AS TO OFFICIAL CONDUCT.**

   A. ***JOHNSON* DOES NOT ESTABLISH A RULE THAT PLACES THE PRESIDENT CATEGORICALLY OUTSIDE OF JUDICIAL AUTHORITY.**

The Government's jurisdictional argument hinges mostly on a 150-year-old case, *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867), and certain broad statements from *Johnson* that (1) "general principles [] forbid judicial interference with the exercise of Executive discretion," and (2) the Supreme Court had "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* at 499-501. The Government asserts that these statements demonstrate that "courts cannot . . . enjoin the President in exercising the executive function." Gov't Mot. at 8. But *Johnson* is not properly read to stand for such a broad legal proposition.

The *Johnson* decision cannot be divorced from its historical context. *Johnson* was issued at a time when "the powers of the national government" had been "strained . . . to their utmost tension," making it necessary for the Court to resist attempts by "persons hostile to the Union . . . to invoke the powers of the courts . . . in order to cripple the exercise of the authority necessary to put down the rebellion." *United States v. Lee*, 106 U.S. 196, 222 (1882); *see also* David P. Currie, *The Constitution and the Supreme Court: The First Hundred Years, 1789-1888* at 296

3

(2015) (observing that *Johnson* was one of "[a] series of cases . . . [that] appeared to confront the Court with . . . [an] explosive issue:  the constitutionality of the statutes providing for the fate of the former Confederate States," which presented "hot potatoes" of "substantive issues [that] were both substantial and difficult").[2]  In *Johnson*, the State of Mississippi filed a motion for leave to file an original bill of complaint that would have sought an injunction restraining the President and the commanding general of the military district of Mississippi and Arkansas from carrying out the just-enacted Reconstruction Acts.  71 U.S. (4 Wall.) at 497.  The question before the Court was:  "Can the President be restrained by injunction from carrying into effect an act of Congress alleged to be unconstitutional?"  *Id.* at 498.  Answering in the negative, the Court opined that when the exercise of presidential authority is "purely executive and political," and flows from "the exercise of the power to see that the laws are faithfully executed," "general principles" would "forbid judicial interference with the exercise of Executive discretion."  *Id.* at 499.  In the *Johnson* Court's view, such a result was necessary because if such an injunction were permissible, the President could either refuse to obey the injunction (which would cause a constitutional crisis with the judiciary) or agree to comply with the injunction and refuse to carry out the law (which would cause a constitutional crisis with the legislature).  *See id.* at 501.

Both courts and commentators have understood *Johnson* as representing an early application of the political question doctrine, rather than turning on the unique qualities of the

---

[2] *Johnson* was one of four postbellum cases in which the Court refused to find itself embroiled in what it viewed as essentially a political fight over enforcement of the Reconstruction Act.  In *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50 (1867), filed on the heels of the denial of leave to file in *Johnson*, the Court took a different route to avoid the political dispute, declining to enjoin the President's subordinates on the ground that states did not have "standing to assert merely political interests."  David P. Currie, *The Constitution and the Supreme Court:  The First Hundred Years, 1789-1888* at 302 (2015).  And in *Ex parte McCardle*, 74 U.S. (7 Wall.) 506 (1869), and *Ex parte Yerger*, 75 U.S. (8 Wall.) 85 (1869), the Court ducked the issue in the context of habeas petitions filed by unreconstructed Southerners challenging their detention by the federal military.

President *eo nomine*. *See Ohio v. Wyandotte Chems. Corp.*, 401 U.S. 493, 496 (1971) (citing *Johnson* as an example of a case that sought "to embroil [the Court] in 'political questions'"); *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 614 (D.C. Cir. 1974) ("[*Johnson*] was dismissed on the ground that it presented a political question . . . ."); Jerry L. Mashaw, *Federal Administration and Administrative Law in the Gilded Age*, 119 Yale L.J. 1362, 1401 n.123 (2010) ("[*Johnson*] was, in essence, a political question case . . . the Court imagined that action of the sort requested would involve it in a political imbroglio."). *Johnson'*s reasoning was thus quickly extended to executive officers generally, instead of being limited to suits against the President of the United States. In *Gaines v. Thompson*, 74 U.S. (7 Wall.) 347 (1869), the Court invoked *Johnson* in holding that the judiciary could not interfere with the Land Office's quasi-judicial proceedings. *Id.* at 353. And several decades after *Johnson*, the Supreme Court's decision in *Louisiana v. McAdoo*, 234 U.S. 627 (1914), cited *Johnson* as an example of a case in which courts had "refuse[d] to substitute their judgment or discretion for that of the official intrusted by law with its execution." *Id.* at 633-34 (collecting cases).

Indeed, *Johnson* makes little sense as a decision about the federal courts' power vis-à-vis the President; a subordinate officer, the commanding general of the military district of Mississippi and Arkansas, also was named as a defendant, yet the Court did not address whether he could be enjoined from carrying out the President's directives. Rather, the Court's holding applied to both the President and his subordinate commander. *See* Currie, *supra,* at 300 n.90; Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612, 1702 (1997) (military commander's presence in the case "vanished into thin air").

The Supreme Court revisited *Johnson* in 1992, when it decided *Franklin v. Massachusetts*, 505 U.S. 788 (1992). *Franklin*'s primary holding—*i.e.*, that the President is not

5

an "agency" for purposes of the Administrative Procedure Act. *Id*. at 800-01—is inapposite here.

A four-Justice plurality of the Supreme Court also opined on how *Johnson* might apply to the President in a contemporary setting, but the plurality ultimately concluded that it "need not decide whether injunctive relief against the President was appropriate" because "the injury alleged [was] likely to be redressed by declaratory relief against the Secretary [of Commerce] alone." *Id.* at 803. The plurality viewed "injunctive relief against the President himself" as "extraordinary," a measure that "should have raised judicial eyebrows." *Id.* at 802. Without discussing how *Johnson* had been viewed and applied by the Court in the past, the plurality repeated *Johnson*'s sweeping and oversimplified statement that a court "'has no jurisdiction . . . to enjoin the President in the performance of his official duties.'" *Id.* at 803 (quoting putative principle, 71 U.S. (4 Wall.) at 501). But the plurality did not actually apply this rule because relief was possible against a member of the Cabinet, which made it "substantially likely that the President . . . would abide by an authoritative interpretation of [a] statute and constitutional provision, . . . even though [he] would not be directly bound by such a determination." *Id.* Justice Scalia, concurring in the judgment of the Court, construed *Johnson* as support for the proposition that "the principals in whom the executive and legislative powers are ultimately vested—viz., the President and the Congress (as opposed to their agents)—may not be ordered to perform particular executive or legislative acts at the behest of the Judiciary." *Id.* at 827 (Scalia, J., concurring in the judgment). But Justice Scalia wrote only for himself.

The Government here relies on a combination of dicta from the plurality opinion in *Franklin*, Justice Scalia's solo concurrence in that case, and *Johnson* itself to assert an absolutist

6

view that courts may never enjoin the official, discretionary conduct of the President. That argument is flawed for at least three reasons.

First, as explained in Part I.B below, courts (including the Supreme Court) have entertained the merits of suits seeking to enjoin the President's subordinate officers on the grounds that *the President* overstepped his statutory or constitutional bounds. Suits against the President are thus unusual mainly because they are usually unnecessary—in most instances, a subordinate can serve as a presidential proxy.

Second, the Supreme Court has never "expressly held" that "a court may *never* enjoin the President with regard to his official behavior," only that "there is something unique about litigation against the President *eo nomine* that should cause a special judicial hesitation." Patricia M. Wald & Jonathan R. Siegel, *The D.C. Circuit and the Struggle for Control of Presidential Information*, 90 Geo. L.J. 737, 758 (2002). As explained above, the Court declined jurisdiction in *Johnson* "not because the President was a defendant but because the issues raised by the litigation were thought to be essentially political in nature." Henry P. Monaghan, *The Protective Power of the Presidency*, 93 Colum. L. Rev. 1, 6 n.30 (1993).

Third, and contrary to Justice Scalia's solo concurrence in *Franklin,* the Supreme Court has not relied on the vague status of the President alone to determine the President's amenability to suit. For example, in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), the Supreme Court held that the President possessed "absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Id*. at 756. To reach that holding, the *Fitzgerald* Court began with the principle that "the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Id.* at 753-54. Although President Nixon tried to argue, as the Government does here, that the President is entitled to

7

immunity because "the Presidency is unique in its authority and responsibilities," Br. for Pet'r Richard Nixon at 30, *Nixon v. Fitzgerald*, Nos. 79-1738, 80-945 (U.S. filed Oct. 27, 1981), the *Fitzgerald* Court eschewed such an absolutist approach in favor of one that "balance[d] the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Fitzgerald*, 457 U.S. at 754. In *Fitzgerald*, that balance tipped in favor of protection for the President on the theory that the "personal vulnerability" of damages lawsuits would "distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* at 751. Thus, it was not special solicitude to the President *eo nomine* that justified immunity, but rather the unique risk of harm posed by exposure to lawsuits for money damages. *Id.*; *see also id.* at 780 (White, J., dissenting) ("No argument is made here that the President, whatever his liability for money damages, is not subject to the courts' injunctive powers."). This reasoning, and the balancing inquiry it contemplates, cuts against the Government's sweeping characterization of *Johnson* as categorically stripping federal courts of equitable jurisdiction in actions against the President.

### B. COURTS HAVE EXERCISED THEIR EQUITABLE POWER TO ENJOIN THE PRESIDENT'S DISCRETIONARY DIRECTIVES.

*Johnson* is best understood as reflecting the Supreme Court's desire to maintain a delicate separation of powers in the volatile post-Civil War Reconstruction period. In subsequent years, particularly after the advent of general federal question jurisdiction, the Supreme Court (and lower federal courts) have repeatedly exercised equitable powers over the Executive Branch even when doing so directly interfered with the President's authority.

The most famous example comes from *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the Supreme Court addressed President Truman's order to the

8

Secretary of Commerce to seize most of the steel mills in the United States. *Id.* at 583. Some of the steel mills sued and sought a declaration that "the orders of the President and Secretary [were] invalid," but they brought suit only against the Secretary of Commerce. *Id.* at 583-84. The Court agreed with the mills and held that neither the Constitution nor a federal statute gave the President the power to order such a seizure. *Id.* at 587.

Although the Secretary of Commerce was the nominal defendant in *Youngstown*, the Justices were acutely aware that the case was about *presidential* authority, not a subordinate's exercise of delegated authority. Indeed, the Secretary became "very much the forgotten man," in opinions focused entirely on the *President's* actions.[3] Krugman Ray, *supra*, at 762. *Youngstown* created by implication a legal fiction by which the President's actions could be restrained: a litigant could "challenge a presidential order in the courts as long as the named defendant was a presidential proxy, the agent selected to implement the executive command." *Id.* at 763. Indeed, Justice O'Connor's opinion in *Franklin* referred to this fiction in commenting that "injunctive relief against the President himself is extraordinary." 505 U.S. at 802.

The fact that a subordinate officer can serve as a proxy for restraining or coercing the President suggests that *Johnson*'s objective of preventing "judicial interference with the exercise of Executive discretion" is an unpersuasive reason for shielding *only* the President from a court's equitable powers. As Judge Patricia Wald and Professor Jonathan Siegel explain:

---

[3] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) ("We are asked to decide whether the President was acting within his constitutional power . . . ."); *id.* at 614 (Frankfurter, J., concurring) ("It is not a pleasant judicial duty to find that the President has exceeded his powers . . . ."); *id.* at 645 (Jackson, J., concurring) (the President is entitled to "the widest latitude of interpretation to sustain his exclusive function to command the instruments of national force," but when the power of the President is "turned inward, not because of rebellion but because of a lawful economic struggle between industry and labor, it should have no such indulgence"); *id.* at 660 (Burton, J., concurring) ("the President's order . . . invaded the jurisdiction of Congress").

9

> If the President has the power to determine whether he must obey an order directed at him or whether he may disobey it because, in his view, it prevents him from fulfilling his constitutional duties, the same principle must apply to court orders directed at any federal official. Although an order may be formally directed at a subordinate federal official, every such order contains an implicit directive to the President—namely, to ensure that the order is enforced.

Wald & Siegel, *supra*, at 757.

Notably, the D.C. Circuit has recognized that, as a result of *Youngstown*'s legal fiction, there is little reason to shield the President from a court's power to restrain or coerce, while leaving his subordinates exposed to the same. *See Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973) ("There is not the slightest hint in any of the *Youngstown* opinions that the case would have been viewed differently if President Truman rather than Secretary Sawyer had been the named party."). Although the D.C. Circuit has reasoned that the President should not be subject to legal process "[a]s a matter of comity" so long as there is "a lower Executive official" to be enjoined to "restrain or compel the President," the court has recognized that if the "President has himself" committed a constitutional violation, "the court's order must run directly to the President." *Id.* The D.C. Circuit has thus recognized that under Supreme Court precedent, including *Johnson*, "a proper regard for separation of powers does not require that the courts meekly avert their eyes from presidential excesses while invoking a sterile view of three branches of government entirely insulated from each other." *Halperin v. Kissinger*, 606 F.2d 1192, 1211-12 (D.C. Cir. 1979). Because *Youngstown*'s legal fiction made it possible to "restrain or compel the President," there is "no rational basis . . . for holding inferior officials liable for constitutional violations while immunizing those higher up." *Id.*

Thus, enjoining the President is "extraordinary" only because, in most cases, it is simply unnecessary—enjoining a subordinate official would achieve the same result. *See, e.g.*, *al-Marri v. Rumsfeld*, 360 F.3d 707, 708 (7th Cir. 2004) ("Suits contesting actions of the executive branch

10

should be brought against the President's subordinates."). *Youngstown*'s legal fiction heads off "any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). But where, as here, effective relief can flow only from the Chief Executive himself, courts may direct coercive legal process to the President directly so that he, too, is held accountable and required to abide by the Constitution. *See Sirica*, 487 F.3d at 709; *see also Lee*, 106 U.S. at 220 ("No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it.").

The Government's assertion that "courts routinely reject demands to enjoin the President's discretionary conduct," Gov't Mot. 9, elides this key issue. Indeed, several of the cases cited by the Government for this proposition reject injunctive relief against the President only because recourse against some other official was clearly available. *See, e.g.*, *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (acknowledging that courts generally should not enjoin the President in the performance of his official duties, but noting that "[i]njunctive relief, however, may run against executive officials"), *judgment vacated as moot by Trump v. Hawaii*, --- S. Ct. ----, 2017 WL 4782860, at *1 (U.S. Oct. 24, 2017); *Swan*, 100 F.3d at 980-81 ("[W]e hold that the partial relief Swan can obtain against subordinate executive officials is sufficient for redressability . . . ."); *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 540 (N.D. Cal. 2017) (observing that an injunction against the President is "not appropriate" because of the availability of injunctive relief against the Attorney General and the Secretary of Homeland Security). These cases do not support the Government's effort here to shield the President's actions from judicial review as a categorical matter.

### C. COURTS HAVE EXERCISED EQUITABLE AUTHORITY DIRECTLY OVER THE PRESIDENT HIMSELF.

The Government's contention that the President can *never* be directly subjected to legal process for discretionary acts that relate to his official duties is also at odds with actual Supreme Court practice in cases after *Johnson*. In particular, in *United States v. Nixon*, 418 U.S. 683 (1974), the special prosecutor investigating the Watergate scandal, Leon Jaworski, issued a subpoena duces tecum to President Richard Nixon for "tapes, memoranda, papers, transcripts or other writings" related to specified meetings with the President. *Id.* at 688. Citing *Johnson*, President Nixon asserted that the disclosure of confidential communications was a discretionary decision that only the President could make, "and that his discretion is not subject to judicial review." Br. of Respondent Richard M. Nixon at 82, President of the United States, *United States v. Nixon*, Nos. 73-1766, 73-1834 (U.S. filed June 21, 1974). But the Supreme Court unanimously rejected that suggestion.

The Court explained that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *Nixon*, 418 U.S. at 706. Indeed, such unqualified immunity would "gravely impair the role of the courts under [Article] III." *Id.* at 707. Rather, as the Court recognized later in *Fitzgerald*, "the separate powers were not intended to operate with absolute independence," and the assertion of Presidential privilege needed to be balanced against "the legitimate needs of judicial process." *Id.*

Since *Nixon*, lower courts have considered suits seeking equitable relief against Presidents on the merits, rather than dismissing them on the "general principle" that the President

cannot be enjoined (as the Government urges here).  *See* Krugman Ray, *supra*, at 789-809.  The Court should follow the same course here.

## **CONCLUSION**

For the foregoing reasons, this Court should not grant Defendants' Motion for Summary Judgment on the ground that it lacks jurisdiction to enjoin the President.

Dated:  November 6, 2017                                   Respectfully Submitted,

/s/ Brian T. Burgess
Brian T. Burgess
Andrew Kim (application for *pro hac* admission forthcoming)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 346-4000
bburgess@goodwinlaw.com
andrewkim@goodwinlaw.com

Of Counsel:
Stephen I. Vladeck
727 East Dean Keeton Street
Austin, TX 78705
(512) 475-9198
svladeck@law.utexas.edu

*Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                                 /s/ Brian T. Burgess
                                                 Brian T. Burgess