**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

KNIGHT FIRST AMENDMENT INSTITUTE
AT COLUMBIA UNIVERSITY, *et al.*,

        *Plaintiffs*,

   v.

DONALD J. TRUMP, President of the United
States, *et al.*,

        *Defendants*.

No. 17-cv-5205 (NRB)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND
REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 2

I.    This Court Lacks Jurisdiction To Grant The Extraordinary Relief Plaintiffs Seek. ............ 2

    A.    Plaintiffs' Alleged Injuries Are Not Redressable Because Injunctive Relief Against The President Is Unavailable. ....................................................................... 2

    B.    Plaintiffs Have Not Established Standing To Sue The President's Aides. ............... 6

II.    The President's Decision to Block Users From His Personal Twitter Account Is Not Subject To The First Amendment. ...................................................................... 8

III.    The Individual Plaintiffs Do Not Have A First Amendment Right To Interact With Or "Follow" The @realDonaldTrump Account On Twitter. .................................................. 12

    A.    The President May Choose Whether To Interact With The Individual Plaintiffs On Twitter, And That Decision Is Not Subject To Forum Analysis. ........................... 13

        i.    The President's Decisions About Whom To Interact With Are Part And Parcel Of His Speech And Not Restricted By The First Amendment. ..................... 13

        ii.    The @realDonaldTrump Account Is A Channel For The President's Speech, Not A "Forum" For The Speech Of Private Parties. ...................................... 19

    B.    The Government Has Not Denied The Individual Plaintiffs Access To Government Information. ........................................................................................ 23

    C.    The Individual Plaintiffs Have No Free-Standing Right To Petition The Government Through The President's Personal Twitter Account. .......................... 24

CONCLUSION .......................................................................................................... 25

## Table of Authorities

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l*,
133 S. Ct. 2321 (2013) .................................................................................... 23

*Allen v. Wright*,
468 U.S. 737 (1984) ........................................................................................ 5

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ........................................................................................ 19

*Baker v. Carr*,
369 U.S. 186 (1962) ........................................................................................ 3

*Baumgartner v. United States*,
322 U.S. 665 (1944) ........................................................................................ 17

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011) ........................................................................................ 25

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001) ........................................................................................ 9

*Burns v. City of Utica*,
590 F. App'x 44 (2d Cir. 2014) ...................................................................... 10

*Claudio v. Sawyer*,
675 F. Supp. 2d 403 (S.D.N.Y. 2009) ............................................................ 10

*Clinton v. Jones*,
520 U.S. 681 (1997) ................................................................................ 3, 4, 5

*Colombo v. O'Connell*,
310 F.3d 115 (2d Cir. 2002) ........................................................................... 11

*Committee to Establish the Gold Standard v. United States*,
392 F. Supp. 504 (S.D.N.Y. 1975) ................................................................ 6

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ........................................................................... 14, 20, 21

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ........................................................................................ 7

*Davison v. Loudoun Cty. Bd. of Supervisors*,
No. 16-cv-932, 2017 WL 3158389 (E.D. Va. July 25, 2017) ......................... 9, 21

*Delta Const. Co. v. EPA*,
   783 F.3d 1291 (D.C. Cir. 2015) ............................................................ 8

*Doe v. Cuomo*,
   755 F.3d 105 (2d Cir. 2014) ................................................................ 8

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .............................................................. 3, 4, 6, 7

*FW/PBS, Inc. v. City of Dallas*,
   492 U.S. 215 (1990) ............................................................................ 2

*Gaines v. Thompson*,
   74 U.S. (7 Wall.) 347 (1868) .............................................................. 3

*Halperin v. Kissinger*,
   606 F.2d 1192 (D.C. Cir. 1979) .......................................................... 4

*Hein v. Freedom from Religion Found., Inc.*,
   551 U.S. 587 (2007) ............................................................................ 5

*Hudgens v. NLRB*,
   424 U.S. 507 (1976) .......................................................................... 20

*Jackson v. Metro. Edison Co.*,
   419 U.S. 345 (1974) ............................................................................ 9

*Kern v. City of Rochester*,
   93 F.3d 38 (2d Cir. 1996) .................................................................. 11

*L.A. Police Dep't v. United Reporting Publ'g Corp.*,
   528 U.S. 32 (1999) ............................................................................ 23

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................ 7

*Mahon v. Ticor Title Ins. Co.*,
   683 F.3d 59 (2d Cir. 2012) .................................................................. 7

*Make the Rd. by Walking, Inc. v. Turner*,
   378 F.3d 133 (2d Cir. 2004) .............................................................. 21

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ............................................................. 2

*Matal v. Tam*,
   137 S. Ct. 1744 (2017) ...................................................................... 23

*McDonald v. Smith*,
   472 U.S. 479 (1985) ..................................................................................... 24

*Minn. State Bd. for Cmty. Colleges v. Knight*,
   465 U.S. 271 (1984) ............................................................................. passim

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1867) ................................................... 2, 3, 4, 5

*Monitor Patriot Co. v. Roy*,
   401 U.S. 265 (1971) ..................................................................................... 17

*Monsky v. Moraghan*,
   127 F.3d 243 (2d Cir. 1997) ...................................................................... 10

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) .......................................................................... 16, 17

*Newdow v. Bush*,
   391 F. Supp. 2d 95 (D.D.C. 2005) .................................................... 6, 8

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ................................................................ 6

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ...................................................................................... 3

*O'Bradovich v. Vill. of Tuckahoe*,
   325 F. Supp. 2d 413 (S.D.N.Y. 2004) ................................................ 11

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) ................................................................. 16, 19, 24

*People for the Ethical Treatment of Animals v. Gittens*,
   414 F.3d 23 (D.C. Cir. 2005) ................................................................... 15

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983) ........................................................................... 14, 21

*Pitchell v. Callan*,
   13 F.3d 545 (2d Cir. 1994) .......................................................................... 9

*Plaut v. Spendthrift Farm, Inc.*,
   514 U.S. 211 (1995) ...................................................................................... 2

*Rodriguez v. Winski*,
   973 F. Supp. 2d 411 (S.D.N.Y. 2013) ................................................ 14

iv

*Rosenberger v. Rector and Visitors of the University of Virginia,*
515 U.S. 819 (1995) ............................................................................. 21, 22

*Sample v. Bureau of Prisons,*
466 F.3d 1086 (D.C. Cir. 2006) ........................................................... 24

*Se. Promotions, Ltd. v. Conrad,*
420 U.S. 546 (1975) ............................................................................. 16

*Schlesinger v. Reservists Comm. to Stop the War,*
418 U.S. 208 (1974) ............................................................................. 5

*Smith v. Ark. State Highway Emp., Local 1315,*
441 U.S. 463 (1979) ............................................................................. 15

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011) ............................................................................. 23

*Spargo v. N.Y. State Comm'n on Judicial Conduct,*
351 F.3d 65 (2d Cir. 2003) .................................................................. 25

*Student Gov't Ass'n v. Bd. of Trustees of Univ. of Mass.,*
868 F.2d 473 (1st Cir. 1989) ............................................................... 15

*Sutliffe v. Epping Sch. Dist.,*
584 F.3d 314 (1st Cir. 2009) ............................................................... 22

*Swan v. Clinton,*
100 F.3d 973 (D.C. Cir. 1996) ............................................................. 6, 7

*United States v. Am. Library Ass'n,*
539 U.S. 194 (2003) ............................................................................. 14, 20

*United States v. Burr,*
25 F. Cas. 187 (C.C.D. Va. 1807) ...................................................... 4

*United States v. Classic,*
313 U.S. 299 (1941) ............................................................................. 8, 9

*United States v. Nixon,*
418 U.S. 693 (1974) ............................................................................. 4

*Van Orden v. Perry,*
545 U.S. 677 (2005) ............................................................................. 9

*W. Farms Assocs. v. State Traffic Comm'n of State of Conn.,*
951 F.2d 469 (2d Cir. 1991) ................................................................ 20

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
   135 S. Ct. 2239 (2015) .................................................................................. 13, 14, 20

*West v. Atkins*,
   487 U.S. 42 (1988) ................................................................................................. 8, 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................................... 4, 7

*Zherka v. DiFiore*,
   412 F. App'x 345 (2d Cir. 2011) ............................................................................ 11

## Statutes

42 U.S.C. § 1983 ............................................................................................................ 9

## Other Authorities

13A Wright & Miller, Federal Practice & Procedure § 3531.5 (3d ed.) ......................... 7

Barack Obama, Twitter, https://twitter.com/barackobama .......................................... 11

Jessica Roy, *On last day of work, Twitter employee deactivates President Trump's account*,

   L.A. Times (Nov. 2, 2017), http://fw.to/ON9b3Ik ................................................... 22

President Obama, Twitter, https://twitter.com/potus44 ............................................... 11

Terms of Service, Twitter, https://twitter.com/en/tos ................................................. 22

Twitter, "About replies and mentions," https://support.twitter.com/articles/14023 ..................... 17

Twitter, "Blocking accounts on Twitter," https://support.twitter.com/articles/117063 .......... 14, 16

Twitter, "Getting started with Twitter," https://support.twitter.com/articles/215585 ................. 16

Twitter, "Muting Accounts on Twitter," https://support.twitter.com/articles/20171399 ............ 14

U.S. Const. amend I ....................................................................................................... 24

## INTRODUCTION

Plaintiffs' conception of the First Amendment's reach is extraordinary, transforming it from a bulwark against unlawful government regulation of speech into a tool for supervising the President's personal Twitter account—an account he created eight years before assuming office. To make that result more palatable, Plaintiffs paint in broad strokes: they label every decision the President makes about his account state action and recast every interaction (or potential interaction) a public official has with a constituent as a "forum," subjecting basic decisions about whether to begin or end a conversation—on social media or otherwise—to judicial scrutiny.

This Court should reject Plaintiffs' undifferentiated application of the First Amendment. Plaintiffs do not challenge any official act or statement the President has made on his Twitter account, but rather the President's choice to use a standard Twitter feature that enables him to customize his personal interaction with other users.  That choice is not state action.  Even if it were, the President's participation in Twitter's privately controlled marketplace of ideas does not create a public forum, and his decisions about whom to engage with on that platform do not directly regulate the speech of other users.  Instead, and as Plaintiffs concede, the President's decision to block other Twitter users prevents only their direct interaction with *him*, while leaving Plaintiffs free to continue voicing their criticism and political views on the site.

The novelty of Plaintiffs' alleged First Amendment injury mirrors the unprecedented nature of the relief they seek to redress it.  Plaintiffs cite no case in which a court has enjoined the President's discretionary exercise of executive power.  Yet after treating the President's actions at issue here as precisely that, Plaintiffs ask this Court ask to take the extraordinary step of overseeing the President's daily operation of his personal Twitter account.  The Court should, and in fact must, decline this invitation.

1

**ARGUMENT**

## I.      This Court Lacks Jurisdiction To Grant The Extraordinary Relief Plaintiffs Seek.

Plaintiffs fail to meet their summary-judgment burden to establish standing to bring their claims.[1]  The evidence establishes neither that the Knight Institute has a cognizable injury,[2] nor that the Individual Plaintiffs' alleged injuries are traceable to anyone other than the President.  And Plaintiffs' citation to certain exceptional circumstances in which courts exercised jurisdiction over lawsuits involving the President fails to establish the availability of such relief in this case.

### A.  Plaintiffs' Alleged Injuries Are Not Redressable Because Injunctive Relief Against The President Is Unavailable.

Even assuming the President's choices about whom to interact with on Twitter constitute state action (which, as discussed below, they do not), Plaintiffs have failed to demonstrate that the relief they seek is available.  In an effort to root their novel lawsuit in established precedent, Plaintiffs attempt to reframe this case as presenting a question of the Court's duty "'to say what the law is' in particular cases and controversies."  *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 26 (1803)).  But that axiomatic statement presumes a justiciable case or controversy, and Plaintiffs have not established that one of the elements of a justiciable case—redressability—is available.

---

[1] For convenience, this memorandum uses the following abbreviations: Stipulation ("Stip."), ECF No. 30-1; Mem. in Supp. of Mot. for Summ. J. ("Defs.' Br."), ECF No. 35; Pls.' Cross-Mot. for Summ. J. and Opp'n to Defs.' Mot. for Summ. J ("Pls.' Br."), ECF No. 43; Br. of *Amici Curiae* First Am. Legal Scholars in Supp. of Pls.' Mot. for Summ. J. ("FALS Br."), ECF No. 47; Br. of *Amicus Curiae* Elec. Frontier Found. in Supp. of Pls.' Mot. for Summ. J. ("EFF Br."), ECF No. 49; Br. for Fed. Courts Scholars as *Amici Curiae* Supporting Pls. ("Fed. Cts. Br."), ECF No. 51.

[2] In a footnote, Plaintiffs make a conclusory assertion of the Knight Institute's standing, Pls.' Br. 22 n.9, which rests on a speculative chain of inferences.  Defs.' Br. 6.  Plaintiffs note that one link in that chain—that a Knight Institute staffer actually reads @realDonaldTrump comment threads—can be "inferred from the fact that the Knight Institute follows @realDonaldTrump."  Pls.' Br. 22 n.9 (citing Stip. ¶ 1).  But standing must appear affirmatively in the record, *FW/PBS, Inc. v. City of Dallas*, 492 U.S. 215, 231 (1990), and in any event, Plaintiffs offer no evidence of the other necessary links in the chain of inferences.  *See also* Defs.' Br. 6 (Knight Institute's injury is a generalized grievance).

The Supreme Court spoke clearly in *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867), when it explained that courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties," *id.* at 501, and that "general principles . . . forbid judicial interference with the exercise of Executive discretion," *id.* at 499.  Five Justices of the Supreme Court revisited and agreed on this point in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), without any dissent on the issue.  *Id.* at 802-03 (plurality); *id.* at 826 (Scalia, J., concurring); *see also id.* at 807-23 (Stevens, J., concurring).  These cases counsel that the constitutional separation of powers precludes this Court from assuming control over the President's discretionary official conduct in the form of an equitable injunction.

Plaintiffs argue that the government misreads the Court's statements of separation-of-powers principles, *see* Pls.' Br. 30; *see also* Fed. Cts. Br. 3-8, but regardless of the factual context in which *Mississippi* arose or the precedential effect of *Franklin*, these principles have been restated and relied on for more than a century.  *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 719 (1997) (Breyer, J., concurring) (discussing Justice Scalia's concurrence in *Franklin* without disagreement); *Nixon v. Fitzgerald*, 457 U.S. 731, 753 n.34 (1982) (citing *Mississippi*, 71 U.S. at 501 for the proposition that courts "have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint"); *Baker v. Carr*, 369 U.S. 186, 225 n.52 (1962) (describing the holding of *Mississippi*); *Gaines v. Thompson*, 74 U.S. (7 Wall.) 347 (1868) (same); *see also* Defs.' Br. 9.

Plaintiffs make no argument that the President's decision to block users is anything other than a discretionary exercise of his executive powers.  *Cf.* Pls.' Br. 31 (stating that the challenged actions are "untethered from any constitutional or statutory duty").  They do not suggest, for example, that the President has a ministerial obligation to unblock users on Twitter.  *See Franklin*,

505 U.S. at 802 (plurality) (noting that *Mississippi* left open "the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty'" (quoting *Mississippi*, 71 U.S. at 498-99)).  And Plaintiffs do not cite any case where a court has done what Plaintiffs ask this Court to do: exercise equitable authority to exert direct control over the President's day-to-day, discretionary conduct as the head of the Executive Branch.  Indeed, the Supreme Court has described such relief as "without a precedent," *Mississippi*, 71 U.S. at 500, in an "apparently unbroken historical tradition," *Franklin*, 505 U.S. at 827 (Scalia, J., concurring).

Instead, Plaintiffs rely on two lines of inapposite cases.  First, Plaintiffs observe that official presidential conduct may be subject to judicial review in appropriate cases through actions directed at the President's subordinates.  *E.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952).  That unremarkable statement is entirely consistent with—and in fact supports—the notion that injunctive relief directed at the President himself is precluded.  Second, Plaintiffs cite to cases where courts have held that the President is amenable to judicial process in certain limited circumstances.  Pls.' Br. 29; *see also* Fed. Cts. Br. 12-13.  But these cases addressed either damages actions for unofficial conduct, *Jones*, 520 U.S. at 692-95, or a subpoena *duces tecum* issued in a criminal proceeding, *United States v. Nixon*, 418 U.S. 693, 714-16 (1974); *United States v. Burr*, 25 F. Cas. 187, 191, 196 (C.C.D. Va. 1807) (No. 14,694).  Neither line of cases addresses an equitable grant of injunctive relief directed at the President's executive discretion.  Indeed, the Court in both *Mississippi* and *Franklin* expressly distinguished the subpoena line of cases upon which Plaintiffs so heavily rely.  *See, e.g.*, *Franklin*, 505 U.S. at 802-03 (plurality); *Mississippi*, 71 U.S. at 479 (describing plaintiff's reliance on *Burr*).[3]

---

[3] *Amici* Federal Courts Scholars argue that *Youngstown* and similar cases support the exercise of jurisdiction to impose equitable restraints on the President's personal exercise of the executive power.  Fed. Cts. Br. 8-11.  *Amici* root this argument in the contention that the Supreme Court has created an irrational "legal fiction."  *Id.* at 9 (describing the

In contrast to this inapposite legal authority, the injunction that Plaintiffs seek here is of a very different kind.  Plaintiffs request that the Court supervise the President's personal operation of his social media account, including his selection of individuals to interact with on that account, in the absence of any ministerial obligation imposed by law.  The Court authorized judicial process directed at the President in *Jones*, *Nixon*, and *Burr* only in narrow and unusual circumstances unrelated to the President's exercise of executive discretion.  Nowhere in any of these cases did the Court contemplate an Article III judge assuming the power to instruct the Chief Executive on how to perform his official duties on a day-to-day basis—an issue at the core of the *Mississippi* line of cases.  *See, e.g.*, *Jones*, 520 U.S. at 701 ("Whatever the outcome of this case, there is no possibility that the decision will curtail the scope of the official powers of the Executive Branch.").  In effect, Plaintiffs seek to "deputize federal courts as 'virtually continuing monitors of the wisdom and soundness of Executive action'" by wielding injunctions to police the President's personal decisions, which, "most emphatically, 'is not the role of the judiciary.'"  *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 612 (2007) (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)); *see also Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222 (1974) (counseling that "distort[ing] the role of the Judiciary in its relationship to the Executive . . . [could] open the Judiciary to an arguable charge of providing 'government by injunction'").

That outcome, as the *Mississippi* line of cases has recognized, is not countenanced by the separation of powers.  *See* 71 U.S. at 500; *see also* Defs.' Br. 9.  Plaintiffs suggest that this line of

---

reasoning of *Mississippi* as "unpersuasive"); *id.* at 10 (suggesting "there is no 'rational basis'" for treating subordinates differently (quoting *Halperin v. Kissinger*, 606 F.2d 1192, 1211-12 (D.C. Cir. 1979))).  But *amici*'s academic disagreement with the reasoning or import of precedent is no basis for this Court to depart from it.  Remarkably, *amici* go so far as to suggest that there is nothing left to *Mississippi* after *Nixon*.  *Id.* at 12-13 ("Since *Nixon*, lower courts have considered suits seeking equitable relief against Presidents on the merits, rather than dismissing them on the 'general principle' that the President cannot be enjoined[.]").  But that extreme reading of *Nixon* cannot be reconciled with a careful consideration of the Court's decision, the *Franklin* plurality's distinguishing of the subpoena cases, or the practice of federal courts since *Nixon* was decided in 1974.  *See* Defs.' Br. 9 (citing cases).

precedent should be given little weight because in each instance the court could have enjoined a subordinate official or ruled against plaintiffs on another ground.  Pls.' Br. 31 n.13.  Not so.  For example, in this Court's decision in *Committee to Establish the Gold Standard v. United States*, 392 F. Supp. 504 (S.D.N.Y. 1975), the Court dismissed the President as a defendant solely on the basis of *Mississippi*.  *Id.* at 506 ("The President of the United States is not amenable to suit in his official capacity where an injunction is sought that would affect the performance of the non-ministerial duties of his office.").  And in any event, the availability of an alternative basis for decision does little to diminish the persuasive force of these courts' reasoning.  *See, e.g.*, *Newdow v. Bush*, 391 F. Supp. 2d 95, 106 (D.D.C. 2005) (determining that there was no "viable alternative to enjoining the President" because "only an injunction or declaratory judgment against the President [could] redress plaintiff's injury," and holding that the court was "without the authority to grant such relief," despite also concluding that the case was moot).  This Court should not depart from the weight of authority to enjoin the President's discretionary executive conduct.[4]

### B.  Plaintiffs Have Not Established Standing To Sue The President's Aides.

Plaintiffs acknowledge that the President, not his aides, blocked the Individual Plaintiffs, Pls.' Br. 11 (describing "the President's blocking"); Stip. ¶¶ 46-52, but contend that presidential aides nonetheless "may be ordered to redress injuries caused by the President's actions, regardless

---

[4] Plaintiffs offer no explanation why declaratory relief is different than injunctive relief in this regard, Pls.' Br. 31 n.14, and it is not.  Courts have treated declaratory relief substantially the same when considering these questions. *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) ("[S]imilar considerations regarding a court's power to issue relief against the President himself apply to [a plaintiff's] request for a declaratory judgment"); *Newdow*, 391 F. Supp. 2d at 105 ("[T]he reasoning is equally applicable to declaratory judgments.").  As Justice Scalia wrote in *Franklin*, the issuance of a "declaratory judgment against the President" is "incompatible with his constitutional position."  505 U.S. at 827 (Scalia, J., concurring).  "Many of the reasons" that the Supreme Court acknowledged in recognizing absolute immunity from damages liability "apply with equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions."  *Id.* Declaratory relief would prove equally distracting and "produce needless head-on confrontations between district judges and the Chief Executive."  *Id.* at 827-28.  Just as Plaintiffs lack authority or precedent for the injunctive relief they seek, courts "have never submitted the President to declaratory relief" in the manner that Plaintiffs request. *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010).

whether those aides were personally responsible for those injuries." Pls.' Br. 32. Plaintiffs' "proposed interpretation of Article III—that it permits suits against non-injurious defendants as long as one of the defendants in the suit injured the plaintiff—is unprecedented." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62-63 (2d Cir. 2012). Subordinates may be ordered to provide redress in certain suits challenging presidential action, *e.g.*, *Youngstown*, 343 U.S. at 587-88, but Plaintiffs still must establish standing to sue each subordinate. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press."). Whether a subordinate is carrying out a presidential directive, *e.g.*, *Swan v. Clinton*, 100 F.3d 973, 979 (D.C. Cir. 1996), or separately injures the plaintiffs, *e.g.*, *Franklin*, 505 U.S. at 803 (plurality), a proper subordinate defendant must be part of the action that caused the injury providing the jurisdictional basis for a lawsuit.

Plaintiffs would have this Court ignore fundamental principles and simply assume standing: if Mr. Scavino *could* provide relief, they argue, he should be ordered to do so.[5] Tellingly, Plaintiffs cite no authority for this proposition. *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (describing the "irreducible constitutional minimum" of standing). The Court must exercise jurisdiction to order relief, and standing is necessary to the Court's jurisdiction. Plaintiffs' suggestion that Mr. Scavino "is contributing to their ongoing injuries" by "failing to unblock them," Pls.' Br. 33, is simply a repackaging of the argument that traceability is not required. To the extent Plaintiffs contend that Mr. Scavino was "obliged to prevent an injury," that argument "is as good as the duty to prevent the harm" and "irrelevant" where there is no such duty. 13A Wright & Miller, Federal Practice & Procedure § 3531.5 (3d ed.). Mr. Scavino has no affirmative "duty to unblock" imposed by law.

---

[5] Ms. Hicks and Ms. Sanders do not have access to the account, Stip. ¶¶ 10-11, and Plaintiffs make no argument that they could provide relief. Summary judgment should be granted to these defendants on that basis alone.

In any event, an order of relief directed at Mr. Scavino alone would not provide redress because an ongoing injury is not redressable where there is an independent cause.  *See, e.g.*, *Delta Const. Co. v. EPA*, 783 F.3d 1291, 1295-97 (D.C. Cir. 2015) (holding that plaintiffs lacked standing to challenge an EPA rule absent challenge to a coordinated and identical NHTSA rule); *Doe v. Cuomo*, 755 F.3d 105, 114 & n.5 (2d Cir. 2014) (finding no standing to challenge statute where conduct was proscribed by unchallenged laws).  Any order effecting redress ultimately must include the President, who blocked the Individual Plaintiffs and will retain the authority to block users from the @realDonaldTrump account.  *See, e.g.*, *Newdow*, 391 F. Supp. at 106 (concluding that only the President could provide relief).  And as discussed above, the relief Plaintiffs seek from the President is not available.

## II.   The President's Decision to Block Users From His Personal Twitter Account Is Not Subject To The First Amendment.

Plaintiffs cannot establish that the President's decisions about whom to interact with on Twitter are subject to the First Amendment.  To bring their claim, Plaintiffs must establish that the President "exercised power 'possessed by virtue of [federal] law and made possible only because [he was] clothed with the authority of [federal] law."  *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).  But Plaintiffs offer no explanation why or how federal law could be considered the source of the President's authority to block users from his personal Twitter account.  Indeed, Plaintiffs argue that the President's actions are "untethered from any constitutional or statutory duty," such that "[e]njoining the President . . . would not interfere in any way with the President's exercise of the powers that the Constitution vests in him, or with the discharge of duties that the Constitution assigns to him."  Pls.' Br. 29, 31.

Nonetheless, Plaintiffs ask the Court to consider the President's personal Twitter account a "tool of governance" and treat any use of the account as state action.  Pls.' Br. 12-15.  Plaintiffs

derive this proposed test from a recent case addressing a municipal official's Facebook page. *Davison v. Loudoun Cty. Bd. of Supervisors*, No. 16-cv-932, 2017 WL 3158389 (E.D. Va. July 25, 2017), *appeal docketed sub nom. Davison v. Randall* (4th Cir. Aug. 29, 2017) (No. 17-2002). Plaintiffs' reliance on that case, which is both distinguishable on its facts and of limited instructional value here,[6] conflicts with Plaintiffs' own exhortation that the Court should "look to the nature of the officer's *act*." Pls.' Br. 16 (quoting *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994)) (emphasis added). Rather than addressing the specific act at issue, Plaintiffs focus on the *medium* used as part of that act—a view that "mistakes the part for the whole." Pls.' Br. 2.

It cannot be the case that any personal medium of communication created or maintained by public officials in their personal capacity is subject to an all-or-nothing state action analysis when that person later becomes an officer of the state. There can be no dispute that the President established the @realDonaldTrump account as a private citizen and continues to use the account for personal and political uses, distinct from any governmental acts that Plaintiffs ascribe to it. Pls.' Br. 12-13 n.4; Defs.' Br 13 n.7; Stip. Ex. A, ECF 30-1. A person may engage in private actions in an official setting and use the "tools of governance" for private purposes. *Cf. Van Orden v. Perry*, 545 U.S. 677, 723 (2005) (Stevens, J., dissenting) ("[W]hen public officials deliver public

---

[6] *Davison* did not deal with a longstanding personal account retained after an official assumes office but rather an account established with the purpose of governance in mind. 2017 WL 3158389 at \*7 ("The impetus for Defendant's creation of the 'Chair Phyllis J. Randall' Facebook page was, self-evidently, Defendant's election to public office."). And in any event, *Davison* grounds its analysis in a line of state-action cases addressing whether a private actor is sufficiently imbued with state power such that its conduct may be considered state action. *See, e.g., Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001) (assessing whether a private interscholastic athletic association engaged in state action). These cases ask whether "there is such a 'close nexus between the State and the challenged action' that the seemingly private behavior 'may be fairly treated as that of the State itself.'" *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). This inquiry is a poor fit for cases where courts must assess whether a public official acted in a private capacity; a public official's conduct seemingly would always have a nexus with the state based on the simple fact that the defendant is an officer of the state. The more appropriate question is whether the official "exercised power 'possessed by virtue of [federal] law'" when engaging in the challenged conduct, as this test—typically applied in analogous 42 U.S.C. § 1983 cases to determine whether an official has acted under color of law or in his personal capacity—focuses on the question whether the official uses state power conferred on him by his position. *West*, 487 U.S. at 49 (quoting *Classic*, 313 U.S. at 326)).

speeches, we recognize that their words are not exclusively a transmission from *the* government because those oratories have embedded within them the inherently personal views of the speaker[.]"); *Burns v. City of Utica*, 590 F. App'x 44, 50 (2d Cir. 2014) (concluding that on-duty firefighter acted in private capacity); *Claudio v. Sawyer*, 675 F. Supp. 2d 403, 409-10 (S.D.N.Y. 2009), *aff'd*, 409 F. App'x 464 (2d Cir. 2011) (concluding that police officer's use of service weapon is not sufficient to establish state action).  To conclude otherwise would place form over function, rendering any action conducted with a tool used for both personal and public uses—for example, the President's phone—the action of the state.

The challenged action at issue here is the President's decision to block users from his personal Twitter account.  But Plaintiffs' state-action analysis addresses blocking only in passing, Pls.' Br. 16, offering no explanation why the decision to block a Twitter user from a personal account is an exercise of the executive power that the President possesses by virtue of federal law. As Defendants have explained, Defs.' Br. 13, the President availed himself of one of several tools that Twitter provides to allow users to structure their own interactions on the platform, and did so on the same terms as any other user.  That the Press Secretary stated that the President's tweets may be considered "official statements" or that the National Archives and Records Administration has advised the White House to preserve the President's tweets says nothing about the President's entirely separate decision to block users.  *See* Pls.' Br. 13-14 (citing, *e.g.*, Stip. ¶¶ 37, 40).

Because "ordinary citizens" may (and do) take the same action on the same platform as the President—blocking users on their personal Twitter accounts—this is not a case where an official "was enabled to take the alleged actions only because of his [official] status."  *Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997).  The President could take the same act before taking office and after leaving office—assuming Twitter retains this feature in the same format, a decision

entirely beyond his control.  And the record does not support the conclusion that the President's decision was made for any reason other than the President's own personal desire not to interact with the Plaintiffs' accounts.  *Cf. Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) (finding no state action where city official acted "solely for the benefit of [his] union, not for the benefit of the City").  In fact, one of the principal factors on which Plaintiffs rely in support of their state action argument—the role that a handful of aides play in drafting tweets or suggesting content, Pls.' Br. 14—indisputably does not apply to the President's decision to block users from his personal account, including the Individual Plaintiffs.  Stip. ¶¶ 36, 46-52.

Plaintiffs suggest that this decision could be viewed as state action because it was "based on the Individual Plaintiffs' response to the President's tweets about official matters."  Pls.' Br. 16.  But the Second Circuit has made clear that such facts are not dispositive.  In *Colombo v. O'Connell*, 310 F.3d 115, 118 (2d Cir. 2002) (per curiam), for example, the plaintiff filed a petition to recall a school official, alleging unlawful conduct, and the official hired a private lawyer to write a letter threatening a libel suit in response.  *Id.* at 116-18.  The Second Circuit concluded that this private response to criticism of official conduct was not state action because the official's power to threaten suit was not possessed by virtue of state law.  *Id.* at 118; *see also, e.g.*, *Zherka v. DiFiore*, 412 F. App'x 345 (2d Cir. 2011) (per curiam); *O'Bradovich v. Vill. of Tuckahoe*, 325 F. Supp. 2d 413 (S.D.N.Y. 2004).

Public officials, including this President and his predecessor, can be associated with both official and personal Twitter accounts, which may convey similar or altogether different information.  *Compare* Barack Obama, Twitter, https://twitter.com/barackobama (last visited Nov. 17, 2017), *with* President Obama, Twitter, https://twitter.com/potus44 (last visited Nov. 17, 2017).  But Plaintiffs would have this Court conflate those accounts, no matter the context for their

11

creation or the facts surrounding their use, by adopting a sweeping rule that brings private conduct within the scope of state action.  The Court should reject this approach and hold that the President's decision to block users from his personal account is not an exercise of state power.

### III.    The Individual Plaintiffs Do Not Have A First Amendment Right To Interact With Or "Follow" The @realDonaldTrump Account On Twitter.

Plaintiffs' sweeping First Amendment arguments are rooted in high-level propositions about social media, rather than the specific factual context this case presents.  Anyone with an internet connection, including the Individual Plaintiffs, can view the @realDonaldTrump account, read the tweets the President posts, and review what other Twitter users have to say in response.  Stip. ¶¶ 18, 36, 55.  When an individual takes the additional step of signing up for a Twitter account, he gains the ability to "interact with users" on the Twitter platform and participate in the overlapping conversations the platform facilitates.  *Id.* ¶¶ 18, 22-23.  Of course, in the "real" (non-digital) world, a conversation requires two willing participants.  And everyone—even public officials—sometimes decides to tune out, walk away from, or even refuse to begin conversations with other individuals for any host of reasons.  Perhaps in recognition of this fact, Twitter has created the "block" feature to allow users to bow out of unwelcome conversations.  Stip. ¶ 28.  In other words, when the blocked user is logged into the blocked Twitter account, he cannot message, reply to, or visit the page of the blocking user.  *Id.*  But when he is logged out, the blocked user is on the same footing as any other member of the general public.  *See id.* ¶¶ 28, 54-55.

Plaintiffs' position is that whenever the President uses the "block" feature, he violates the First Amendment if he happens to disagree with the views of someone he decides not to engage with—in other words, that the Constitution requires him or any other public official to continue that interaction as an unwilling listener.  That absolutist view of the First Amendment is not the law.

### A. The President May Choose Whether To Interact With The Individual Plaintiffs On Twitter, And That Decision Is Not Subject To Forum Analysis.

The @realDonaldTrump account is a channel through which the President expresses his views on a range of subjects and makes expressive choices about the information he consumes and the individuals with whom he interacts. The account itself accordingly is not a "public forum" for the speech of private individuals and is not subject to the restrictions that accompany such a designation. Plaintiffs' arguments to the contrary misapprehend the relevant First Amendment principles and the manner in which those principles apply to the interactions that Twitter facilitates.

### i. The President's Decisions About Whom To Interact With Are Part And Parcel Of His Speech And Not Restricted By The First Amendment.

Plaintiffs do not contest that the vast majority of the actions the President takes through his Twitter account are *his* speech—that when he publishes a tweet, retweets the contents of another account, or selects an image for his Twitter page, those actions are not restricted by the First Amendment. *See* Defs.' Br. 15. Plaintiffs agree that if those choices are considered actions of the state, they are at most government speech. *Id.* at 14-15; *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015) ("First Amendment strictures that attend the various types of government-established forums do not apply" to government speech.). The only question, then, is whether the President's choices about whom to interact with on Twitter are subject to a different, more searching form of First Amendment scrutiny. In the non-digital world, that question has an easy answer: No.

When an elected official is out in public, he is free to choose with whom he does, and does not, speak. He can talk politics with a supporter in a park, and he can discuss policy with a critic on a public street. But he can also do none of the above—he can decide not to take photos with supporters, and therefore wave away anyone who expresses agreement with his views, and he can refrain from engaging with constituents that he knows to be unpleasant critics, reasoning that there

are better uses of his time.  Moreover, the official can repeat the same choices over time—he can choose to always steer clear of an overly enthusiastic supporter, and he can make a practice of ignoring an especially unpleasant critic that he knows he will never persuade.[7]

If someone ignored by a public official under these kinds of circumstances tried to bring a lawsuit, he would lose.  Even if a court were to conclude that the daily choices an elected official makes about whom to interact with are state action, the First Amendment would not constrain those choices.  The Supreme Court has long held that "[a] person's right to speak is not infringed when government simply ignores that person while listening to others."  *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 288 (1984).  Accordingly, these associational decisions "that take the form of speech" would be subject to, at most, the rules for government speech, which do not require viewpoint neutrality.  *Walker*, 135 S. Ct. at 2245-46; *United States v. Am. Library Ass'n*, 539 U.S. 194, 205 (2003) (plurality opinion).

The setting in which a public official makes these kinds of associational decisions does not alter the analysis.  An official can wave off a trade association representative at a reception on private property (which is not a First Amendment "forum," *see Rodriguez v. Winski*, 973 F. Supp. 2d 411, 420 (S.D.N.Y. 2013)); he can decline to chat with an environmental advocate that he encounters in a government building (a "nonpublic forum," *see Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 805 (1985)); and he can ignore a protestor's invitation to strike up a conversation in a public park (a "traditional" public forum, *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).  The analysis does not differ across these settings

---

[7] The manner in which a public official chooses not to engage with a constituent does not alter this analysis.  An official can tune out an unpleasant conversation, walk away in the middle of it, or avoid a conversation before it has been begun.   The same is true on Twitter.   *Compare* Twitter, "Muting Accounts on Twitter," https://support.twitter.com/articles/20171399 (last visited Nov. 17, 2017), *with* Twitter, "Blocking accounts on Twitter," https://support.twitter.com/articles/117063 (last visited Nov. 17, 2017).

because in each the official is serving as a participant in, not a regulator of, the marketplace of ideas.[8]  *See Student Gov't Ass'n v. Bd. of Trustees of Univ. of Mass.*, 868 F.2d 473, 477 (1st Cir. 1989) (distinguishing between "the government in its role as a *regulator* in the marketplace of ideas" and the government's role "as a *player* in the marketplace of ideas" (emphasis added)); *see also People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28-31 (D.C. Cir. 2005).

Put differently, because the official is not actually denying anyone the chance to speak—the protestor, for instance can continue protesting after the official has walked by—the First Amendment does not impose viewpoint-based restrictions on the public official's conduct.  Instead of curtailing speech, the public official who avoids a protester is simply declining to have that speech directed at *him*, a decision that can itself be the subject of speech and criticism.  *See Knight*, 465 U.S. at 300 (Stevens, J., dissenting) ("It is inherent in the republican form of government that high officials may choose—in their own wisdom and at their own peril—to listen to some of their constituents and not to others.").  To be sure, the decision not to engage with a particular individual will disappoint whomever the public official chooses to ignore.  Engaging directly with a public official in a setting where others can witness the interaction is an opportunity to garner attention and amplify one's message.  But the risk of losing out on that "[a]mplification . . . is inherent in [the] government's freedom to choose" with whom to speak.  *Id*. at 288 (majority opinion). Accordingly, whatever "impairment" results from these decisions "is not one the Constitution prohibits."  *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 466 (1979) (per curiam).

The First Amendment does not impose additional requirements on a public official's associational decisions when the official participates in a digital "space" controlled by a private

---

[8] Plaintiffs' conception of the relevant First Amendment principles likewise appears not to vary across settings, but with the absurd result that even at private events (like conferences or fundraisers), a public official would not be free to choose with whom he speaks.  *See* Defs.' Br. 20.

company, instead of a more familiar physical space like a park.  That is particularly true in the

context of Twitter, which stands out among social media sites for mirroring the kinds of back-and-

forth conversations that take place in the non-digital world.[9]  As Plaintiffs concede, "the defining

feature of Twitter is its facilitation of real-time interaction."  Pls.' Br. 18.  Twitter's website

highlights the fact that the platform makes such interactions possible on an unprecedented scale,

noting that users can "[j]oin or start any conversation in the world with a simple Tweet."  Twitter,

"Getting started with Twitter," https://support.twitter.com/articles/215585 (last visited Nov. 17,

2017).  And Twitter describes "blocking" as "a feature that helps you control how you *interact*

with other accounts on Twitter."  Twitter, "Blocking accounts on Twitter," https://support.

twitter.com/articles/117063 (last visited Nov. 17, 2017) (emphasis added); *see also* Stip. ¶ 28.

These characteristics reinforce that the Court should treat a public official's decision not to interact

with someone on Twitter the same as it would treat that choice in a non-digital setting.

Accordingly, the President's choices not to interact with the Individual Plaintiffs on Twitter should

be considered, at most, government speech.

Plaintiffs would regulate these choices through a rule of astounding reach: a blanket First

Amendment prohibition on public officials choosing to ignore ("not to hear from") certain critics.

*See* Pls.' Br. 21.  That position is untenable.  As an initial matter, the only authorities Plaintiffs cite

for this position are entirely unrelated to the issue of whether a government official must permit

everyone that wants to engage with him in a public setting to do so.  *See id.*  All three of the cited

cases instead involve a government attempt to use the law to effectively *prohibit* critical or disloyal

speech and punish the offender.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 256 (1964)

---

[9] The distinction between various social media platforms reinforces the value of looking closely at Twitter and the @realDonaldTrump account specifically, rather than lumping together all forms of social media (or the internet writ large).  *Compare Packingham v. North Carolina*, 137 S. Ct. 1730, 1744 (2017) (Alito, J., concurring in the judgment), *with* FALS Br. at 6-7; *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975).

(Alabama city commissioner had been awarded $500,000 in suit claiming that an ad about backlash to the civil rights movement was libelous); *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 266–67 (1971) (candidate had won $20,000 in libel action against a newspaper that published a column critical of him); *Baumgartner v. United States*, 322 U.S. 665, 665-69 (1944) (government had revoked the citizenship of a German-born man for statements supportive of Hitler and the Nazis).

But in *Sullivan*, *Roy*, and *Baumgartner*, the Court had to resolve the foundational issue of whether the targeted speech was *lawful*, not whether a public official had to listen to it.[10]  Here, although the Individual Plaintiffs have been blocked from engaging with a particular Twitter account, they remain fully able to engage in "vehement, caustic, and sometimes unpleasantly sharp attacks on [the] government," *Sullivan*, 376 U.S. at 270, as a cursory look at their Twitter accounts confirms.  Since they were blocked, the Individual Plaintiffs have continued to engage in extensive criticism of the President, on a platform accessible to the general public, and in a manner that directly links the President's Twitter account to their comments.[11]  Thus, the blocking does not prevent Plaintiffs' speech; it simply alters their relationship with the President himself by eliminating direct interaction.  *See Knight*, 465 U.S. at 288 ("A person's right to speak is not infringed when government simply ignores that person while listening to others.").

---

[10] Further underscoring why this case is different is the hyperbolic suggestion from the First Amendment Scholars that blocking the Individual Plaintiffs is analogous to an authoritarian regime's efforts to "quash[] democratic impulses." FALS Br. 19.  The robust and unimpeded criticism of the President (along with countless other public officials) that takes place on Twitter confirms that any such comparison is fanciful.

[11] *See, e.g.*, Stip. Ex. C at 4 ("Anyone who stands behind Trump at this point tacitly endorses racism at a minimum."), ECF No. 33-3; *id.* Ex. D at 13 ("President Snowflake must be protected from ugly pictures"), ECF No. 33-4; *id.* Ex. E at 8 ("I call him 'Nostradumbass'"), ECF No. 33-5; *id.* Ex. F at 1 ("Trump is so quick to condemn anyone who is either a woman or a person of color.  It's a misogynist, racist Pavlonian response."), ECF No. 33-6; *id.* Ex. G at 4 ("I want to go back to the days when the celebrity I hated most was The Kardashians and @realDonaldTrump was just some pervy old guy."), ECF No. 33-7; *id.* Ex. H at 5 ("Trumpcare: $800,000,000,000 taken from poor to give to rich.  @realDonaldTrump now starts to kill Americans for money . . ."), ECF No. 33-8; *see also* Twitter, "About replies and mentions," https://support.twitter.com/articles/14023 (last visited Nov. 17, 2017) (explaining that when a Twitter user inserts another person's username (like @realDonaldTrump) into the body of a tweet, other users searching for that username can see the tweets that "mention" the username).

According to Plaintiffs, the President has no ability to ignore someone who wishes to speak to him directly.  Adopting that position would place courts in the untenable role of policing basic decisions that public officials make, in both digital and "real world" settings, about whether to engage with a member of the public.  For example, if a congressman walks away from an advocacy group's lawyer at a public reception, can the lawyer ask a court to determine his motivation for leaving?  If a mayor turns away from a protestor at a public event, can a court force him to return until the protestor is finished?  In neither situation is the individual prohibited from speaking after the official leaves; courts therefore should have no role in structuring those routine interactions.

Finally, Plaintiffs resist characterizing the President's decision to block certain users from the @realDonaldTrump account as government speech because the replies to the President's tweets, and the replies to those replies (*i.e.*, the "comment threads") are not *also* government speech.  Pls.' Br. 20.  But Defendants have not suggested that they were.  Instead, and as explained in Defendants' opening brief, responses to the President's tweets, and replies to those responses, are the speech of the users who post them.  And as Plaintiffs concede, although Twitter has made choices about how to *display* that information, those choices do not actually prevent the Individual Plaintiffs from replying to any user other than @realDonaldTrump.  *See* Pls.' Br. 21 n.8.  In fact, several of the Individual Plaintiffs continue to participate extensively in comment threads.[12]

To be sure, it appears that many of the Individual Plaintiffs would prefer to engage directly with the President on Twitter, and have modified their behavior accordingly.  *See* Pls.' Br. 21-22

---

[12] For example, Plaintiff Eugene Gu posted a series of six tweets in the comment threads responding to an August 17, 2017 tweet from the @realDonaldTrump account, and Plaintiff Rebecca Buckwalter posted her own reply to one of Dr. Gu's responses.  Stip. Ex. C at 2 ("Just going to leave this here . . ."), ECF No. 33-3, *available at* https://twitter.com/rpbp/status/898177038774927361; *see also, e.g.*, *id.* Ex. D at 7-8 (Plaintiff Phillip Cohen posting three tweets—a photo with the hyperlink https://t.co/J28JojHrhf, "i am not fake. here is the original," and "Wait, slow down"—in an @realDonaldTrump comment thread), ECF No. 33-4.  Indeed, to take just one day as an example, Mr. Gu posted tweets mentioning the @realDonaldTrump handle 31 times on September 24, 2017, the vast majority of which appear in comment threads responding to @realDonaldTrump tweets.  *See id.* Ex. F at 1-2, ECF No. 33-6.

n.8.  But that is true of most anyone who unsuccessfully seeks out a conversation with a public

official in the hopes of amplifying their message.  *See Knight*, 465 U.S. at 288.  The fact that the

Individual Plaintiffs were unsuccessful in their efforts to engage directly with the President, yet

remain free to share their criticisms of the President on Twitter, is an indication that the

marketplace of ideas is functioning as it should: individuals are free to speak, and public officials

are free to choose whether to engage with them.  *See id.*

### ii.  The @realDonaldTrump Account Is A Channel For The President's Speech, Not A "Forum" For The Speech Of Private Parties.

Plaintiffs' analysis of the @realDonaldTrump account leaps immediately to the conclusion

that it is a designated public forum.  Pls.' Br. 17.  But that logical leap ignores whether forum

analysis is even appropriate in the first place.  *See* Defs.' Br. 19.  That fundamental question should

not be so readily set aside in light of the Supreme Court's reluctance to extend forum analysis to

"very different context[s]."  *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673 (1998);

*see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1744 (2017) (Alito, J., concurring in the

judgment) (emphasizing that courts "should be cautious in applying our free speech precedents to

the internet" and "should proceed circumspectly, taking one step at a time").[13]  No court has ever

extended the public forum doctrine to cover the President's personal Twitter account.  And here,

the record and relevant authorities confirm that this Court should not be the first.

---

[13] Plaintiffs and *amici* rely on the Court's opinion in *Packingham*, which emphasizes in dicta the importance of the internet to free speech.  *See, e.g.*, Pls.' Br. 18; FALS Br. 2; *see also Packingham*, 137 S. Ct. at 1735, 1737.  But the nature of the First Amendment injury at issue in that case reinforces why there is not one here.  In *Packingham*, the Court struck down a North Carolina law that *completely* barred registered sex offenders from even accessing "commonplace social media websites like Facebook, LinkedIn, and Twitter."  137 S. Ct. at 1732; *see also id.* at 1737 ("North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge.").  Here, in contrast, the Individual Plaintiffs are free to express their views to the world through their Twitter accounts and able to consume information from across the Twitter platform, including from the President's @realDonaldTrump account, *see* Stip. ¶ 55.

To qualify as a "forum," the space in question must meet two requirements: it must be government-owned (or government-controlled), and the government must have opened up the space for private parties to "communicate ideas to others." *W. Farms Assocs. v. State Traffic Comm'n of State of Conn.*, 951 F.2d 469, 473 (2d Cir. 1991); *see also Walker*, 135 S. Ct. at 2250 ("[The] government 'does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.'" (quoting *Cornelius*, 473 U.S. at 802)).   If either of these attributes is lacking, forum analysis does not apply. *See Hudgens v. NLRB*, 424 U.S. 507, 520–21 (1976) (holding that picketers did not have a First Amendment right to speech at a shopping center because it was not public property); *Am. Library Ass'n*, 539 U.S. at 206 (declining to apply forum analysis to the installation of internet filtering software at public libraries because "a public library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves").

By labeling the @realDonaldTrump account a "forum," Plaintiffs elide the distinction between Twitter as an overall platform—which is unquestionably a place where private parties communicate, but is not public property—and the @realDonaldTrump account specifically—which, even if it is considered government-controlled property, is not a place where private parties communicate.  Put differently, if the government controlled all of Twitter, that presumably would constitute a public forum.  But the President controls only his account, and while *he* speaks through that account, private parties do not.  His account accordingly is not a "forum."

The fact that comment threads about the President's tweets are viewable from the @realDonaldTrump page (in addition to the pages of those who reply to the President's tweets) does not change the fact that the account itself is not a "forum."  Drawing a parallel to the non-digital world reinforces this conclusion.  If two individuals have a conversation in a public park,

no one would label the person who started the conversation a "forum"; the space in which the conversation takes place—*i.e.*, the park—would clearly be the relevant forum.  Similarly, if two Twitter users engage in a "conversation," *see supra* at 15-16, it makes no sense to call one of the two Twitter accounts the relevant "forum," given that the "space" in which the conversation takes place is the Twitter platform.  To be sure, the pages of each participant in a Twitter conversation contain a *record* of the conversation, but neither page is itself the "forum."

The President's inability to control the comment threads that his tweets provoke further illustrates why it makes little sense to label his account a "forum."  Plaintiffs do not dispute that the President cannot alter any of the content that is posted in response to his tweets, and he cannot prevent a blocked user from participating in the comment threads.  Defs.' Br. 16 & n.8; *cf. Davison*, 2017 WL 3158389, at *5 (finding a First Amendment violation where a public official deleted a critical comment by removing the original Facebook post to which the comment responded and prevented the plaintiff from participating in comments on the official's Facebook page).  That contrasts sharply with the control exercised in the public forum cases that Plaintiffs cite.  *See* Pls.' Br. 17-18.  In *Cornelius*, for example, the government had excluded legal defense and political advocacy organizations from participating in a federal charity drive.  473 U.S. at 790.  In *Perry*, a school district had cut off access to the interschool mail system and to teacher mailboxes for all but one teachers' union.  460 U.S. at 38-39.  And in *Rosenberger v. Rector and Visitors of the University of Virginia*, a university had completely withheld payments from a student activities fund—the relevant forum in that case—from a student paper.  515 U.S. 819, 822-23, 827 (1995); *see also Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 137 (2d Cir. 2004) (applying forum analysis to the exclusion of an advocacy organization from welfare office waiting rooms).  Plaintiffs do not identify any case where the government has as little control over a "forum" as the

President has over the conversations that take place in response to his tweets.  The fact that the President does not have the control necessary to exclude users altogether from the comment threads reaffirms that his account is not a "forum"—even in a "metaphysical" sense, *Rosenberger*, 515 U.S. at 830—that the government has established for private speech.[14]

Plaintiffs' effort to recast the President's Twitter account as analogous to "a digital town hall" suffers from the same shortcoming.  Pls.' Br. 1; *see also Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 334 (1st Cir. 2009) (cautioning against "highly strained" public forum analogies).  Both the setting and the nature of the interactions at issue distinguish this case from instances where courts have reached the uncontroversial conclusion that, when a government body carves out time on public property for citizens to voice their views about matters of public policy, the government cannot silence the citizens with whom it disagrees.  *See* Pls.' Br. 19 (citing cases).  In this case, there is no public property on which citizens have been invited to speak.  *Supra* at 19-22.  And again, no one has been silenced, as anyone blocked by the President can still participate in the supposed "town hall" by participating in the comment threads.  *Supra* at 18-19.[15]

More broadly, Plaintiffs' characterization of the President's Twitter account as akin to a town hall again conflates the regulation of a forum, which might take place when the government hosts citizens for a town hall, with the President's role as a speaker in Twitter's marketplace of

---

[14] Twitter, in contrast, has actual control over the speech of Twitter users.  Twitter's terms of service provide that it may "suspend or terminate" an account, or "cease providing [an account] with all or part of the [platform's] Services," for "no reason" or for actions that violate Twitter's rules.  *Terms of Service*, Twitter, https://twitter.com/en/tos (last visited Nov. 17, 2017).  And as recent events illustrate, one Twitter employee can exercise far more control over another user's Twitter account than the President can.  *See* Jessica Roy, *On last day of work, Twitter employee deactivates President Trump's account*, L.A. Times (Nov. 2, 2017), http://fw.to/ON9b3Ik (reporting that a Twitter employee temporarily deactivated the @realDonaldTrump account).

[15] Additionally, neither Plaintiffs nor *amicus* the Electronic Frontier Foundation provide evidence that the President has sought to recreate a "town hall" discussion on Twitter.  *See* EFF Br. 18-19 (citing examples from other officials).

ideas.  And although the First Amendment may constrain the former, it does not prevent the President from declining to engage with the Individual Plaintiffs on Twitter.

### B. The Government Has Not Denied The Individual Plaintiffs Access To Government Information.

Similarly, the Individual Plaintiffs have no First Amendment right to follow the @realDonaldTrump account as a means of accessing official information.  Plaintiffs contend that blocking is a "burden on the Individual Plaintiffs' access to government information that Defendants otherwise make generally available to the public," Pls.' Br. 23, but they rest this access-to-information claim primarily on cases involving total restrictions on information.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011); *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32 (1999).  In *United Reporting*, a California statute provided for the release of certain arrestee information only to selected types of records requesters.  528 U.S. at 35.  In *Sorrell*, a Vermont statute prohibited the sale or disclosure of pharmaceutical records with certain exceptions.  564 U.S. at 557.  Neither case supports the proposition that the Individual Plaintiffs have a right to interact with the President on social media, and Plaintiffs' reliance on these cases is misplaced.[16]

Even accepting the unproven premise that there is a constitutional right to the information on the @realDonaldTrump account, the President's decision to block the Individual Plaintiffs is not a denial of access.  The information on the account is offered to the public at large on the President's personal Twitter page: www.twitter.com/realDonaldTrump.  Stip. ¶¶ 36, 55.  Unlike in *United Reporting*, any member of the public can access the information, and unlike in *Sorrell*, there is no legal sanction for using that information to engage in speech.  The Individual Plaintiffs

---

[16] Plaintiffs also direct the Court to *Matal v. Tam*, 137 S. Ct. 1744 (2017), for the general proposition that "the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'"  *Id.* at 1760-61 (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 133 S. Ct. 2321, 2328 (2013)).  Plaintiffs have not identified the denial of a public benefit akin to the trademark at issue in *Tam*, nor have they identified a resulting limitation on the Individual Plaintiffs' speech.

are free to access the information and speak about it.  But Plaintiffs assert that Twitter users have a constitutional right to engage with the President on social media on their own terms—that is, to have the most convenient possible access to information.  There is no First Amendment right to have public information delivered according to a plaintiff's preferences.  *See, e.g.*, *Sample v. Bureau of Prisons*, 466 F.3d 1086, 1087-88 (D.C. Cir. 2006) (federal agencies required to respond to Freedom of Information Act requests only in "readily reproducible" formats).

At bottom, Plaintiffs seek to enforce new First Amendment rules for public officials on social media by requiring officials to engage with all users that so desire.  And many of the decisions about who is even in that pool of users in the first instance—who may create an account, who is banned by Twitter as a consequence of a violation of a term of service—are beyond the reach of public officials.  The First Amendment does not, and cannot, guarantee undifferentiated engagement with officials' personal social media accounts.

### C. The Individual Plaintiffs Have No Free-Standing Right To Petition The Government Through The President's Personal Twitter Account.

Lastly, Plaintiffs cannot establish that the President's decision to block their accounts violates the right "to petition the Government for a redress of grievances."  U.S. Const. amend I.  Generally, there "is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions," *McDonald v. Smith*, 472 U.S. 479, 485 (1985), but the Individual Plaintiffs argue that their tweets enjoy petition rights greater than speech rights because the President's Twitter account is "a channel through which ordinary citizens can petition the President directly."  Pls.' Br. 26.[17]  This conclusory assertion—

---

[17] Plaintiffs cite dicta from *Packingham*, where the Court observed that "on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner."  137 S. Ct. at 1735; *see also id.* at 1738 (Alito, J., concurring).  This passage does not suggest any basis for a distinct First Amendment analysis here.

which would apply to any remotely plausible petition claim—identifies no "special concerns of the Petition Clause [that] would provide a sound basis for a distinct analysis." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 389 (2011).  And Plaintiffs offer no distinct analysis to apply.

Even if the Court were to consider a free-standing petition claim, Plaintiffs cannot establish a violation of any cognizable petition rights.  The Individual Plaintiffs are free to tweet about the President on their Twitter accounts and express their grievances at length—as they continue to do.  Stip. Exs. C-I, ECF 33-3 to 33-9.  They can directly reply to the @POTUS and @WhiteHouse accounts maintained by the President and the White House.  Stip. ¶ 45.  And they can both "mention" the @realDonaldTrump account and tweet in its comment threads.  Stip. ¶ 30.  Blocking is simply the embodiment of the President's affirmative decision not to read those tweets or engage with the users who post them.  *Id.* ¶ 28.  And the Petition Clause does not "require government policymakers to listen or respond to individuals' communications on public issues." *Knight*, 465 U.S. at 285.  The President could just as easily decide not to read unofficial mail or not to interact with participants at a public event, and no one could seriously argue that his decision would implicate the Petition Clause.  Thus, the Individual Plaintiffs cannot establish a violation of their petition rights.[18]

## CONCLUSION

For these reasons, Defendants respectfully request that the Court grant their motion, deny Plaintiffs' cross-motion, and enter judgment for Defendants on all claims.

---

[18] In a footnote, Plaintiffs offer a conclusory defense of their claim that the Knight Institute has been denied a First Amendment "right to receive" the Individual Plaintiffs' direct replies to the @realDonaldTrump account.  Pls.' Br. 22 n.9.  However, Plaintiffs do not refute Defendants' argument that any putative "right to receive" speech under the First Amendment can be no greater than a speaker's First Amendment right to speak.  Defs.' Br. 25 (citing, *inter alia*, *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 83 (2d Cir. 2003)).  The Knight Institute accordingly has no basis for relief independent of the Individual Plaintiffs' claims.

Dated: November 17, 2017          Respectfully submitted,

                                  CHAD A. READLER
                                  Principal Deputy Assistant Attorney General

                                  BRETT A. SHUMATE
                                  Deputy Assistant Attorney General

                                  ERIC R. WOMACK
                                  Assistant Branch Director

                                  */s/ Michael H. Baer*             
                                  MICHAEL H. BAER
                                  DANIEL HALAINEN
                                  Trial Attorneys
                                  U.S. Department of Justice,
                                  Civil Division, Federal Programs Branch
                                  20 Massachusetts Avenue, NW
                                  Washington, DC 20530
                                  Telephone:     (202) 305-8573
                                  Facsimile:      (202) 616-8460
                                  E-mail: Michael.H.Baer@usdoj.gov

                                  *Counsel for Defendants*