1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   KNIGHT FIRST AMENDMENT
    INSTITUTE AT COLUMBIA
4   UNIVERSITY, et al.,

5                   Plaintiffs,

6           v.                              17 CV 5205 (NRB)

7   DONALD TRUMP, et al.,

8                   Defendants.

9   ------------------------------x
                                           New York, N.Y.
10                                         March 8, 2018
                                           2:20 p.m.
11
    Before:
12
                      HON. NAOMI REICE BUCHWALD,
13
                                           District Judge
14
                           APPEARANCES
15
    KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY
16       Attorneys for Plaintiffs
    BY: KATHERINE AMY FALLOW
17      JAMEEL JAFFER
        CARRIE DeCELL
18      ALEXANDER ABRAHAM ABDO

19  U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
         Attorneys for Defendants
20  BY:  MICHAEL HENDRY BAER
         DANIEL HALAINEN
21       BRETT A. SHUMATE
         ERIC R. WOMACK
22

23

24

25

1              (Case called)

2              THE DEPUTY CLERK:  Are the plaintiffs present and

3    ready to proceed?

4              MS. FALLOW:  Yes, your Honor.  Katie Fallow for the

5    plaintiffs.

6              MR. JAFFER:  Jameel Jaffer also for the plaintiffs.

7    I'm here with Carrie DeCell, Alex Abdo.  And I also just wanted

8    to alert the Court that three of our plaintiffs are in the

9    courtroom -- Nick Pappas, Philip Cohen, and Rebecca Buckwalter.

10             THE DEPUTY CLERK:  Are the defendants present and

11   ready to proceed?

12             MR. BAER:  Yes.  Good morning, your Honor.  Michael

13   Bare from the Department of Justice on behalf of defendants.

14   I'm joined by my colleagues -- Daniel Halainen, Eric Womack,

15   and Brett Shumate.

16             THE COURT:  Who will be speaking for the defense?

17             MR. BAER:  Just me, your Honor.

18             THE COURT:  Then that's the only name I need to know

19   how to pronounce.

20             I have several pages of questions.  So I'd like to

21   start with those, and if at the end of our discussion we

22   haven't covered some territory that you think we should, I'll

23   give you the floor.

24             So there are certain arguments that have been repeated

25   throughout the briefing that I don't find particularly

 1   meaningful.  So I would ask, so we can focus on more

 2   significant arguments, I would appreciate counsel refraining

 3   from relying on at least these two arguments:  First, that the

 4   President had the @realDonaldTrump account before he became

 5   President; and second, that the plaintiffs are blocked from

 6   generally available public information.

 7           I'm going to start by asking you a few questions on

 8   standing and jurisdiction.  Other than my questions, I would

 9   ask you to please otherwise refrain from addressing the case

10   law on the Court's power to afford plaintiffs' equitable relief

11   as I think it's been exhaustively addressed in the papers.

12           Mr. Baer, you have argued in your papers that no

13   relief can be ordered against Mr. Scavino because he didn't

14   personally block any of the plaintiffs.

15           Assume with me for the moment that if the Court were

16   to conclude that the President's blocking is unconstitutional,

17   wouldn't Mr. Scavino be under a duty to unblock the plaintiffs

18   under the government's general duty to follow the law?  So, in

19   other words, couldn't effective relief be afforded against

20   Mr. Scavino?

21           MR. BAER:  Your Honor, I don't believe that the

22   standing cases concerning causation create a duty that broad

23   for government officials.  I think, by that logic, any

24   government official would always have a duty to step in in sort

25   of any situation, and yet in cases --

1        THE COURT:  I'm not asking the director of the

2   Bureau of Prisons to come to the White House and engage in the

3   Twitter feed.  We're talking about somebody here who it is

4   acknowledged has the capacity to block or unblock and who is

5   directly involved in the creation of some of the tweets.

6        MR. BAER:  Absolutely, your Honor.  But I don't think

7   that gets around the second prong of Article III standing

8   regarding causation.  The injuries still must be fairly

9   traceable to a particular individual, and plaintiffs haven't

10   identified -- and we have not found -- a case in which someone

11   who did not cause the direct injury that plaintiffs complain of

12   can be the subject of relief.

13        And I think --

14        THE COURT:  You would prefer the relief to go directly

15   to the President?

16        MR. BAER:  No, your Honor, because, for the reasons

17   that your Honor has acknowledged in the papers, we don't

18   believe that the Court has the power to issue that relief.

19        Certainly if the Court concludes that it has power to

20   issue relief as to both defendants, we think the relief should

21   be issued against Mr. Scavino, but that's sort of a choice

22   between two different grounds on which the Court would lack

23   jurisdiction; that it lacks jurisdiction with respect to

24   Mr. Scavino as a defendant by virtue of the causation prong of

25   Article III, and it lacks jurisdiction with respect to the

1    President by virtue of the redressability prong.

2              THE COURT:  So I understand from your papers that you

3    are vehemently opposed to the position that the Court can

4    enjoin a president to comply with the law.

5              Do you have equally strong feelings about declaratory

6    relief?  And if so, would you please explain.

7              MR. BAER:  Sure.  In this case, your Honor, yes, we

8    do.  I would start by noting that courts have analogized

9    declaratory and injunctive relief against the President.

10   Judge Bates in his decision in Newdow addressed the issue at

11   some length.

12             I think here this case illustrates why the effect of

13   the two forms of relief is the same, because if a declaratory

14   judgment would redress plaintiffs' alleged injuries, then it

15   would only do so by virtue of causing the President to engage

16   in the very action that plaintiffs seek to have the President

17   engage in via injunction.

18             In other words, while in some cases you may have a

19   declaratory judgment before someone has acted, here the effect

20   of declaratory relief and injunctive relief is the same.  It's

21   to get the President to log into his Twitter account and

22   unblock the plaintiffs, and the Court doesn't have the power,

23   respectfully, to order that relief.

24             THE COURT:  There is, to my recollection -- although

25   we haven't looked for it recently, but I recall using this case

```
1    when I was an assistant U.S. Attorney.  And I recall that there
2    is a case in the Second Circuit that says that it's unnecessary
3    to enjoin the government because once the government learns
4    what the law is, the Court can presume that the government will
5    follow the law as declared by the Court.
6              Do you think that case might have some relevance here?
7              MR. BAER:  So, your Honor, without knowing the details
8    of the case, I don't want to --
9              THE COURT:  I don't remember the details.  I believe
10   the defendant was the Department of Housing and Urban
11   Development, but it was some years ago that I was an assistant.
12   I tend not to, candidly, remember case names.  But this is
13   somehow a case that I recall, maybe because I used it more than
14   once.
15             MR. BAER:  Your Honor, from my understanding from the
16   principle that that case stands for, I think the application
17   would be to reaffirm the position I just articulated, which is
18   that if the point of declaratory relief is to presume that the
19   government will comply with the implications, then it is the
20   same effect as an injunction directed at the President.
21             THE COURT:  The point of the case though is that once
22   the government agency learns what the law is, they take it upon
23   themselves to comply without the necessity of being
24   specifically ordered to do so.
25             MR. BAER:  But, your Honor, when the focus of the
```

declaration would be not on broad principles of law but the

specific question of whether a particular presidential action

violated the law, then, again, that presumption, to my mind,

simply reinforces that the point of seeking declaratory relief

is to have this Court, in effect if not in practice, issue a

decision that would force the President to take particular

actions in his discretionary capacity which implicates all of

the same --

THE COURT:  Yes.  But the other possibility is that a

government official -- in other words, I don't start out with

the assumption -- and we don't need to be speaking about the

President in this but just anyone who works for the government.

I don't start out with the assumption that that person

intentionally takes action knowing that it's in violation of

the law.

In other words, I start out with a good-faith

assumption.  So the notion, I think, of that -- the principle

of that case is that the government actor, upon learning that

their good-faith assumption was in fact ill founded, would then

voluntarily, without being ordered, change their action because

at any high level -- you, me -- when we take our jobs, we swear

to uphold the Constitution and the laws of the United States.

So we may have been in something that either you or I

did, because there is no infallibility doctrine in the world of

Article III or I think even Article I, that we may be mistaken

 1    and that we may need to learn.

 2         MR. BAER:  Absolutely, your Honor.  I don't take any

 3    issue with that assumption, as you've stated it.  The question

 4    though -- and the issue here is -- the President is different.

 5         The President is different with respect to both

 6    declaratory and injunctive relief, as the court recognized both

 7    in plurality and Justice Scalia's concurrence in Franklin v.

 8    Massachusetts.

 9         Let me be clear.  The President is different just with

10    respect to the Court's power to issue the relief, not with

11    regards to the nature of the assumption.  So I think if the

12    Court were to issue declaratory relief directed at the

13    President -- again, the relief would have to be directed at the

14    defendants for which there is standing in this case -- the

15    effect of that relief would be for the Court to be saying that

16    the President has to take a specific action with respect to his

17    Twitter account, and that raises all of the same structural

18    separation powers issues that I gather your Honor is well

19    versed in from the briefs.

20         THE COURT:  It's not that I don't think those are

21    important issues.  I think they've been exhaustively addressed

22    in the papers, and I don't think it would be valuable for us to

23    spend time, since we have about 2 1/2 pages of questions as it

24    is.

25         Let me maybe just on this ask the plaintiffs whether

1     the plaintiffs see a difference between injunctive and

2     declaratory relief.  And if so, what do you think the

3     difference is?

4              MR. JAFFER:  Your Honor, let me start by saying that

5     we think the Court does have the authority to enjoin the

6     President.

7              THE COURT:  I understand that.

8              MR. JAFFER:  I think you're right to be asking whether

9     you need to exercise that authority even if you have it.  There

10    are a couple cases in which the courts have issued declaratory

11    relief against the President after having considered the

12    possibility of issuing injunctive relief and concluded that

13    declaratory relief would be less intrusive.

14             The two I have in mind are the line-item veto case,

15    Clinton v. New York; and NTEU, which is a D.C. Circuit case

16    that we cite several times in our briefing.

17             There is a passage in NTEU that goes precisely to this

18    question that you've asked.  It's at page 616 of that case.  If

19    I could just read two sentences.  This is after the court has

20    considered the possibility of injunctive relief:  "This case

21    presents a most appropriate instance for the use of a

22    declaratory decree.  Accordingly, we confine ourselves at this

23    time to a declaration of the law, that is, that the President

24    has a constitutional duty forthwith to grant" -- and it

25    explains the relief.  "We so restrict ourselves at this time in

1    order to show the utmost respect to the office of the

2    presidency and to avoid, if at all possible, direct involvement

3    by the courts in the president's constitutional duties

4    faithfully to execute the laws and to avoid any clash within

5    the judicial and executive branches of government."

6          So I think that is an example of a case that is

7    essentially saying declaratory relief is less intrusive than

8    injunctive relief, which I think makes sense.  A declaration

9    doesn't directly require anyone to do anything.

10         My understanding is no one can be held in contempt for

11   failing to abide by a declaration.  It seems like a less

12   intrusive step.  If the Court were to issue declaratory relief

13   here, we would of course like the Court to make clear that

14   should further relief be necessary, the plaintiffs could come

15   back before the Court and ask for that relief.

16         THE COURT:  Mr. Baer, another question for you.  I

17   think that you've argued in your papers that the President's

18   actions in blocking the plaintiffs are taken solely in a

19   personal capacity.

20         If that's the case, isn't there a minimal interference

21   with the President's exercise of executive power?

22         MR. BAER:  So, your Honor, I think if I understand the

23   question correctly --

24         THE COURT:  It was not perfectly phrased.

25         In other words, if there was relief ordered, given

1   that you've argued that blocking is a personal act, doesn't it

2   follow that there's a minimal interference in his exercise of

3   executive power?

4        MR. BAER:  Well, your Honor, I think if there were to

5   be a declaratory judgment with respect to an act that is

6   personal, then the judgment wouldn't be addressing the act and

7   wouldn't require the President to do anything different or

8   wouldn't have any effect.

9        I think part of the challenge here, your Honor, is

10  that plaintiffs have brought an official capacity suit against

11  the President.  So, at the jurisdictional phase of the

12  analysis, we have to assume that the President was taking these

13  actions in an official capacity, which is why we label the

14  decision whether to block or follow particular users on Twitter

15  one of executive discretion because if we sort of operate under

16  the assumption that it's official action, then it has to be

17  discretionary action.

18        But if, as we believe and as we've argued in the

19  papers, it is the personal action of the President, then it is

20  not subject to any First Amendment restrictions because it's

21  not state action.  So a declaratory judgment wouldn't redress

22  anything stemming from non-state action on behalf of the

23  President.

24        THE COURT:  Well, that sort of segues nicely into my

25  next series of questions.

1        I'd like to continue with some questions about state

2   action, although I'm not certain that analytically it is the

3   first step.

4        Do counsel -- and I want to hear from both of you --

5   agree, to the extent that you're arguing state action, that

6   that is doctrinally distinct from the public forum analysis?

7        Let the plaintiffs go first.

8        MS. FALLOW:  Yes.  Thank you, your Honor.  We wanted

9   to say at the outset thank you for letting us divide the

10  argument.  Hopefully it's not too cumbersome.

11       THE COURT:  No problem.  I just don't like during a

12  trial to have two lawyers objecting.

13       MS. FALLOW:  We won't object.

14       I think that the state action inquiry is generally the

15  first question as to whether the First Amendment is at issue

16  here.  I think that the record shows unambiguously that the

17  President operates his account in an official capacity.

18       The defendants have conceded all of the facts showing

19  that he is operating it in an official capacity, including the

20  fact that he uses it to make official pronouncements of policy

21  like his announcement this last summer about banning

22  transgender individuals from serving in the military,

23  announcing executive actions like his appointment of a new FBI

24  director.  And I think the record shows clearly that White

25  House staff assist the President in administering this account.

1   So this is not a purely personal account.

2         One of the notable facts in this case is DOJ itself

3   considers tweets from the @realDonaldTrump account to be

4   official statements from the President of the United States,

5   and the courts and administrative agencies have treated his

6   tweets as official statements of the President with legal

7   effect.

8         So, if you look at the totality of the circumstances

9   and all of the facts in the record in this case, it shows that

10  he's using this account as an official account.  And then when

11  he blocked the plaintiffs from that account, that is state

12  action.  That's a long answer to your question.  I apologize.

13        THE COURT:  So there are two questions or maybe three

14  here.  I'm a little puzzled as to why are you relying on state

15  action cases and the under color of state law doctrine in the

16  1983 framework given that there are no state actors here.

17  There are only federal actors.

18        Would it not be really more analytically sound to

19  argue it the way you just did, in part -- you went back and

20  forth -- between official action and personal action?

21        But the concept of state action simply isn't

22  applicable because the President is not a state actor and this

23  is not a 1983 case.  So I was really very puzzled as to why

24  everybody was using these cases.

25        MS. FALLOW:  I think it is a little confusing in the

1    case law.  I think that my understanding is that courts have

2    treated the question of under color of law or whether it's

3    state action for purposes of 1983 or the 14th Amendment as

4    interchangeable.

5             THE COURT:  Neither of those apply here.  Right?

6             MR. BAER:  Your Honor, if I may briefly on this.

7             THE COURT:  Sure.

8             MR. BAER:  I think the analogy is to state action

9    under the 14th Amendment because there the purpose of the

10   inquiry is usually to figure out whether the Constitution

11   attaches to the particular government action at issue.

12            So I think your Honor is absolutely right that

13   government action, rather than state action, would be the way

14   to frame this.  But because the case law is worded in state

15   action terms, I think we've looked to cases that help

16   illustrate when you can fairly label a particular action the

17   action of the government or whether it is something that the

18   constitution doesn't attach to.

19            And as I believe Ms. Fallow just noted, the case law

20   certainly merges on the 1983 under color of law analysis and

21   the 14th Amendment state action or what we might call for

22   purposes of this action government action analysis.

23            THE COURT:  So you sort of agree with me that in a

24   sort of precise way, state action really has nothing to do with

25   this case.  That's not really the right phrase; that it's

 1    either official action or it's government action, but it's not

 2    technically state action.

 3         MR. BAER:  Absolutely, your Honor.  I think government

 4    action is probably the better way to think of it, simply by

 5    virtue of the fact that anything the President does publicly as

 6    the chief executive of the United States.

 7         Whether it's in a campaign context or at a fundraiser

 8    or at the White House, there will certainly be the trappings of

 9    officialdom, and the President certainly can make official

10    statements from all of those settings, but we wouldn't treat

11    the President's activity at a campaign event, even though he's

12    announcing a new policy or initiative for the first time, as

13    actions in his governmental capacity.  That would be a

14    political capacity, certainly with regards to who was allowed

15    into that campaign event.

16         THE COURT:  Or who pays to get him there.

17         MR. BAER:  Yes, your Honor.  So that's why I think the

18    focus would be whether a particular action, not sort of an

19    overall setting is an action that can be attributed to the

20    government because that's the threshold inquiry for whether the

21    Constitution will attach to the Court's evaluation of that

22    action.

23         THE COURT:  I'm a little puzzled about that argument

24    because -- are you just saying that certain things that the

25    President says -- or certain tweets that he tweets on the

1    @realDonaldTrump are government speech?

2         MR. BAER:  Absolutely, your Honor.  The President

3    makes official government statements from that account.

4         THE COURT:  My first question though was:  Do you

5    agree with me that this government action argument is

6    doctrinally different from the public forum analysis?

7         MR. BAER:  Yes, your Honor, because it's a threshold

8    question.

9         THE COURT:  Which is the threshold question?

10        MR. BAER:  Sorry.  The government action inquiry is

11   the threshold question because first there has to be government

12   action, and then the public forum doctrine, which provides the

13   substantive constitutional standard by which certain government

14   actions are evaluated, would come into the analysis.

15        THE COURT:  I just want to be sure I understand your

16   argument.  Your argument is that if this account is used as

17   official government action that it follows that it is a public

18   forum?

19        MR. BAER:  No, your Honor.  I apologize.

20        THE COURT:  I didn't think you wanted to say that.

21        MR. BAER:  Two points of clarification.  The first is

22   that the question I think the Court should ask first is is the

23   particular action that plaintiffs are challenging the action of

24   the government or the action of the President in a

25   nongovernmental capacity.

 1          And if the answer to the question is it's government

 2     action, the Court turns to the question of whether or not the

 3     First Amendment prohibits that action.  And then the public

 4     forum doctrine comes in because plaintiffs have made a First

 5     Amendment claim relying on public forum doctrine, and we would

 6     I think then investigate whether or not the President's actions

 7     by blocking particular individual plaintiffs implicate the

 8     public forum doctrine, and we have arguments as to why it

 9     doesn't.  But you only reach that inquiry after first

10     determining whether or not there is government action in the

11     first place.

12          The second clarification I'd like to make, your Honor,

13     is I think that the Court should be focused not on the question

14     of the account as a whole but on the specific issue of whether

15     the decision to block plaintiffs is government action.

16          Here is where I do think the 1983 cases are helpful,

17     because in the 1983 cases, courts interrogate whether a

18     particular act is an act that an official has been vested with

19     state authority to perform or if it's an act that the official

20     could, as a private citizen, perform.

21          Here plaintiffs haven't identified any law or

22     authority that enables the President to block people from the

23     @realDonaldTrump.  That's a personal decision that he has

24     always had the ability to make with respect to that account.

25               THE COURT:  But if it were determined that the

1    @realDonaldTrump account as a whole was a forum, then the act

2    of blocking would in this case be based on viewpoint

3    discrimination.

4           In other words, to just use an analogy -- and it's not

5    an analogy that I mean to apply fully.  If you had a town hall

6    and it is considered, for our purposes, a public forum and

7    people were speaking at a mike, certainly there is no statute

8    that authorizes -- gives the President the power to turn off

9    the mike.

10          But if the President turned off the mike or whoever

11   the government actor was turned off the mike because he simply

12   didn't like what the speaker was saying, that would be a First

13   Amendment problem but not because there is presidential mike

14   authority.  Everybody can flip the switch on the mike.

15          So I'm not sure that I follow your logic that you

16   start with the capacity of every Twitter holder, I understand,

17   to block people from their account.  I don't dispute that

18   that's factually the case.

19          By the way, just to segue, I meant to say at the

20   outset of the argument, thank you, all of you, for your really

21   excellent efforts on the stipulation of facts.  It was

22   extremely professional and extremely helpful to the resolution

23   of this case.  It was lawyering on the high order, and I very

24   much appreciate it.

25          MR. BAER:  Your Honor, can I engage with that example

1    you just gave?

2            THE COURT:  Yes.

3            MR. BAER:  So I think the problem with analogizing

4    this case to that particular town hall context, there are

5    several reasons why that analogy breaks down --

6            THE COURT:  I think I made it clear that I wasn't

7    adopting -- for the purposes of my question, I wasn't adopting

8    the entire argument of the plaintiffs.  I was just trying to

9    respond to you about there not being any particular statute or

10   power to turn off a mike or block a Twitter account that

11   belongs to an executive official.

12           MR. BAER:  Absolutely, your Honor.  But in that

13   example, the place where I was going to start with the

14   distinctions, the whole holding of the town hall would be a

15   government endeavor.

16           So there would be the authority vested in the

17   officials organizing the town hall, and it would be clear that

18   if a government official were -- in the context of a town hall

19   where there is city business being discussed, if a government

20   official were to turn off a microphone, there would be no

21   question that it was the authority that that official had as an

22   organizer of the town hall or as a member of the government to

23   take that particular action.

24           So, in other words, the government action analysis is

25   sort of baked into the characterization of that as a government

1    town hall.  And we, for a number of reasons, don't think that

2    that applies aptly here.

3            THE COURT:  That was why I asked the question earlier.

4    Isn't the first issue analytically is it a forum, not the whole

5    state action piece of the breach that a good deal of time was

6    spent on.

7            MS. FALLOW:  Your Honor, if I may.  I think you're

8    absolutely right that the state action cases don't overlay our

9    situation as neatly as they should and that the main question

10   is does the President operate his account -- and the record

11   shows that he does -- in his official capacity.  And thus he is

12   operating it like a virtual town hall.  It is viewed with

13   official action, and his act of blocking the plaintiffs based

14   on viewpoint from that virtual forum is both state action and

15   violates the First Amendment.

16           I do think it is possible to get first to the forum

17   question and then determine whether the person who is operating

18   a public forum or running a public forum, if you had to get to

19   that question, is a state actor.  But I think, regardless of

20   which way you approach it, the record shows this is an official

21   account and it is being used as a forum for speech.

22           THE COURT:  Let me make it clear that when we talk

23   about blocking, we're not discussing tweets or comment threads

24   that are threatening or obscene.  So just get all of that out

25   of the picture.

1          Ms. Fallow, you've just basically argued that the

2    President's use of Twitter here is government action because he

3    is using a nominally personal Twitter account for

4    overwhelmingly government purposes.

5          Is there any line drawing that you would concede was

6    appropriate?  Because I don't think it's totally accurate that

7    every tweet on the account could be considered an official

8    statement of a government position.  There might be a birthday

9    wish in there someplace.

10          MS. FALLOW:  Right.  Certainly, just as in a city

11    council meeting, a city councilor counselor could give a

12    birthday wish to someone in the audience or make personal

13    statements.

14          But I think, if you look at the record and the tweets

15    that are attached as exhibit A to the joint stipulation -- and

16    the joint stipulation itself says that the President, since he

17    was inaugurated, has used the account as a means of

18    communicating to the public about his presidency.

19          And occasionally and only sporadically, if you look at

20    the tweets, does he mention anything that's not related to his

21    presidency.  There could be some cases where if you applied the

22    analysis of the totality of the circumstances, you would say,

23    this is more like a personal account than an official account,

24    but we're not even close to the line here.

25          It is overwhelmingly used for official purposes.  The

1    President himself views it that way.  His aides view it that

2    way.  The courts and DOJ views it that way.  We're not even

3    close to that.  In this case the plaintiffs were blocked after

4    they tweeted replies to him about official matters.

5           THE COURT:  Is there anything in the record that shows

6    how frequently the President actually responds to another

7    tweet?  I'm not talking about forwarding it on is.

8           MR. BAER:  Retweeting.

9           THE COURT:  You can tell this is something that I

10   don't consider appropriate for judges to engage in.  I do

11   understand the record.  I just lost the word.

12          Leave aside retweeting.  Is there anything in the

13   record that shows how often he engages in a responsive way with

14   a tweet, other than blocking them?

15          MS. FALLOW:  Your Honor, in the Exhibit A -- I would

16   have to go through, and I could submit a list of the times that

17   he's actually directly replied to people who replied to him via

18   his account.  They are in here.

19          THE COURT:  I was snowbound yesterday.  I didn't have

20   Exhibit A with me.

21          MS. FALLOW:  You would have to click on the link in

22   order to see them.  I do also respectfully submit that the

23   retweets also show an engagement with the speech that is in the

24   comment threads.  He retweets his repliers a lot.  That you can

25   just see by the RT in the spreadsheet.  We could also provide

1    notes.

2              THE COURT:  That's okay.

3              Mr. Baer, can the government constitutionally block

4    users from the @POTUS or @WhiteHouse accounts?

5              MR. BAER:  Well, your Honor, I think that raises much

6    more difficult questions because first --

7              THE COURT:  I'll take a yes or a no.

8              MR. BAER:  Your Honor, the reason why I don't know

9    that I can give you a precise answer there is because I think

10   it would depend on the factual circumstances.

11             THE COURT:  Again, no obscenity, no threats, a comment

12   that is not flattering or dissenting and the tweet is on the

13   @POTUS or @WhiteHouse accounts.

14             Can the government block those tweeters?

15             MR. BAER:  Your Honor, if I can get to the answer by

16   virtue of proceeding with how the government thinks that

17   analysis should go, the first point of inquiry would be is

18   there some exercise of government power in the decision to

19   block there.

20             The reason why there much more likely would be is

21   because the @POTUS and @WhiteHouse accounts follow the

22   institution and office of the presidency and not the official.

23   So the only way someone is operating those accounts is by

24   virtue of power vested in them by assuming the office of the

25   presidency or by working for the President.  So that would

1    clear the government action hurdle.

2           Then the question is well, what First Amendment right

3    would it violate.  The public forum analysis from our briefs I

4    think would apply there as well because when you're blocking

5    someone from an account, your Honor, you're not actually

6    excluding them from a place where individuals can communicate

7    with other individuals.

8           I think it's really important to distinguish the

9    tweets that come from an account and the conversation that

10   takes place after that tweet has sort of gone out into the

11   Twitter ether.

12          The reason why that is really important to distinguish

13   is because in all of our real-world examples that we're drawn

14   to when we think about this case, we think of someone being

15   ejected from a physical space, but as the stipulation

16   acknowledges, all but one of the individual plaintiffs have

17   continued to participate in the discussions that take place in

18   response.

19          THE COURT:  You're going farther afield than my

20   question.

21          My question is:  Yes or no?  It is constitutionally

22   acceptable to block a citizen from tweeting on the @POTUS or

23   @WhiteHouse account.  Yes or no?

24          MR. BAER:  So, your Honor, I think it is probably not

25   but not for public forum reasons, which I realize --

1          THE COURT:  It's unconstitutional because?

2          MR. BAER:  So, your Honor, I think that would raise

3   First Amendment issues.  I am not sure what the right First

4   Amendment analysis would be there candidly.

5          THE COURT:  Go back.

6          Why isn't it a public forum?

7          MR. BAER:  It's not a public forum, your Honor,

8   because a public forum requires two things:  It requires

9   government property where individuals communicate with one

10  another.

11         THE COURT:  And why isn't the government's Twitter

12  account @POTUS and @WhiteHouse not a governmental account?

13         MR. BAER:  Because, your Honor, the only parts of the

14  account are just government speech.  The only thing that is

15  unique to that account are the tweets that are posted from a

16  government account and the other sort of images that are posted

17  to the account.

18         The actual replies to those tweets aren't a part of

19  the account, and the Court can know this because the tweets and

20  replies that are responding to another account on Twitter are

21  viewable from the pages of anyone who has responded to that

22  government statement.

23         So there is not a particular place that the government

24  can exclude people from when they block someone on Twitter.  In

25  other words, you're blocking the ability to interact directly

 1    with that account.  You're not interfering with the ability to

 2    interact with other people.

 3            THE COURT:  You've blocked someone's ability to

 4    interact directly.

 5            If we are talking about official government accounts,

 6    why is that not a violation of the First Amendment?

 7            MR. BAER:  Because the ability to interact directly

 8    with the government is not the issue the public forum doctrine

 9    engages with.  Your Honor, what I'm trying to say is --

10            THE COURT:  I don't understand that.  Go back to the

11    town hall analogy.  Once it is a public forum, you can't shut

12    somebody up because you don't like what they're saying.

13            So why is it all right to block someone from an

14    official White House government-run account that precedes this

15    President, that has absolutely nothing to do with this

16    President -- or it does in some ways, but leave that aside.

17            Why is that possibly okay?

18            MR. BAER:  So, your Honor, it certainly raises First

19    Amendment problems and likely would run afoul of the First

20    Amendment but not because of the public forum doctrine.

21            So, if I may, I really would like to drill down and

22    distinguish the act of blocking from the sort of town hall

23    analogy because I think that analogy is really where

24    plaintiffs' First Amendment argument rests.

25            The reason why it's not applicable is because a town

1    hall features two things:  It features interaction with public

2    officials and the ability to interact with constituents and

3    other members of the public.  And it's that interaction with

4    constituents that the public forum doctrine is principally

5    focused on.

6            THE COURT:  The interacting with the government --

7    that doesn't count?

8            MR. BAER:  That may be subject to different First

9    Amendment analyses, your Honor.

10            THE COURT:  What's the difference?

11            MR. BAER:  So, your Honor, I'd like the Court to look

12   at the Knight case where the Supreme Court held that there is

13   no right for individuals to a government audience or to be

14   able --

15            THE COURT:  Don't get me wrong.  I am not remotely

16   suggesting that citizens have the right to insist that someone

17   in the government actually read their mail.  Indeed, the notion

18   that everyone who writes a letter to the President has either a

19   right or a reason to believe that the President will ever see

20   that letter is fanciful.

21            It's even more so when you consider the number of

22   comments in response to any tweet, particularly of the account

23   that we're talking about.  No one has the time.  There are not

24   remotely enough hours in the day to expect that everything is

25   going to be read.

1       So I'm not remotely suggesting that a citizen has a

2  right to expect that their communication to the government will

3  actually be read by anybody, but there is still the point that

4  the citizen has the right to send the communication.

5       MR. BAER:  If I may, your Honor.

6       THE COURT:  Yes.

7       MR. BAER:  I think first what this line of inquiry

8  illustrates is that what blocking is about is exclusively the

9  interaction between the President and a constituent.

10      THE COURT:  That's also not true because when you

11 block somebody, that means that the other constituents are

12 impacted by not being able to engage in the cross-communication

13 that sort of Twitter is known for.

14      So it isn't just an isolated harm to the block, but it

15 has impacts for the rest of the participating public.

16      MR. BAER:  Respectfully, your Honor, I don't believe

17 that's an accurate characterization of the effect of blocking

18 because, as the stipulation acknowledges in paragraph 30 -- and

19 as an example in paragraph 57 illustrates -- blocking doesn't

20 prevent the individual who has been blocked from an account

21 from participating in the full marketplace of ideas that

22 Twitter allows individuals to engage in.  If you're blocked,

23 you can still respond to everyone who has responded to one of

24 the President's tweets.

25      THE COURT:  But you can't respond directly to the

1    blocker, and when you can't do that, the other people who are

2    also following this account do not immediately see what you

3    have said.

4         Look.  I'm not suggesting -- your stipulation is very

5    honest about the fact that individuals who are blocked can

6    engage in work-arounds.  Whether that is ultimately, if there

7    is a constitutional violation, an acceptable burden or not is a

8    very separate question.

9         But it is not the case that the only person who is

10   harmed by blocking is the blockee.  So we're back to if we're

11   dealing with official government accounts like @POTUS or

12   @WhiteHouse, I would think that the answer is that you can't

13   block anybody unless they were engaging in some sort of

14   improper-type speech.

15        MR. BAER:  Your Honor, I think the reason why that

16   probably is true is because -- it is probably true that

17   government cannot block individuals purely on the basis of

18   viewpoint from a government account like the @POTUS account

19   because there there isn't the same type of associational

20   interest with a particular public official that is implicated.

21        In other words, when the President is choosing not to

22   engage with someone on Twitter, just as he could if he were at

23   some sort of public conference and could walk away from someone

24   who he didn't want to engage with -- even though I should note

25   that walking away from that individual would prevent that

1   individual from directing speech at the President in a public

2   setting, around other individuals.  So it would, in that sense,

3   create an additional challenge for the individual to

4   communicate with other people in a public setting -- the

5   President has an associational interest in deciding who he's

6   going to spend his time with in that setting.

7        THE COURT:  Fine.  Then isn't the answer he just mutes

8   the person that he finds personally offensive?  Isn't that a

9   solution?

10       MR. BAER:  No, your Honor, because, to use this

11  analogy of sort of the President at a public conference, the

12  President can choose not to engage someone in a number of ways.

13       He could tune someone out, he could mute them in a

14  conversation but not walk away from them, or he could move to

15  the other side of the room and never approach them in the first

16  place, which would make it harder for that individual -- which

17  would essentially prevent that individual from interacting with

18  the President.

19       In other words, blocking prevents the interaction.

20  Muting is the effect of tuning it out, but both decisions are

21  within the President's associational freedoms.

22       THE COURT:  But to the extent that the reason that the

23  President has blocked these individuals is because he does not

24  welcome what they have to say, he can avoid hearing them simply

25  by muting them.

1        Is that not correct?

2        MR. BAER:  That's my understanding, although I do

3   believe that there are -- there are ways you can end up seeing

4   someone's tweets who you have muted, but it requires another

5   program.

6        THE COURT:  But that would require the Twitter account

7   holder to engage in some other action, but that would be

8   voluntary.  So, if they subject themselves to the tweet that

9   they muted, that's their problem.  I don't have to worry about

10  that.

11       MR. BAER:  Yes, your Honor.

12       THE COURT:  So the President's desire not to read a

13  tweet that for some reason he does not want to read can be

14  satisfied by muting.  True?

15       MR. BAER:  To read that content, yes.  That's true.

16       THE COURT:  So let's assume that I don't find that the

17  plaintiffs have an independent cause of action or right to

18  petition which is affected by the facts of this case.  I don't

19  quite know why we're here.

20       In other words, why is it not a solution that serves

21  the expressed interests of both sides to, instead of blocking

22  these plaintiffs, the President mutes them?  When he mutes

23  them, he doesn't affect the interaction of the other, as you

24  call them, other constituents.

25       All that goes on.  The plaintiff can respond directly

```
 1   since I agree with your proposition that there is no

 2   constitutional right to be heard in the literal sense of people

 3   in government have to read what you write to them.

 4        Why are we here?  Don't we have a solution that serves

 5   the interests of the plaintiffs, serves the interests of the

 6   President, assuming that there is no independent right, another

 7   cause of action, for petition?

 8        MR. BAER:  I certainly agree with your Honor's

 9   suggestion that it would not create any constitutional

10   difficulty for the President to mute these individuals on

11   Twitter.

12        The reason though why I think the government still

13   prevails when blocking is the tool used rather than muting --

14   respectfully, your Honor, the Knight case that we were

15   discussing earlier I think goes further than saying whether the

16   government has to listen.

17        What both the Knight case and the Smith case, which

18   sort of deal with dueling instances of union versus individual

19   methods of bringing grievances to the government, deal with is

20   the complete closure of a particular channel to one class of

21   individuals.

22        So, in the Knight case, it was only the union's direct

23   representative that could negotiate with government officials

24   about policies related to their professional businesses.  And

25   in the Smith case, it was only individuals and not the union
```

 1   that could file grievances with the state.

 2          So what I think that helps illustrate, your Honor, is

 3   that when you're talking about interactions between individuals

 4   and the government, the government can at times say that it's

 5   not going to interact with a particular individual through a

 6   channel, and public officials can make that decision all the

 7   time.

 8          THE COURT:  The point is, like with every case, there

 9   is always a risk that you can lose.  And if there is a

10   settlement which serves the interests of the respective

11   parties, it's often considered the wiser way to go because you

12   don't necessarily want to risk law being made that is actually

13   not the law you want to have on the books.  So no one should

14   assume that you're definitely going to win.  Nor should the

15   plaintiffs assume that they're definitely going to win.

16          MR. BAER:  Absolutely, your Honor.  We can certainly

17   take that suggestion that your Honor has put forward back and

18   discuss it.

19          THE COURT:  I think you both should do that, but let's

20   go on.

21          MS. FALLOW:  Your Honor, if I could just say very

22   quickly.

23          THE COURT:  Yes.

24          MS. FALLOW:  We had mentioned muting as sort of a less

25   restrictive alternative to serving the President's sort of

1   interests, and I do think that is a way of not blocking the

2   plaintiffs or other dissenting people from participating in the

3   comment threads, which is the forum at issue here, despite the

4   defendants' attempt to try to disaggregate the comments from

5   the account.  That is the public forum.

6          As to the muting, I think, like you say, there is no

7   right to have a public official listen and agree with

8   everything you say.  It does impact the right to petition, and

9   it serves as a kind of prior restraint where that person can

10  never then make the next tweet where that person wants to

11  report on a grievance of another sort.  So I think it's not

12  necessarily a perfect solution, but it is certainly far less

13  restrictive.

14         THE COURT:  The right to petition certainly is in the

15  Constitution, but I'm not sure why the petition claims, which

16  are sort of in your papers -- I don't want to quite call them a

17  throwaway, but they have a very secondary role.  I'm not sure

18  why they should be analyzed separately.

19         But the second point would be, which I think is more

20  the substantive point, is that there is no question that there

21  are alternative means to petition.  The @realDonaldTrump is

22  hardly the only way for a citizen to express their views to the

23  government.  There are even those traditional ways that I grew

24  up with where you write a letter.  I know it's close to unheard

25  of, but it's a nice tradition.

1        So there are alternative means, including bringing

2    a -- a lawsuit counts as a means of petition.  And I don't

3    think, unless you tell me to the contrary, that there is

4    authority requiring the government to be receptive to

5    petitioning through every possible channel.

6        MS. FALLOW:  I don't think there is authority to that

7    effect.  I do think though that -- yes.  This is the third

8    claim listed in our complaint, but I think for the most part

9    it's because the relief we seek for all of our First Amendment

10   claims is the same, which is an order requiring the President

11   to unblock the plaintiffs in this case and to not block people

12   based on viewpoint.

13       I do think the fact that this is admitted blatant

14   viewpoint discrimination violates the first amendment under any

15   applicable theory, regardless of whether it's a public forum,

16   access to information, or the right to petition, that that is a

17   totally impermissible government motivation to cut off an

18   avenue of petition or certainly to exclude someone from a

19   public forum.

20       THE COURT:  Let's get to forum, which to me was always

21   in a sense the first question.

22       As you know, the Supreme Court has recognized that

23   some spaces are not forum or fora at all.  So how do we analyze

24   as a threshold whether a space is or is not a forum?  Because

25   most of the cases you're citing are about classifying types of

1    forum, not addressing the earlier question of is it a forum,

2    regardless of what kind it is, since we all understand that

3    what kind it is is in a sense irrelevant for our purposes,

4    because you can't have viewpoint discrimination in pretty much

5    any kind.

6              So how do you suggest that a court should go about

7    deciding whether something is or is not a forum?

8              MS. FALLOW:  Your Honor, I think you should start

9    first from looking at what is the space involved.  The

10   Supreme Court has recognized that the space can consist of a

11   channel of communication.  Like in the Cornelius case, the

12   federal charity campaign drive or in the Perry case, the

13   mailboxes for the teachers.

14             You define the forum by the access that is sought by

15   the speaker.  So here the access is to the @realDonaldTrump,

16   meaning the ability to follow him, read his tweets, and reply

17   directly to him without being blocked.  And that is, as in I

18   think it's Justice Kennedy's words, a metaphysical space, but

19   it is clearly a channel of communication.

20             Then I think the appropriate standard is to look at

21   how the government has maintained this space and what is the

22   purpose of the space and what is the nature of this channel of

23   communication.

24             It is clearly compatible with expressive activities.

25   That's the very nature of Twitter.  The President has chosen to

1    maintain this account not in any kind of protective way but

2    open to allcomers, and people do in fact, members of the

3    public, come in the thousands or tens of thousands in response

4    to each of his tweets.

5         So this is a new kind of forum, but it seems like it's

6    sort of a very good example of a government-controlled channel

7    of communication where speech by the public is happening all

8    the time and without limitation.

9         MR. BAER:  Your Honor, I think there are two

10   requirements for a forum:  First, there must be government

11   control their own property; and second, that property -- I mean

12   property can include sort of in the metaphysical sense, to be

13   clear.  And that property needs to be a place where individuals

14   speak to one another.  So using a channel of communication to

15   engage with other private citizens.

16        The problem is plaintiffs have characterized this case

17   is about the @realDonaldTrump account, but the @realDonaldTrump

18   account is actually two separate components, at least as

19   they've characterized it.

20        The first component, which is unquestionably

21   government controlled, if we've assumed government action here,

22   is the part of the account where the President speaks or the

23   President makes statements about official matters, retweets on

24   occasion individuals on Twitter.

25        All of that is certainly government controlled, but

1    no one contends that the plaintiffs have a right to be featured

2    in any of those retweets.  That would clearly be a question of

3    government speech.

4            The second part of the account is what plaintiffs have

5    labeled and what the stipulation refers to as the comment

6    thread.  So the discussion that takes place that is kicked off

7    by a presidential comment.

8            But that part isn't government controlled because the

9    President has no ability to exclude people from those

10   discussions.  And in fact, your Honor, if the President were to

11   delete a tweet that conversation had taken place about, none of

12   the ensuing comments would be deleted whatsoever, which is

13   distinct from the Davis and Facebook case that plaintiffs rely

14   on.

15           So, unlike Cornelius where there was control over the

16   combined federal campaign, unlike the Perry case where there

17   was control over the school mailboxes, unlike the University of

18   Virginia case where there was control over the funds that were

19   directed to student groups, there is no government control over

20   who participates in the comments thread, and that's reflected

21   by the fact that those same comment threads are visible both

22   underneath the President's tweets and under the tweets and

23   replies heading of every individual who comments or responds to

24   those tweets.

25           So to label the account as a whole a forum is to, I

1   think, conflate really two very distinct things.  There is a

2   place for discussion, but that place is Twitter Writ Large, and

3   the record of that discussion is reflected underneath the

4   President's tweets, as well as underneath the tweets of those

5   who have participated in the discussion.  And then there is the

6   content from the President himself where he's acting as a

7   participant in that marketplace of ideas.

8         THE COURT:  When he has blocked somebody, that

9   blocking affects the comment thread.

10        MS. FALLOW:  Your Honor, that's exactly right.  He

11   does have control.  He controls access to the comment threads.

12   By blocking, you may not reply directly to the President.  That

13   is the control.

14        MR. BAER:  Your Honor, that control is the same

15   control that any public official exercises when he's a

16   participant in any other marketplace of ideas.

17         So, again, I think if we're going to focus on

18   real-world analogies, the better one is to a conference or

19   convention where you can imagine thousands of people milling

20   about and groups of conversations taking place.

21         And that public official is free to approach whoever

22   he wants, be approached by whoever he wants, and to say no,

23   thank you to whomever he wants and to take any number of

24   considerations into account when making those decisions.

25         If you imagine, your Honor, a protestor at that

1    convention and the President or another public official says,

2    no, thank you.  I don't want to have a conversation with you

3    and walks away or even sees the protestor on the other side of

4    the room and chooses not to approach, that protestor will then

5    have a more difficult time interacting with other people who

6    are talking with that public official, but he is not prohibited

7    from doing so.

8         The protestor can still -- in this case, the analogy

9    is to individuals who can participate in the comment threads --

10   discuss the public officials' comments, views, criticize the

11   public official, praise the public official, whatever he or she

12   wants.  But the public official still maintains control over

13   who or she interacts with in that setting.

14        THE COURT:  Isn't that the point that we were talking

15   about earlier?  The public official -- the analogy is to muting

16   the speaker that you don't want to hear.  It's sort of like you

17   could be walking through this room, and you either put earplugs

18   in or cover your ears with your hands, but the person who is

19   delivering the diatribe that you don't want to hear is not in

20   any way affected in terms of what he's saying and what other

21   people can hear.

22        So isn't the muting, not the blocking, the answer to

23   your point?  I don't disagree with you that a public official

24   doesn't have to stand there and constantly take it.

25        MS. FALLOW:  Your Honor, I think that in the

1  convention analogy, the real analogy here is that there is a

2  conference room, a giant conference room at that convention

3  called the Presidential Debate and Speech Conference Room, and

4  the President stands at the front of the door and tells people

5  whether he can go in or out.

6          Once he's in the room, he can decide who to talk to,

7  but he is actually controlling access into that forum.

8          MR. BAER:  Your Honor, I think the better analogy

9  here, to get back to your question about muting, the President

10 can ignore the comments of a protestor and choose not to

11 engage, but the President can, if he is surrounded by a group

12 of other individuals, say, you know, I don't want to walk over

13 to the protestors in the first place, and I'm going to move

14 this conversation over here.

15         That then creates -- that makes it harder for the

16 protestors to reach the other people who are talking with the

17 President, but because he is a participant in this broader

18 marketplace of ideas, he's free to make these interactive

19 decisions that have these sort of collateral speech

20 consequences.

21         So the case law that I would point to is, again, the

22 Knight case where the court talked about how inevitably the

23 decision to engage or not engage with a particular individual

24 has amplification ramifications.

25         When a public official chooses to engage with a

1   particular constituent or to permit that constituent to direct

2   speech towards him or her, that invariably amplifies that

3   message.

4           But it does not violate the First Amendment when the

5   public official makes the sort of foundational associative

6   decision not to have that engagement, even though it means that

7   that individual who wanted to speak to the public official may

8   be worse off than he or she would have been if the public

9   official had permitted the engagement.

10          THE COURT:  What's your answer to that?

11          MS. FALLOW:  I think in the end, we just fundamentally

12  think that they're using the wrong analogy; that the effect of

13  blocking -- the President controls access to the ability to

14  participate in the comment threads, including by replying

15  directly to the President, and then your reply shows up in the

16  comment threads.  It's not just the President turning away from

17  a conversation he doesn't like.

18          I think, as your Honor has pointed out, to the extent

19  that that's the interest he's trying to serve, you have the

20  muting option.  But by blocking, you prevent the plaintiffs

21  from participating in the comment threads.

22          MR. BAER:  Your Honor, the stipulation contradicts

23  that last point there.  You don't prevent them from

24  participating in the comment threads.  Paragraph 30 confirms

25  this.  Paragraph 57 provides an example.  The individual

1    plaintiffs, in fact, all but one of them, have continued to

2    participate in the comment threads after having been blocked by

3    the President.

4           I will make one note, your Honor.  The real-world

5    analogies are sort of a necessary evil in trying to think

6    through how to apply the First Amendment in this new context,

7    but I don't think we can decide this case on the basis of

8    analogies alone because even in Ms. Fallow's example of sort of

9    a separate conference room, you have someone who is actually

10   excluded from the ability in real time to engage with everybody

11   else in that conference room.

12          That's not how Twitter works.  Twitter is a series of

13   overlapping conversations across millions of people, millions

14   of users.  It's like everyone is speaking and responding to one

15   another simultaneously.

16          All blocking does is say one individual is not

17   responding directly to the President, but it does not prevent

18   them from responding to everyone else on Twitter, and it does

19   not prevent them from what's known as mentioning the President

20   on Twitter.

21          So, if an individual who has been blocked begins a

22   tweet with the @realDonaldTrump, then everyone on Twitter who

23   can see the plaintiffs' account can see what the plaintiff says

24   about the President.

25          So this just is not like the public forum cases where

1    a microphone has been turned off.  It's just the President

2    choosing not to engage with a certain set of individuals, a

3    choice that every public official has whenever he or she is in

4    a public setting.

5         MS. FALLOW:  Your Honor, to be precise, the blocking

6    has the impact of preventing the plaintiffs from participating

7    fully and immediately in the comment threads.  If they happen

8    to follow someone else -- they've been blocked.  They can't see

9    his tweets.  They're not automatically notified of his tweets.

10        But if someone else that they follow replies to the

11   President and they see that, they can't see his tweets.  They

12   can't understand the context.  They have to take additional

13   steps and take additional time to find out his tweets, figure

14   out the context, and then respond.

15        Yes, it is possible to reply to replies in that way,

16   but it creates all of these additional time barriers and extra

17   steps you have to take which, although it's not a total ban, it

18   still is a significant burden on their speech, and there is no

19   legitimate government interest that would justify that here.

20   This is blatant viewpoint discrimination.

21        MR. BAER:  Your Honor, the additional steps that

22   plaintiffs have talked about are precisely the same kind of

23   incidental burdens that are always placed on speakers.

24        This goes back to the amplification language from

25   Knight that whenever a government official makes decisions

1    about who to engage with or not, and those decisions, as I

2    think plaintiffs would concede, in other public settings can

3    take viewpoint into account, unless the plaintiffs really are

4    of the view that our President or a public official cannot at a

5    conference choose who to have a conversation with, whose speech

6    to engage with, and whose to ignore.

7          All of the decisions a public official makes in that

8    setting have implications for the ability of other individuals

9    to engage with that public official or to get their views

10   heard.

11         So long as that public official is not actually

12   preventing them from having those conversations in that broader

13   space -- and the President is certainly not doing that with

14   respect to individual plaintiff's ability to continue to

15   communicate their views on Twitter to anyone who is a receptive

16   audience -- then it does not violate the First Amendment.

17         THE COURT:  Speaking about the comment threads, the

18   question is for both of you.

19         What is your position as to whether the comment

20   threads are government speech?

21         MR. BAER:  Your Honor, the government is not

22   contending that the comment threads themselves are government

23   speech.  Those comments are the speech of the individuals who

24   post them.

25         MS. FALLOW:  We agree.

1    THE COURT:  Mr. Baer, earlier you said that for a

2    space to be a forum, the property in question or the space must

3    be either government owned or government controlled and have

4    been opened up with the intent of allowing parties to

5    communicate.

6        Where does your two-prong test come from?

7        MR. BAER:  So, your Honor, it comes from the language

8    that courts I think have consistently used in describing what a

9    public forum looks like.  And so in I think both our opening

10   brief and in our opposition and reply brief, we cite sort of

11   the basic requirements that it has to be government owned or

12   controlled property and that it is a place where private

13   individuals are sort of free to speak to one another.

14        I would note for the intent requirement, that that

15   comes from a number of Supreme Court cases, including, for

16   instance, the American Library Association case where the court

17   in the plurality opinion, although Justice Breyer in his

18   concurrence agreed that it was not a public forum, reasoned

19   that because the government doesn't open up librairies and give

20   access to the Internet for the purpose of facilitating speech

21   between individuals but rather for the purpose of giving access

22   to educational content, that public forum analysis was

23   inappropriate there.

24        The other example I would use is the Forbes case where

25   the court held that, at least as a general matter, public

1    broadcasting is not subject to forum analysis because even

2    though it is government-controlled property and even though it

3    is a place where others speak, the purpose is not to open up a

4    forum for discussion between citizens.  It's to facilitate the

5    provision of certain content that requires, that necessitates,

6    some kind of editorial discretion.

7           So there those are the two cases I would invite

8    your Honor to consider for the purposes of where intent is sort

9    of at the forefront of the Court's analysis.

10          THE COURT:  But one of those cases is in a public

11   forum/non public forum context rather than forum/not a forum

12   distinction.

13          MR. BAER:  No, your Honor.  Forbes is particularly

14   clear on this.  Forbes, to be sure, ultimately holds that a

15   candidates' debate is a nonpublic forum, or it may have used

16   the phrase "limited public forum," which courts sometimes use

17   interchangeably.

18          But Forbes talks about how forum analysis writ large

19   is generally applicable to public broadcasting and uses the

20   fact that that viewpoint is sort of inherently taken into

21   account when a public broadcasting station is trying to decide

22   what content to produce.

23          And there the analogy I would draw, your Honor, is

24   similarly when an official is in a public setting and deciding

25   which constituents or which individuals to engage with,

1    viewpoint is one of many factors that are invariably taken into

2    account when a public official is deciding how to spend his or

3    her time or with whom to interact.

4         THE COURT:  Do you want to say anything?

5         MS. FALLOW:  I think those cases are inapplicable

6    because they involve things like library selection or, in the

7    Finley case, awarding art grants or, in the Forbes case, public

8    broadcasting where there was such a level of editorial

9    discretion or selectivity.  That is simply not the case here.

10        I think that the appropriate test is articulated in

11   Cornelius, in the Second Circuit's decision in Paulsen, and in

12   many other cases where you look at what is the forum, and you

13   determine the government's intent -- it can be inferred from

14   whether the forum is compatible with expressive activities and

15   whether the government has, through its policy and practice,

16   opened the forum to speech by the public.

17        Applying that here, as we've done in our briefs, we

18   argue that Twitter is inherently compatible with expressive

19   activities and that the President has maintained this

20   completely open account where everyone can follow it.  There

21   are no limitations.  And there is speech by the public

22   occurring in the thousands or tens of thousands, and he is

23   aware of that speech and in fact retweets some of the messages

24   and replies directly to others.

25        THE COURT:  So beyond the President's selection of

1    Twitter, is there other evidence that he intended to open up

2    his Twitter account as a forum for private individuals to

3    communicate?

4         MS. FALLOW:  Well, I think, first of all, it's

5    important to note, as in the Paulsen case, that when

6    determining what the government's intent is, you don't just

7    accept the bare assertions of the government defendant that

8    they didn't mean to open up a forum.

9         I think you can look at the choice of Twitter as

10   opposed to a one-way blog or website where you would not afford

11   the opportunity to the public to speak, the fact that he didn't

12   protect his tweets or try to issue any policy that would limit

13   who could follow him, who could speak in the comment threads

14   and what can be discussed.

15        And I do think that his regular habit of retweeting

16   the messages in the comment threads shows that he is -- he and

17   Mr. Scavino, who also sometimes retweets, is paying attention

18   to that speech, is aware of it, and encourages it, because it's

19   part of the whole point of Twitter.

20        MR. BAER:  Your Honor, if I may.  The one thing I

21   would note is the Paulsen test that Ms. Fallow refers to only

22   comes into play once the Court has resolved the threshold

23   question of whether there is a forum in the first place.

24        And so I think the question of sort of how a

25   government official has used a particular forum in the past

1    sort of presumes the existence of a forum, and for all the

2    reasons we've been discussing, there isn't one here.

3          The one other thing though I would note about how the

4    President uses Twitter differently from how government

5    officials have used forums that plaintiffs point to in their

6    briefs -- all of the sort of town hall or city council meeting

7    examples involve events where there is a Board of Education

8    meeting or a city council meeting where the point of hosting

9    the meeting is to get government participation in a government

10   decision.

11         There is just no evidence in the record that that's

12   how the President uses his Twitter account.  He uses it to

13   communicate his message.  And to be sure, he sometimes retweets

14   the messages of others that he finds to be supportive, but

15   that's very different from a government official convening in a

16   government space a meeting to discuss how government decisions

17   are to be made.

18         So, again, I think this just all reinforces that the

19   President uses Twitter to communicate his views.  And as he can

20   whenever he is in a public setting, a participant in the

21   marketplace of ideas, he is free to decide who to engage with

22   or not in that context, so long as he doesn't then prevent

23   others from disseminating their views and trying to reach other

24   people and convince them of their views.

25         THE COURT:  However, the President has other

1  mechanisms to communicate his views.  He could issue

2  press releases constantly, but he chose Twitter.  So the

3  question is is there some significance to the fact that he

4  chose a medium which by definition is interactive.

5          MR. BAER:  No, your Honor.  For purposes of forum

6  analysis, there is no significance, just as there is no

7  significance for forum analysis to a public official attending

8  an event in a public park or attending a conference or a

9  meeting where he knows that he is going to interact with other

10 people.

11          In fact, what I would say is it is the interactive

12 notion of Twitter rather than sort of the kind of public

13 message board that a government controls function that

14 reinforces that the President's decisions are permissible here.

15          But they are the decisions of a public official

16 choosing with whom to interact, not the decisions of a public

17 official curating content in a government meeting.

18          THE COURT:  Except that he opened up the account free

19 to everybody and then shut some people down when he didn't

20 apparently like what they were saying, which is I think a

21 little different.

22          MR. BAER:  Just as a public official who attends a

23 conference by walking through the door is inviting anyone who

24 may be around to come up to him and engage in a conversation.

25 Again, he's free to tune them out or to walk away or, after

1    they've made their initial salvo in the conversation to say,

2    respectfully, I don't want to talk to you for the rest of this

3    conference.

4          All of those decisions are permissible, and they stem

5    from the associative freedoms that public officials maintain in

6    public office to choose who they interact with.  This is an

7    example of that.

8          I do think, your Honor, that Twitter's sort of

9    interaction functions sort of reinforces that that's why the

10   frame just described is the right way to think of this

11   particular decision.

12         THE COURT:  What I'd actually like to ask you to do is

13   tell me what you think my decision tree ought to go like.  In

14   other words, we've been talking about forum and official action

15   and government speech.

16         If you were my law clerk, how would you suggest step

17   one, find this.  Then down a decision tree.

18         So let me let the plaintiff start since it's their

19   case.

20         MS. FALLOW:  Sure.  I don't think this will be a huge

21   surprise, but how I would start the opinion is with a section

22   that rejects the government's argument that the First Amendment

23   doesn't apply here.

24         And part A of that could be either because this is

25   plainly an official account that is used in an official manner

1    just as the @POTUS or @WhiteHouse Twitter account are used,

2    looking at the facts in the record and applying a totality of

3    the circumstances.

4         Or an alternative is this operates as a public forum,

5    and it satisfies all of the requirements of a public forum

6    because it's a government-controlled space that the public is

7    allowed to speak in, and I don't think this is just a purely

8    personal account.

9         What I would probably do, if I were the clerk, is

10   start from A, this is an official account, and then go to why

11   his blocking of the plaintiffs violates the First Amendment,

12   because it is a public forum for the reasons I have stated.

13        THE COURT:  Wait a second.

14        Is the first line in the decision tree this is a

15   public forum?  Or is the first line in the decision tree the

16   President is acting in an official capacity and therefore it is

17   a public forum?

18        MS. FALLOW:  As the clerk, I would say first this is

19   an official capacity.  Next is public forum.

20        THE COURT:  So it's because he's acting in an official

21   capacity that it creates a public forum.

22        MS. FALLOW:  That makes it --

23        THE COURT:  Yes?

24        MS. FALLOW:  Yes.

25        THE COURT:  And then it becomes easy.  From your

1    perspective, at that point, it's a public forum.  It's

2    viewpoint discrimination.  You can't do it.

3            MS. FALLOW:  Yes.  It violates public forum doctrine

4    regardless of whether it's designated, limited, or nonpublic.

5    And if you want, and it also just denies access to important

6    government information purely based on this completely -- there

7    are no cases -- even the cases that the government is citing of

8    Knight or the Smith case, there is no allegation there of any

9    viewpoint discrimination.  As Justice Kennedy recently stated

10   in the Tam case, when you have viewpoint discrimination, it's

11   almost always illegal, unconstitutional.

12           THE COURT:  Okay.

13           MR. BAER:  My suggestion, your Honor, would be to

14   proceed as follows:  First, because jurisdiction always has to

15   come first, the Court would hold that there is no jurisdiction

16   here because the only defendant for whom plaintiffs satisfy the

17   first two prongs of Article III standing is the President

18   himself.

19           THE COURT:  And he's above the law?

20           MR. BAER:  No, your Honor.

21           THE COURT:  I just want to check.

22           MR. BAER:  In fact, your Honor, I would invite the

23   Court to look at Section 5 of the Nixon v. Fitzgerald opinion

24   where not only did the court reject that argument, it actually

25   rejected that phrase.

1          The dissent had charged that the court was holding

2     that the President was above the law, and I believe in footnote

3     41 or 42 of the Nixon v. Fitzgerald opinion, the majority

4     explained that to hold that a particular avenue of redress

5     through the courts is unavailable as a function of our

6     structural separation of powers is not to hold that the

7     President is above the law, in light of all of the other

8     constitutional and political checks that exist on presidential

9     power and authority.

10         But returning to your Honor's question, I would start

11    with jurisdiction first.  The President is the only defendant

12    for whom the first two prongs of Article III standing could be

13    satisfied.

14         The third prong though, redressability, cannot be

15    satisfied with respect to the President.  Therefore, it lacks

16    jurisdiction to enter any relief in this case.  But even if

17    that were not true, the Court would then turn to the -- "Even

18    if" would be part of the structure of the opinion.

19         The next issue would be whether there is any

20    government action to which the First Amendment attaches.  And

21    one reason, your Honor, to start with the government action

22    question rather than the is-this-a-public-forum question is the

23    other First Amendment claims that plaintiffs are bringing also,

24    of course, because they invoke the First Amendment, hinge on

25    the existence of government action, which I think reinforces,

1   your Honor, the value of focusing narrowly on what the specific

2   challenged action is, and that's the decision to block the

3   individual plaintiffs.

4          Because, irrespective of whether there is or is not a

5   public forum here, plaintiffs have argued that the blocking

6   decision violates the First Amendment for denying access and

7   for violating their petition clause rights and for violating

8   the Knight Institute's right to hear -- all of those claims

9   require an assumption of government action.

10         So I would write the government action section of the

11  opinion and conclude that there is no government action here

12  because the President is not exercising any government

13  authority when he makes the particular decision to block the

14  individual plaintiffs.

15         Finally, I would turn to the merits of the First

16  Amendment claim saying even if I were to hold that there is

17  government action here, the plaintiffs' First Amendment claims

18  fail on the merits.

19         First I would write the public forum section by saying

20  plaintiffs essentially allege the existence of a public forum

21  here, but the President, even if he's acting in a governmental

22  capacity, is not regulating access to a public forum.

23         Rather, he is choosing individuals that he wishes or

24  does not wish to interact with through the Twitter platform,

25  and that associational decision doesn't implicate forum

1    analysis because he is not exercising any control over a space

2    where private individuals on government property speak to one

3    another, again, no more so than he would in exercising control

4    over who he wishes to speak with in another public setting.

5              I would essentially analogize Twitter as a platform to

6    any other public setting that an official can be engaging with

7    other individuals in say that the freedom to choose who to

8    interact with in that setting is not a decision that the First

9    Amendment reaches.  Rather, it falls within the ambit of

10    government speech because it's a public official making

11    associational differences.

12              From there, I would move quickly through the remainder

13    of the plaintiffs' First Amendment claims noting that, first,

14    because there is no denial of access to generally public

15    information, all of the individual plaintiffs retain the

16    ability to see all of the President's tweets by just visiting

17    the President's Twitter web page when they're not signed into

18    their accounts.

19              And also because the petition clause does not

20    guarantee the right of individuals to petition the government

21    through a particular channel when there remains a plethora of

22    other ways to communicate their views, there is no First

23    Amendment -- there is no First Amendment claim there.

24              And then, finally, I would get to the Knight

25    Institute's claim which I suppose actually I might dispense

1    with with a footnote at the jurisdictional phase of the opinion

2    to note that they failed to adequately allege that they have

3    standing to bring their right to hear claim because they have

4    in no way identified how the President's decision to block

5    individuals prevents them from hearing specific comments or

6    views of any individual, much less the individual plaintiffs

7    here.

8             In any event, even if they were to satisfy the

9    standing bar, the question of whether they have a right to hear

10   can reach no further than the question of whether any

11   individuals have the right to speak.

12            So, on that ground, the Knight Institute can't claim a

13   right to speech that the individual plaintiffs don't have a

14   right to make in the first place, and for all of the First

15   Amendment reasons that we've discussed, there is no First

16   Amendment right for them to have access to that

17   @realDonaldTrump.

18            THE COURT:  One second.

19            (Pause)

20            THE COURT:  I told you at the outset that I'd give you

21   a chance to cover any territory that my questions didn't

22   address if you thought there was something that had not been

23   said well in your papers or that you wanted to especially

24   emphasize.

25            So let me give Ms. Fallow or Mr. Jaffer a chance to

1    speak if there is something we haven't covered.

2            MS. FALLOW:  I think we've covered our First Amendment

3    arguments.

4            Mr. Jaffer.

5            MR. JAFFER:  Thank you, your Honor.

6            Just one point on jurisdiction.  As you know, the

7    government has made the argument that the Court lacks authority

8    to enjoin subordinate officials because those subordinate

9    officials were not personally involved in causing the injury.

10           In our papers, we point the Court to the Swan case in

11   which the injury in question was caused by the President.  Only

12   the President could have caused the injury because only the

13   President had the authority to use the recess appointment

14   power.

15           The court nonetheless in that case enjoined

16   subordinate officials finding that it had the power to do so

17   because those officials could remedy the injury.

18           The question there wasn't whether they were personally

19   involved in inflicting the injury but, rather, whether they

20   were in a position to remedy it.  In fact, Swan goes on to

21   enjoin even individuals who were not before the court, who were

22   not defendants in the case, which we're not asking the Court to

23   do here.

24           Since we've filed the reply brief, we've identified

25   other cases which state that proposition even more clearly.  If

1    it would be helpful, I could just give a couple cites to the

2    Court.  One is a Ninth Circuit case called Hartman, and the

3    relevant sentence is at page 1127.  The relevant analysis is at

4    1127.

5            THE COURT:  Let's start with the volume.

6            MR. JAFFER:  Sorry.  707 F.3d 1114.  Again, 1127 is

7    the pin cite.  It's 2013 from the Ninth Circuit.

8            There are two sentences that I think sort of capture

9    it:  "A plaintiff seeking injunctive relief against the state

10   is not required to allege a named official's personal

11   involvement in the acts or omissions constituting the alleged

12   constitutional violation.  Rather, a plaintiff need only

13   identify the law or policy challenged as a constitutional

14   violation and name an official within the entity who can

15   appropriately respond to injunctive relief," which I think is

16   what we've done here by naming the subordinate officials.

17           I'm not going to quote from the other cases, but the

18   other two cases that I think the Court may find useful -- one

19   is called Parkell, Third Circuit, 833 F.3d 313, a 2016 case.

20   The other case is called Luckey v. Harris, Eleventh Circuit

21   1988, 860 F.2d 1012, and the pin cite is 1015.

22           As I said earlier, your Honor, I think the Court also

23   has the power to issue declaratory relief against all of the

24   defendants and, should it became necessary, to enjoin the

25   President, although I don't think the Court has to do that in

1    the first instance.  Thank you, your Honor.

2        MR. BAER:  Your Honor, I would only just briefly

3    respond to what Mr. Jaffer just discussed and note two things

4    with respect to the Swan decision.

5        First, I don't believe the Court actually issued any

6    injunctive relief there.  It simply held for purposes of the

7    jurisdictional analysis that in theory it could.  It therefore

8    didn't discuss the sort of causation implications of that

9    holding because ultimately, on the merits, I believe it ruled

10   against Mr. Swan.

11       More to the point, I think if the Court had engaged in

12   the Article III causation analysis that we've suggested is

13   appropriate here, would have found that there is injury fairly

14   traceable to the individuals who the court considered

15   enjoining.

16       The court didn't focus on a broad class of government

17   employees.  It focused specifically on other members of the

18   board and other employees at the National Credit Union

19   Administration who would have to choose whether or not to

20   recognize Mr. Swan, the plaintiff who sought to continue to be

21   a board member of the National Credit Union Administration.

22       In other words, those employees, those specific

23   individuals, would have inflicted injury on Mr. Swan if he were

24   entitled to have maintained that position by not treating him

25   as a board member.

1          In other words, it was a classic example of a decision

2     that is made by a higher official that is implemented by lower

3     officials and then puts it into the category of cases like

4     Youngstown where you have a decision that's being implemented

5     by an official who is not the President, and therefore

6     declaratory or injunctive relief can issue against that

7     individual.

8          So that's a long way of saying, your Honor, I think

9     that even if the court had engaged in the causation analysis in

10    Swan, there would have been causation with respect to the class

11    of individuals that it had hypothesized it could enjoin, but

12    there is no argument from plaintiff here that Mr. Scavino in

13    any way, shape, or form caused the blocking of the individual

14    plaintiffs, and it's that decision, that injury, that's at

15    issue here.

16          MR. JAFFER:  Your Honor, I don't think the

17    government's characterization of the relief in Swan is

18    accurate, but ultimately nothing turns on Swan in particular

19    because this is a much broader principle.

20          Kentucky v. Graham, which is a Supreme Court case

21    which we cite in our brief, makes clear that suits against

22    officials sued in their official capacity should be understood

23    as suits against the government.  The relevant question there

24    for traceability purposes is whether the injury is traceable to

25    the government.

1            Whether we have standing to seek injunctive relief

2     against, for example, Mr. Scavino turns on the question of

3     whether Mr. Scavino is in a position to remedy the injury.

4     Again, the cases that I cited earlier go to that point.

5            Just one last point, your Honor.  I don't mean to

6     concede that Mr. Scavino was not personally involved or is not

7     personally involved in the injury here.  While it is true that

8     the President himself blocked the individual plaintiffs in the

9     first instance, the injury is a continuing injury for which

10    Mr. Scavino is partly responsible.

11           Mr. Scavino, by the government's admission, helps

12    administer the account.  He has the power to block or unblock

13    individuals from the account.  He is a full participant in the

14    continuing injury.  He's certainly much more closely associated

15    with the injury than the defendants in Swan who were enjoined

16    by the court in that case because they were in a position to

17    remedy the injury.

18           THE COURT:  So it comes down to the President hit the

19    block button versus telling Scavino to hit the block button.

20           MR. BAER:  Yes, your Honor.  I think that's what the

21    court in Franklin held when it -- that's what the court in

22    Franklin reasoned when it considered the import of the

23    Youngstown decision.

24           So it considered the same argument that plaintiffs

25    raised in their brief, that if Youngstown is properly decided

1    where the injunction was against the Secretary of Commerce,

2    then surely there is jurisdiction to enjoin the President.  And

3    the four justice plurality and Justice Scalia in greater depth

4    in concurrence said no.

5              MR. JAFFER:  Your Honor, I think that this is simpler

6    than the government is making it out to be.  There is no

7    dispute that Mr. Scavino is in a position to remedy the injury

8    that's stated in the joint stipulation.

9              There is a whole line of cases -- frankly, Swan, the

10   more recent travel ban cases from the Fourth and

11   Ninth Circuits, Marbury v. Madison -- in which the Court's have

12   made clear that it is not just appropriate but required that

13   the courts assume that executive officials, including the

14   President, even if there is no injunctive relief directed at

15   the President himself.

16             I think that's the position that you, your Honor, are

17   in right now.  The government has not said that President Trump

18   intends to subvert the Court's authority.

19             In the absence of that kind of statement, which I'm

20   glad they're not making, the Court is entitled to, and indeed

21   required, to assume that the President will abide by the

22   Court's authoritative declaration of the law, even if there is

23   no injunction directed at the President.

24             THE COURT:  Thank you very much.

25             MR. JAFFER:  Thank you.

1          THE COURT:  Consider my earlier suggestion.  As

2     interesting as this may be intellectually -- and it certainly

3     is -- it might be better to resolve it in a practical fashion.

4     We'll give you a decision in due course, not instantly because

5     I know what else we have to finish.  Thank you very much.  I

6     appreciate it.

7          MR. JAFFER:  Thank you, your Honor.

8          MR. BAER:  Thank you, your Honor.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25