18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1:17-cv-05205-NRB

# In the
# United States Court of Appeals
# For the Second Circuit

---

August Term 2018

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Apr 01 2020

No. 18-1691-cv

KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY,
REBECCA BUCKWALTER, PHILIP COHEN, HOLLY FIGUEROA, EUGENE
GU, BRANDON NEELY, JOSEPH PAPP, and NICHOLAS PAPPAS,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES and DANIEL
SCAVINO, WHITE HOUSE DIRECTOR OF SOCIAL MEDIA AND ASSISTANT
TO THE PRESIDENT,

*Defendants-Appellants,*

SARAH HUCKABEE SANDERS, WHITE HOUSE PRESS SECRETARY,

*Defendant.*[*]

---

Appeal from the United States District Court
for the Southern District of New York
No. 17 Civ. 5205 (NRB), Naomi R. Buchwald, District Judge, Presiding.
(Argued: March 26, 2019; Decided: July 9, 2019)

---

[*] The Clerk of Court is respectfully directed to amend the official caption as indicated above.

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1       Before:     PARKER, HALL, and DRONEY, *Circuit Judges.*

2

3       Plaintiffs Buckwalter, Cohen, Figueroa, Gu, Neely, Papp, and Pappas
4 ("Individual Plaintiffs") are social media users who were blocked from accessing
5 and interacting with the Twitter account of President Donald J. Trump because
6 they expressed views he disliked.  The Knight First Amendment Institute at
7 Columbia University is an organization alleging a right to hear the speech that
8 the Individual Plaintiffs would have expressed had they not been blocked.  The
9 Plaintiffs sued President Trump along with certain White House officials,
10 contending that the blocking violated the First Amendment.  The United States
11 District Court for the Southern District of New York (Buchwald, *J.*) found that
12 the "interactive space" in the account is a public forum and that the exclusion
13 from that space was unconstitutional viewpoint discrimination.  We agree, and,
14 accordingly, we affirm the judgment of the District Court.

15

16      **AFFIRMED.**

17                                    Jameel Jaffer (Katherine Fallow,
18                                    Caroline DeCell, Alexander Abdo,
19                                    Knight First Amendment Institute at
20                                    Columbia University, New York, NY,
21                                    Jessica Ring Amunson, Tali R.
22                                    Leinwand, Jenner & Block, Washington,
23                                    D.C., *on the brief*), Knight First
24                                    Amendment Institute at Columbia
25                                    University, New York, NY, *for Plaintiffs-*
26                                    *Appellees.*

27

28                                    Jennifer Utrecht, Attorney, Appellate
29                                    Staff, Civil Division (Scott McIntosh,
30                                    Attorney, Appellate Staff, *on the brief*),
31                                    *for* Chad A. Readler, Acting Assistant
32                                    Attorney General, Hashim M.
33                                    Mooppan, Deputy Assistant Attorney
34                                    General, Washington, D.C., *for*
35                                    *Defendants-Appellants.*

36

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

| | |
|---|---|
| 1 | David Greene, Electronic Frontier |
| 2 | Foundation, San Francisco, CA, *for* |
| 3 | *amicus curiae*, Electronic Frontier |
| 4 | Foundation, *in support of Plaintiffs-* |
| 5 | *Appellees*. |
| 6 | |
| 7 | Amy L. Marshak, Joshua A. Geltzer, |
| 8 | Mary B. McCord, Institute for |
| 9 | Constitutional Advocacy and Protection |
| 10 | at Georgetown University Law Center, |
| 11 | Washington, D.C., *for amici curiae*, |
| 12 | Ashutosh Bhagwat, Erwin |
| 13 | Chemerinksy, Genevieve Lakier, Lyrissa |
| 14 | Lidsky, Helen Norton, Amanda Shanor, |
| 15 | Geoffrey R. Stone, Laurence H. Tribe, |
| 16 | and Rebecca Tushnet, *in support of* |
| 17 | *Plaintiffs-Appellees*. |
| 18 | |
| 19 | Dan Backer, Political.Law PLLC, |
| 20 | Alexandria, VA, *for amicus curiae*, |
| 21 | Coolidge-Reagan Foundation, *in support* |
| 22 | *of Defendants-Appellants*. |
| 23 | |
| 24 | Donald B. Verrilli, Jr., Chad I. Golder, |
| 25 | Rachel G. Miller-Ziegler, Munger, Tolles |
| 26 | & Olson LLP, Washington, D.C., *for* |
| 27 | *amicus curiae*, Internet Association, *in* |
| 28 | *support of neither party*. |
| 29 | |
| 30 | |

31  BARRINGTON D. PARKER, *Circuit Judge*:

32      President Donald J. Trump appeals from a judgment of the United States

33  District Court for the Southern District of New York (Buchwald, *J.*) concluding

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    that he engaged in unconstitutional viewpoint discrimination by utilizing

2    Twitter's "blocking" function to limit certain users' access to his social media

3    account, which is otherwise open to the public at large, because he disagrees

4    with their speech.  We hold that he engaged in such discrimination and,

5    consequently, affirm the judgment below.

6        The salient issues in this case arise from the decision of the President to use

7    a relatively new type of social media platform to conduct official business and to

8    interact with the public.  We do not consider or decide whether an elected official

9    violates the Constitution by excluding persons from a wholly private social

10    media account.  Nor do we consider or decide whether private social media

11    companies are bound by the First Amendment when policing their platforms.

12    We do conclude, however, that the First Amendment does not permit a public

13    official who utilizes a social media account for all manner of official purposes to

14    exclude persons from an otherwise-open online dialogue because they expressed

15    views with which the official disagrees.[1]

16        Twitter is a social media platform that allows its users to electronically

17    send messages of limited length to the public.  After creating an account, a user

---

[1] The facts in this case are not in dispute as the case was resolved below on stipulated facts.

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    can post their own messages on the platform (referred to as tweeting).  Users

2    may also respond to the messages of others (replying), republish the messages of

3    others (retweeting), or convey approval or acknowledgment of another's

4    message by "liking" the message.  All of a user's tweets appear on that user's

5    continuously-updated "timeline," which is a convenient method of viewing and

6    interacting with that user's tweets.

7        When one user replies to another user's tweet, a "comment thread" is

8    created.  When viewing a tweet, this comment thread appears below the original

9    tweet and includes both the first-level replies (replies to the original tweet) and

10   second-level replies (replies to the first-level replies).  The comment threads

11   "reflect multiple overlapping 'conversations' among and across groups of users"

12   and are a "large part" of what makes Twitter a "'social' media platform."  App'x

13   at 50.

14       The platform also allows users to directly interact with each other.  For

15   example, User A can "mention" User B in User A's tweet, prompting a

16   notification to User B that he or she has been mentioned in a tweet.  Twitter users

17   can also "follow" one another.  If User A follows User B, then all of User B's

18   tweets appear in User A's "feed," which is a continuously-updated display of

Case 18-1691, Document 166-2, 04/01/2020, 2814358, Page6 of 29

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    content mostly from accounts that User A has chosen to follow.  Conversely,

2    User A can "block" User B.  This prevents User B from seeing User A's timeline

3    or any of User A's tweets.  User B, if blocked by User A, is unable to reply to,

4    retweet, or like any of User A's tweets.  Similarly, User A will not see any of User

5    B's tweets and will not be notified if User B mentions User A.[2]  The dispute in

6    this case exclusively concerns the President's use of this blocking function.  The

7    government has conceded that the account in question is not itself "independent

8    of [Trump's] presidency," but contends that the act of blocking was private

9    conduct that does not implicate the First Amendment.  Oral Arg. R. at 1:00 – 1:15.

10       President Trump established his account, with the handle

11   @realDonaldTrump, (the "Account") in March 2009.  No one disputes that before

12   he became President the Account was a purely private one or that once he leaves

13   office the Account will presumably revert to its private status.  This litigation

14   concerns what the Account is now.  Since his inauguration in January 2017, he

---

[2] All of these features are part of the platform set up by Twitter, a private company.  Use of the platform is governed by terms of service which users agree to when they use the platform.  *See generally Twitter Terms of Service*, Twitter, https://twitter.com/en/tos (last visited June 6, 2019).  A Twitter user cannot choose to have an account that has a subset of these features.  For example, a user cannot obtain from Twitter an account that prohibits certain other users from blocking them.  Nor can a user obtain from Twitter an account with the ability to disable the comment thread.

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    has used the Account, according to the parties, "as a channel for communicating

2    and interacting with the public about his administration."  App'x at 54.  The

3    President's tweets from the Account can be viewed by any member of the public

4    without being signed into a Twitter account.  However, if a user has been

5    blocked from the Account, they cannot view the Account's tweets when logged

6    in to their account.  At the time of the parties' stipulation, the Account had more

7    than 50 million followers.  The President's tweets produce an extraordinarily

8    high level of public engagement, typically generating thousands of replies, some

9    of which, in turn, generate hundreds of thousands of additional replies.  The

10   President has not generally sought to limit who can follow the Account, nor has

11   he sought to limit the kind of speech that users can post in reply to his tweets.

12         The public presentation of the Account and the webpage associated with it

13   bear all the trappings of an official, state-run account.  The page is registered to

14   Donald J. Trump "45th President of the United States of America, Washington

15   D.C."  *Id.* at 54-55.  The header photographs of the Account show the President

16   engaged in the performance of his official duties such as signing executive

17   orders, delivering remarks at the White House, and meeting with the Pope,

18   heads of state, and other foreign dignitaries.

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    The President and multiple members of his administration have described

2    his use of the Account as official.  The President has stipulated that he, with the

3    assistance of Defendant Daniel Scavino, uses the Account frequently "to

4    announce, describe, and defend his policies; to promote his Administration's

5    legislative agenda; to announce official decisions; to engage with foreign political

6    leaders; to publicize state visits; [and] to challenge media organizations whose

7    coverage of his Administration he believes to be unfair."  *Id.* at 56.  In June 2017,

8    then-White House Press Secretary Sean Spicer stated at a press conference that

9    President Trump's tweets should be considered "official statements by the

10    President of the United States."  *Id.* at 55-56.  In June 2017, the White House

11    responded to a request for official White House records from the House

12    Permanent Select Committee on Intelligence by referring the Committee to a

13    statement made by the President on Twitter.

14    Moreover, the Account is one of the White House's main vehicles for

15    conducting official business.  The President operates the Account with the

16    assistance of defendant Daniel Scavino, the White House Director of Social

17    Media and Assistant to the President.  The President and his aides have

18    characterized tweets from the Account as official statements of the President.  For

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1  example, the President used the Account to announce the nomination of

2  Christopher Wray as FBI director and to announce the administration's ban on

3  transgender individuals serving in the military.  The President used the Account

4  to first announce that he had fired Chief of Staff Reince Priebus and replaced him

5  with General John Kelly.  President Trump also used the Account to inform the

6  public about his discussions with the South Korean president concerning North

7  Korea's nuclear program and about his decision to sell sophisticated military

8  hardware to Japan and South Korea.

9       Finally, we note that the National Archives, the agency of government

10  responsible for maintaining the government's records, has concluded that the

11  President's tweets are official records.  The Presidential Records Act of 1978

12  established public ownership of the President's official records.  44 U.S.C. § 2202.

13  Under that Act, "Presidential records" include documentary materials created by

14  the President "in the course of conducting activities which relate to or have an

15  effect upon the carrying out of the constitutional, statutory or other official or

16  ceremonial duties of the President."  *Id*. § 2201.  The statute authorizes the

17  Archivist of the United States to "maintain and preserve Presidential records on

18  behalf of the President, including records in digital or electronic form."  *Id.* §

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    2203.  Accordingly, the National Archives and Records Administration has

2    advised the White House that the President's tweets are "official records that

3    must be preserved under the Presidential Records Act."  App'x at 57.

4         In May and June of 2017, the President blocked each of the Individual

5    Plaintiffs (but not the Knight First Amendment Institute) from the Account.  The

6    government concedes that each of them was blocked after posting replies in

7    which they criticized the President or his policies and that they were blocked as a

8    result of their criticism.  The government also concedes that because they were

9    blocked they are unable to view the President's tweets, to directly reply to these

10   tweets, or to use the @realDonaldTrump webpage to view the comment threads

11   associated with the President's tweets.

12        The Individual Plaintiffs further contend that their inability to view,

13   retweet, and reply to the President's tweets limits their ability to participate with

14   other members of the public in the comment threads that appear below the

15   President's tweets.  The parties agree that, without the context of the President's

16   original tweets (which the Individual Plaintiffs are unable to view when logged

17   in to their accounts), it is more difficult to follow the conversations occurring in

18   the comment threads.  In addition, the parties have stipulated that as a

1   consequence of their having been blocked, the Individual Plaintiffs are burdened

2   in their ability to view or directly reply to the President's tweets, and to

3   participate in the comment threads associated with the President's tweets.

4        While various "workarounds" exist that would allow each of the

5   Individual Plaintiffs to engage with the Account, they contend that each is

6   burdensome.  For example, blocked users who wish to participate in the

7   comment thread of a blocking user's tweet could log out of their accounts,

8   identify a first-level reply to which they would like to respond, log back into

9   their accounts, locate the first-level reply on the author's timeline, and then post

10  a message in reply.  The blocked users' messages would appear in the comment

11  thread of the blocking user's tweet, although the blocking user would be unable

12  to see it.  Blocked users could also create a new Twitter account.  Alternatively,

13  blocked users could log out of their accounts, navigate to the blocking user's

14  timeline, take a screenshot of the blocking user's tweet, then log back into their

15  own accounts and post that screenshot along with their own commentary.

16       In July 2017, the Individual Plaintiffs and the Knight Institute sued Donald

17  Trump, Daniel Scavino, and two other White House staff members alleging that

18  blocking them from the Account violated the First Amendment.  The parties

1    cross-moved below for summary judgment.  The District Court granted

2    summary judgment in favor of the plaintiffs and entered a declaratory judgment

3    that "the blocking of the individual plaintiffs from the [Account] because of their

4    expressed political views violates the First Amendment."  *Knight First*

5    *Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 579 (S.D.N.Y.

6    2018).  The District Court held that the "interactive space" associated with each

7    tweet constituted a public forum for First Amendment purposes because it was a

8    forum "in which other users may directly interact with the content of the tweets

9    by . . . replying to, retweeting or liking the tweet."  *Id.* at 566.  The Court reasoned

10   that: (1) "there can be no serious suggestion that the interactive space is

11   incompatible with expressive activity," and (2) the President and his staff hold

12   the Account open, without restriction, to the public at large on a broadly-

13   accessible social media platform.  *Id.* at 574-75.  As to the government control

14   requirement of the public forum analysis, the court found that "the President

15   presents the @realDonaldTrump account as being a presidential account as

16   opposed to a personal account and . . . uses the account to take actions that can

17   be taken only by the President as President."  *Id.* at 567.  The court concluded that

18   "because the President and Scavino use the @realDonaldTrump account for

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1  governmental functions" they exercise government control over the relevant

2  aspects of the Account, including the blocking function.  *Id.* at 569. The court also

3  rejected the idea that speech within the interactive space on the platform is

4  government speech not subject to First Amendment restrictions, concluding that

5  "replies to the President's tweets remain the private speech of the replying user."

6  *Id.* at 572.

7  After concluding that the defendants had created a public forum in the

8  interactive space of the Account, the court concluded that, by blocking the

9  Individual Plaintiffs because of their expressed political views, the government

10  had engaged in viewpoint discrimination.  *Id.* at 577.  Finally, the court held that

11  the blocking of the Individual Plaintiffs violated the Knight Institute's right to

12  read the replies of the Individual Plaintiffs which they cannot post because they

13  are blocked.  *Id.* at 563-64.[3]

---

[3] The District Court concluded that all plaintiffs had standing to sue, a conclusion the government does not challenge on this appeal and with which we agree. After the District Court granted declaratory relief, the defendants unblocked the Individual Plaintiffs from the Account.  This does not render the case moot. *Walling v. Helmerich & Payne*, 323 U.S. 37, 43 (1944) ("Voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power.").

Case 19-1691, Document 166-2, 04/01/2020, 2814352, Page14 of 39

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    This Court reviews a grant of summary judgment *de novo*, applying the

2    same standards that governed the district court's resolution of the motion.

3    *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013). All questions presented

4    on this appeal, including questions of constitutional interpretation, are ones of

5    law which we review *de novo*. *All. for Open Soc'y Int'l, Inc. v. United States Agency*

6    *for Int'l Dev.*, 911 F.3d 104, 109 (2d Cir. 2018). Because we agree that in blocking

7    the Individual Plaintiffs the President engaged in prohibited viewpoint

8    discrimination, we affirm.

9                              **DISCUSSION**

10    The President's primary argument in his brief is that when he blocked the

11    Individual Plaintiffs, he was exercising control over a private, personal account.

12    At oral argument, however, the government conceded that the Account is not

13    "independent of [Trump's] presidency," choosing instead to argue only that the

14    act of blocking was not state action. Oral Arg. R. at 1:00 – 1:15. The President

15    contends that the Account is exclusively a vehicle for his own speech to which

16    the Individual Plaintiffs have no right of access and to which the First

17    Amendment does not apply. Secondarily, he argues that, in any event, the

18    Account is not a public forum and that even if the Account were a public forum,

14

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    blocking the Individual Plaintiffs did not prevent them from accessing the forum.

2    The President further argues that, to the extent the Account is government-

3    controlled, posts on it are government speech to which the First Amendment

4    does not apply.  We are not persuaded.  We conclude that the evidence of the

5    official nature of the Account is overwhelming.  We also conclude that once the

6    President has chosen a platform and opened up its interactive space to millions

7    of users and participants, he may not selectively exclude those whose views he

8    disagrees with.

9                                        I.

10         The President concedes that he blocked the Individual Plaintiffs because

11   they posted tweets that criticized him or his policies.  He also concedes that such

12   criticism is protected speech.  The issue then for this Court to resolve is whether,

13   in blocking the Individual Plaintiffs from the interactive features of the Account,

14   the President acted in a governmental capacity or as a private citizen.

15         The President maintains that Twitter is a privately owned and operated

16   social media platform that he has used since 2009 to share his opinions on

17   popular culture, world affairs, and politics.  Since he became President, he

18   contends, the private nature of the Account has not changed.  In his view, the

Case 19-1691, Document 166-2, 04/01/2020, 2814355, Page16 of 39
Case 1:17-cv-05205-NRB Document 76 Filed 04/01/20 Page 16 of 29

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    Account is not a space owned or controlled by the government. Rather, it is a

2    platform for his own private speech and not one for the private expression of

3    others. Because the Account is private, he argues, First Amendment issues and

4    forum analysis are not implicated. Although Twitter facilitates robust public

5    debate on the Account, the President contends that it is simply the means

6    through which he participates in a forum and not a public forum in and of itself.

7       No one disputes that the First Amendment restricts government regulation

8    of private speech but does not regulate purely private speech.[4] If, in blocking,

9    the President were acting in a governmental capacity, then he may not

10    discriminate based on viewpoint among the private speech occurring in the

11    Account's interactive space. As noted, the government argues first that the

12    Account is the President's private property because he opened it in 2009 as a

13    personal account and he will retain personal control over the Account after his

14    presidency. However, the fact that government control over property is

15    temporary, or that the government does not "own" the property in the sense that

---

[4] *See, e.g.*, *Harris v. Quinn*, 573 U.S. 616, 629 n.4 (2014); *Loce v. Time Warner Entm't Advance/Newhouse P'ship*, 191 F.3d 256, 266 (2d Cir. 1999); *see also Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (stating that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out").

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1 it holds title to the property, is not determinative of whether the property is, in

2 fact, sufficiently controlled by the government to make it a forum for First

3 Amendment purposes. *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547-52

4 (1975) (holding privately-owned theater leased to and operated by city was

5 public forum).[5] Temporary control by the government can still be control for

6 First Amendment purposes.

7      The government's contention that the President's use of the Account

8 during his presidency is private founders in the face of the uncontested evidence

9 in the record of substantial and pervasive government involvement with, and

10 control over, the Account. First, the Account is presented by the President and

11 the White House staff as belonging to, and operated by, the President. The

12 Account is registered to "Donald J. Trump, '45th President of the United States of

13 America, Washington, D.C.'" App'x at 54. The President has described his use

14 of the Account as "MODERN DAY PRESIDENTIAL." *Id.* at 55. The White

---

[5] *See also Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 749 (1996) (plurality opinion) (stating that "public forums are places that the government has opened for use by the public as a place for expressive activity" (internal quotation marks omitted)); *U.S. Postal Serv. v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 132 (considering "question of whether a particular piece of personal or real property owned *or controlled* by the government" is a public forum (emphasis added)).

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    House social media director has described the Account as a channel through

2    which "President Donald J. Trump . . . [c]ommunicat[es] directly with you, the

3    American people!" *Id.* The @WhiteHouse account, an undoubtedly official

4    Twitter account run by the government, "directs Twitter users to 'Follow for the

5    latest from @POTUS @realDonaldTrump and his Administration.'" *Id.* Further,

6    the @POTUS account frequently republishes tweets from the Account.[6] As

7    discussed earlier, according to the National Archives and Records

8    Administration, the President's tweets from the Account "are official records that

9    must be preserved under the Presidential Records Act." *Id.* at 57.

10       Second, since becoming President he has used the Account on almost a

11   daily basis "as a channel for communicating and interacting with the public

12   about his administration." *Id.* at 54. The President utilizes White House staff to

13   post tweets and to maintain the Account. He uses the Account to announce

14   "matters related to official government business," including high-level White

---

[6] The President and the White House operate two other Twitter accounts:
@POTUS and @WhiteHouse. Both accounts are official government accounts.
Those accounts belong strictly to the government, in the sense that the President
and members of the White House administration will not retain control over
those accounts upon leaving office. The @POTUS account is the official account
of the U.S. President. The @WhiteHouse account is the official account for the
White House administration.

18

1   House and cabinet-level staff changes as well as changes to major national

2   policies. *Id*. at 56. He uses the Account to engage with foreign leaders and to

3   announce foreign policy decisions and initiatives. Finally, he uses the "like,"

4   "retweet," "reply," and other functions of the Account to understand and to

5   evaluate the public's reaction to what he says and does. In sum, since he took

6   office, the President has consistently used the Account as an important tool of

7   governance and executive outreach. For these reasons, we conclude that the

8   factors pointing to the public, non-private nature of the Account and its

9   interactive features are overwhelming.

10          The government's response is that the President is not acting in his official

11  capacity when he blocks users because that function is available to all users, not

12  only to government officials. However, the fact that any Twitter user can block

13  another account does not mean that the President somehow becomes a private

14  person when he does so. Because the President, as we have seen, acts in an

15  official capacity when he tweets, we conclude that he acts in the same capacity

16  when he blocks those who disagree with him. Here, a public official and his

17  subordinates hold out and use a social media account open to the public as an

18  official account for conducting official business. That account has interactive

Case 1:17-cv-05205-NRB Document 76 Filed 04/01/20 Page 20 of 29
Case 19-1691, Document 166-2, 04/01/2020, 2814352, Page20 of 29

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1   features open to the public, making public interaction a prominent feature of the

2   account.  These factors mean that the account is not private.  *See generally*

3   *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995)

4   (applying the same principles to "metaphysical" forums as to those that exist in

5   "a spatial or geographic sense"); *see also Davison v. Randall*, 912 F.3d 666, 680 (4th

6   Cir. 2019) (holding that a public official who used a Facebook Page as a tool of

7   her office exercised state action when banning a constituent); *Robinson v. Hunt*

8   *Cty., Texas*, 921 F.3d 440, 447 (5th Cir. 2019) (finding that a government official's

9   act of banning a constituent from an official government social media page was

10  unconstitutional viewpoint discrimination).  Accordingly, the President excluded

11  the Individual Plaintiffs from government-controlled property when he used the

12  blocking function of the Account to exclude disfavored voices.

13         Of course, not every social media account operated by a public official is a

14  government account.  Whether First Amendment concerns are triggered when a

15  public official uses his account in ways that differ from those presented on this

16  appeal will in most instances be a fact-specific inquiry.  The outcome of that

17  inquiry will be informed by how the official describes and uses the account; to

18  whom features of the account are made available; and how others, including

Case 19-1691, Document 166-2, 04/01/2020, 2814353, Page21 of 39

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1  government officials and agencies, regard and treat the account.  But these are

2  concerns for other cases and other days and are ones we are not required to

3  consider or resolve on this appeal.

4                                        II.

5        Once it is established that the President is a government actor with respect

6  to his use of the Account, viewpoint discrimination violates the First

7  Amendment.  *Manhattan Community Access Corp. et al. v. Halleck et al.*, 587 U.S. __

8  (2019) ("When the government provides a forum for speech (known as a public

9  forum), the government may be constrained by the First Amendment, meaning

10  that the government ordinarily may not exclude speech or speakers from the

11  forum on the basis of viewpoint . . . ."); *see also Pleasant Grove*, 555 U.S. at 469-70

12  (viewpoint discrimination prohibited in traditional, designated, and limited

13  public forums); *Cornelius*, 473 U.S. at 806 (viewpoint discrimination prohibited in

14  nonpublic forums).

15        The government makes two responses.  First, it argues that the Account is

16  not a public forum and that, even if it were a public forum, the Individual

17  Plaintiffs were not excluded from it.  Second, the government argues that the

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    Account, if controlled by the government, is government speech not subject to

2    First Amendment restrictions.

3                                         A.

4         As a general matter, social media is entitled to the same First Amendment

5    protections as other forms of media. *Packingham v. North Carolina*, 137 S. Ct. 1730,

6    1735-36 (2017) (holding a state statute preventing registered sex offenders from

7    accessing social media sites invalid and describing social media use as "protected

8    First Amendment activity"). "[W]hatever the challenges of applying the

9    Constitution to ever-advancing technology, 'the basic principles of freedom of

10   speech and the press, like the First Amendment's command, do not vary' when a

11   new and different medium for communication appears." *Brown v. Entm't*

12   *Merchants Ass'n*, 564 U.S. 786, 790 (2011) (quoting *Joseph Burstyn, Inc. v. Wilson*,

13   343 U.S. 495, 503 (1952)). A public forum, as the Supreme Court has also made

14   clear, need not be "spatial or geographic" and "the same principles are

15   applicable" to a metaphysical forum. *Rosenberger*, 515 U.S. at 830.

16        To determine whether a public forum has been created, courts look "to the

17   policy and practice of the government" as well as "the nature of the property and

18   its compatibility with expressive activity to discern the government's intent."

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    *Cornelius*, 473 U.S. at 802.  Opening an instrumentality of communication "for

2    indiscriminate use by the general public" creates a public forum.  *Perry Educ.*

3    *Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983).  The Account was

4    intentionally opened for public discussion when the President, upon assuming

5    office, repeatedly used the Account as an official vehicle for governance and

6    made its interactive features accessible to the public without limitation.  We hold

7    that this conduct created a public forum.

8         If the Account is a forum—public or otherwise—viewpoint discrimination

9    is not permitted.  *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679

10   (1992); *see also Pleasant Grove*, 555 U.S. at 469-70 (viewpoint discrimination

11   prohibited in traditional, designated, and limited public forums); *Cornelius*, 473

12   U.S. at 806 (viewpoint discrimination prohibited in nonpublic forums).  A

13   blocked account is prevented from viewing any of the President's tweets,

14   replying to those tweets, retweeting them, or liking them.  Replying, retweeting,

15   and liking are all expressive conduct that blocking inhibits.  Replying and

16   retweeting are messages that a user broadcasts, and, as such, undeniably are

17   speech.  Liking a tweet conveys approval or acknowledgment of a tweet and is

18   therefore a symbolic message with expressive content.  *See, e.g., W. Virginia State*

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1   *Bd. of Educ. v. Barnette*, 319 U.S. 624, 632-33 (1943) (discussing symbols as speech).

2   Significantly, the parties agree that all of this expressive conduct is

3   communicated to the thousands of users who interact with the Account. By

4   blocking the Individual Plaintiffs and preventing them from viewing, retweeting,

5   replying to, and liking his tweets, the President excluded the Individual Plaintiffs

6   from a public forum, something the First Amendment prohibits.

7   The government does not challenge the District Court's conclusion that the

8   speech in which Individual Plaintiffs seek to engage is protected speech; instead,

9   it argues that blocking did not ban or burden anyone's speech. *See Knight First*

10  *Amendment*, 302 F. Supp. 3d at 565. Specifically, the government contends that

11  the Individual Plaintiffs were not prevented from speaking because "the only

12  material impact that blocking has on the individual plaintiffs' ability to express

13  themselves on Twitter is that it prevents them from speaking directly to Donald

14  Trump by replying to his tweets on the @realDonaldTrump web page."

15  Appellants Br. at 35.

16  That assertion is not well-grounded in the facts presented to us. The

17  government is correct that the Individual Plaintiffs have no right to require the

18  President to listen to their speech. *See Minnesota State Bd. for Cmty. Colleges v.*

24

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    *Knight*, 465 U.S. 271, 283 (1984) (a plaintiff has "no constitutional right to force

2    the government to listen to their views").  However, the speech restrictions at

3    issue burden the Individual Plaintiffs' ability to converse on Twitter with others

4    who may be speaking to or about the President.[7]  President Trump is only one of

5    thousands of recipients of the messages the Individual Plaintiffs seek to

6    communicate.  While he is certainly not required to listen, once he opens up the

7    interactive features of his account to the public at large he is not entitled to

8    censor selected users because they express views with which he disagrees.[8]

9         The government's reply is that the Individual Plaintiffs are not censored

10   because they can engage in various "workarounds" such as creating new

---

[7] If, for example, the President had merely prevented the Individual Plaintiffs from sending him direct messages, his argument would have more force.

[8] The government extends this argument to suggest that the Individual Plaintiffs are claiming a right to "amplify" their speech by being able to reply directly to the President's tweets.  The government can choose to "amplify" the speech of certain individuals without violating the rights of others by choosing to listen or not listen.  *See Minnesota State Bd.*, 465 U.S. at 288 (stating that "[a]mplification of the sort claimed is inherent in government's freedom to choose its advisers.  A person's right to speak is not infringed when government simply ignores that person while listening to others.").  That is not what occurred here; the Individual Plaintiffs were not simply ignored by the President, their ability to speak to the rest of the public users of the Account was burdened.  In any event, the government is not permitted to "amplify" favored speech by banning or burdening viewpoints with which it disagrees.

25

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    accounts, logging out to view the President's tweets, and using Twitter's search

2    functions to find tweets about the President posted by other users with which

3    they can engage.

4         Tellingly, the government concedes that these "workarounds" burden the

5    Individual Plaintiffs' speech. *See* App'x 35-36, 66. And burdens to speech as well

6    as outright bans run afoul of the First Amendment. *See Sorrell v. IMS Health Inc.*,

7    564 U.S. 552, 566 (2011) (stating that government "may no more silence

8    unwanted speech by burdening its utterance than by censoring its content");

9    *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000) ("The distinction

10   between laws burdening and laws banning speech is but a matter of degree. The

11   Government's content-based burdens must satisfy the same rigorous scrutiny as

12   its content-based bans."). When the government has discriminated against a

13   speaker based on the speaker's viewpoint, the ability to engage in other speech

14   does not cure that constitutional shortcoming. *Christian Legal Soc. Chapter of the*

15   *Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 690 (2010).

16   Similarly, the fact that the Individual Plaintiffs retain some ability to "work

17   around" the blocking does not cure the constitutional violation. Neither does the

18   fact that the Individual Plaintiffs can post messages elsewhere on Twitter.

Case 19-1691, Document 166-2, 04/01/2020, 2814335, Page27 of 39

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    Accordingly, we hold that the President violated the First Amendment when he

2    used the blocking function to exclude the Individual Plaintiffs because of their

3    disfavored speech.

4                                       B.

5         Finally, the government argues that to the extent the Account is controlled

6    by the government, it is government speech.  Under the government speech

7    doctrine, "[t]he Free Speech Clause does not require government to maintain

8    viewpoint neutrality when its officers and employees speak" about

9    governmental endeavors.  *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017).  For

10   example, when the government wishes to promote a war effort, it is not required

11   by the First Amendment to also distribute messages discouraging that effort.  *Id.*

12   at 1758; *see also Pleasant Grove*, 555 U.S. at 467 ("The Free Speech Clause restricts

13   government regulation of private speech; it does not regulate government

14   speech.").

15        It is clear that if President Trump were engaging in government speech

16   when he blocked the Individual Plaintiffs, he would not have been violating the

17   First Amendment.  Everyone concedes that the President's initial tweets

18   (meaning those that he produces himself) are government speech.  But this case

Case 19-1691, Document 166-2, 04/01/2020, 2804/8352, Page28 of 39

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1    does not turn on the President's initial tweets; it turns on his supervision of the

2    interactive features of the Account.  The government has conceded that the

3    Account "is generally accessible to the public at large without regard to political

4    affiliation or any other limiting criteria," and the President has not attempted to

5    limit the Account's interactive feature to his own speech.  App'x at 55.

6          Considering the interactive features, the speech in question is that of

7    multiple individuals, not just the President or that of the government.  When a

8    Twitter user posts a reply to one of the President's tweets, the message is

9    identified as coming from that user, not from the President.  There is no record

10    evidence, and the government does not argue, that the President has attempted

11    to exercise any control over the messages of others, except to the extent he has

12    blocked some persons expressing viewpoints he finds distasteful. The contents of

13    retweets, replies, likes, and mentions are controlled by the user who generates

14    them and not by the President, except to the extent he attempts to do so by

15    blocking.  Accordingly, while the President's tweets can accurately be described

16    as government speech, the retweets, replies, and likes of other users in response

17    to his tweets are not government speech under any formulation.  The Supreme

18    Court has described the government speech doctrine as "susceptible to

18-1691-cv
*Knight First Amendment Institute, et al v. Donald J. Trump, et al*

1   dangerous misuse." *Matal*, 137 S. Ct. at 1758. It has urged "great caution" to

2   prevent the government from "silenc[ing] or muffl[ing] the expression of

3   disfavored viewpoints" under the guise of the government speech doctrine. *Id.*

4   Extension of the doctrine in the way urged by President Trump would produce

5   precisely this result.

6       The irony in all of this is that we write at a time in the history of this nation

7   when the conduct of our government and its officials is subject to wide-open,

8   robust debate. This debate encompasses an extraordinarily broad range of ideas

9   and viewpoints and generates a level of passion and intensity the likes of which

10  have rarely been seen. This debate, as uncomfortable and as unpleasant as it

11  frequently may be, is nonetheless a good thing. In resolving this appeal, we

12  remind the litigants and the public that if the First Amendment means anything,

13  it means that the best response to disfavored speech on matters of public concern

14  is more speech, not less.

15                          **CONCLUSION**

16      The judgment of the District Court is **AFFIRMED**.